# 26-2427

## In the United States Court of Appeals for the Second Circuit

PEOPLE OF THE STATE OF NEW YORK,

*Plaintiff-Appellee,*

–v.–

PRESIDENT DONALD J. TRUMP,

*Defendant-Appellant.*

On Appeal from the United States District Court for the Southern District of New York (No. 23-cv-3773)
(Hon. Alvin K. Hellerstein)

# OPENING BRIEF FOR DEFENDANT-APPELLANT PRESIDENT DONALD J. TRUMP

BRENDAN P. CULLEN
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California 94301
(650) 461-6500

DIANE L. MCGIMSEY
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California 90067
(310) 712-6600

ROBERT J. GIUFFRA, JR.
JOHN L. WARDEN
MAXWELL F. GOTTSCHALL
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*Counsel for Defendant-Appellant President Donald J. Trump*

# TABLE OF CONTENTS

*Page*

**TABLE OF AUTHORITIES** .......... iii

**INTRODUCTION** .......... 1

**JURISDICTIONAL STATEMENT** .......... 8

**STATEMENT OF THE ISSUES** .......... 8

**STATEMENT OF THE CASE** .......... 9

A. The New York State Criminal Indictment .......... 9

B. President Trump's First Removal Notice .......... 11

C. The State Trial And Post-Trial Proceedings .......... 12

D. President Trump's Second Removal Notice .......... 16

E. This Court's Decision To Vacate And Remand .......... 17

F. The District Court's Order After Remand .......... 19

G. The Pending State Court Appeal .......... 21

**SUMMARY OF ARGUMENT** .......... 21

**STANDARD OF REVIEW** .......... 25

**ARGUMENT** .......... 26

**I. THE FEDERAL-OFFICER REMOVAL STATUTE PERMITS REMOVAL POST-JUDGMENT FOR "GOOD CAUSE"** .......... 26

A. The District Court Erred In Holding That The Federal-Officer Removal Statute Does Not Permit Removal While A Criminal Prosecution Is Pending On Direct Appeal .......... 26

B. The District Court's Reading Of The Federal-Officer Removal Statute Is Wrong ........ 33

**II. PRESIDENT TRUMP'S SECOND REMOVAL NOTICE EASILY SATISFIED THE REQUIREMENTS OF THE FEDERAL-OFFICER REMOVAL STATUTE ........ 37**

A. This Prosecution "Relates To" President Trump's Official Acts ........ 37

1. A prosecution "relates to" a President's official acts if the government uses such acts as evidence ........ 38

2. DANY used President Trump's official acts as evidence at trial ........ 42

B. President Trump's Second Removal Notice Asserted Colorable Federal Defenses ........ 51

1. President Trump asserted a colorable defense of Presidential immunity ........ 51

2. President Trump asserted a colorable defense of federal preemption ........ 52

**III. PRESIDENT TRUMP HAD GOOD CAUSE TO FILE A SECOND REMOVAL NOTICE AFTER TRIAL AND DID SO DILIGENTLY ........ 55**

A. President Trump Could Not Have Filed This Removal Notice Before Trial Or Before *Trump* v. *United States* ........ 55

B. President Trump Acted Diligently By Seeking To Remove Within Two Months Of The Supreme Court's Decision In *Trump* ........ 59

C. President Trump Did Not Waive His Right To Remove By First Raising *Trump* To The State Trial Court In An Effort To Prevent His Sentencing Ten Days Later ........ 61

**CONCLUSION ........ 67**

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Abraham Watkins Nichols Agosto Aziz & Stogner* v. *Festeryga*,
155 F.4th 456 (5th Cir. 2025) ........................................................63, 65

*Albuquerque* v. *Soto Enterprises, Inc.*,
864 F.3d 1089 (10th Cir. 2017)...............................................8, 25, 64

*Arizona* v. *Manypenny*,
451 U.S. 232 (1981)............................................................30, 35, 60

*AT&T Corp.* v. *Atos IT Sols. & Servs., Inc.*,
714 F. Supp. 3d 310 (S.D.N.Y. 2024)................................................59

*Badilla* v. *Midwest Air Traffic Control Serv., Inc.*,
8 F.4th 105 (2d Cir. 2021)...................................................................38

*Barr* v. *Matteo*,
360 U.S. 564 (1959)............................................................................46

*Blassingame* v. *Trump*,
87 F.4th 1 (D.C. Cir. 2023) ..................................................................48

*Butner* v. *Neustadter*,
324 F.2d 783 (9th Cir. 1963) ...............................................................32

*Chevron USA Inc.* v. *Plaquemines Parish*,
608 U.S. 1 (2026)...............................................................22, 39, 40

*Clinton* v. *Jones*,
520 U.S. 681 (1997)............................................................................45

*Council on American Islamic Relations* v. *Ballenger*,
444 F.3d 659 (D.C. Cir. 2006)........................................................46, 47

*County of Westchester* v. *Express Scripts, Inc.*,
2026 WL 2589574 (2d Cir. Sep. 2, 2026) ...........................................41

*Ex parte Fisk*,
113 U.S. 713 (1885) .......... 34

*FDIC* v. *Keating*,
12 F.3d 314 (1st Cir. 1993) .......... 28

*Fritsch* v. *Swift Transp. Co. of Arizona, LLC*,
899 F.3d 785 (9th Cir. 2018) .......... 57

*Granny Goose Foods, Inc.* v. *Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*,
415 U.S. 423 (1974) .......... 22, 31

*Harris* v. *U.S. Dep't of Transp. FMCSA*,
122 F.4th 418 (D.C. Cir. 2024) .......... *passim*

*Holtzman* v. *Oliensis*,
91 N.Y.2d 488 (1998) .......... 53

*Ingersoll-Rand Co.* v. *McClendon*,
498 U.S. 133 (1990) .......... 39

*Jefferson Cnty.* v. *Acker*,
527 U.S. 423 (1999) .......... *passim*

*Kassner* v. *2nd Ave. Delicatessen Inc.*,
496 F.3d 229 (2d Cir. 2007) .......... 60

*Kenny* v. *Wal-Mart Stores, Inc.*,
881 F.3d 786 (9th Cir. 2018) .......... 62, 63, 64

*Lester* v. *Resolution Tr. Corp.*,
994 F.2d 1247 (7th Cir. 1993) .......... 29

*McGucken* v. *Content IQ LLC*,
2021 WL 5357473 (S.D.N.Y. Nov. 16, 2021) .......... 60

*McKay* v. *Triborough Bridge & Tunnel Auth.*,
2007 WL 3275918 (S.D.N.Y. Nov. 5, 2007) .......... 61

*Mesa* v. *California*,
489 U.S. 121 (1989) .......... 4, 11, 51

*Matter of Meyerland Co.*,
960 F.2d 512 (5th Cir. 1992) .......... 28, 32, 34

*Morales* v. *Trans World Airlines, Inc.*,
504 U.S. 374 (1992) .......... 39, 40

*New York* v. *Trump*,
158 F.4th 458 (2d Cir. 2025) .......... *passim*

*Nixon* v. *Fitzgerald*,
457 U.S. 731 (1982) .......... 45, 51, 60

*Northrop Grumman Tech. Servs., Inc.* v. *DynCorp Int'l LLC*,
865 F.3d 181 (4th Cir. 2017) .......... 62, 63

*Perez* v. *Campbell*,
402 U.S. 637 (1971) .......... 54

*Putnam* v. *DeRosa*,
963 F.2d 480 (1st Cir. 1992) .......... 29

*Resolution Tr. Corp.* v. *Allen*,
16 F.3d 568 (4th Cir. 1994) .......... 29, 34

*Resolution Tr. Corp.* v. *BVS Development, Inc.*,
42 F.3d 1206 (9th Cir. 1994) .......... 29, 36

*Resolution Tr. Corp.* v. *Nernberg*,
3 F.3d 62 (3d Cir. 1993) .......... 29, 34

*In re Savers Fed. Sav. & Loan Ass'n*,
872 F.2d 963 (11th Cir. 1989) .......... 28, 29

*Trump* v. *Slaughter*,
146 S. Ct. 2283 (2026) .......... 49

*Trump* v. *United States*,
603 U.S. 593 (2024) .......... *passim*

*United States* v. *Bongiovanni*,
2023 WL 3723265 (W.D.N.Y. May 30, 2023) .......... 59

*United States* v. *Edwards*,
834 F.3d 180 (2d Cir. 2016) ........................................................................27

*United States* v. *Elias*,
2022 WL 805334 (E.D.N.Y. Mar. 16, 2022) ..................................................61

*United States* v. *Epskamp*,
832 F.3d 154 (2d Cir. 2016) ........................................................................25

*United States* v. *Zhong*,
26 F.4th 536 (2d Cir. 2022) ..........................................................................57

*Ward* v. *Resolution Tr. Corp.*,
972 F.2d 196 (8th Cir. 1992) ........................................................................29

*Willingham* v. *Morgan*,
395 U.S. 402 (1969) .............................................................................*passim*

*Yusefzadeh* v. *Nelson, Mullins, Riley & Scarborough, LLP*,
365 F.3d 1244 (11th Cir. 2004) ....................................................................64

**Statutes**

12 U.S.C. § 632 ................................................................................21, 30, 32

12 U.S.C. § 1441a ................................................................................................29

12 U.S.C. § 1452 ..................................................................................................30

12 U.S.C. § 1789 ..................................................................................................29

12 U.S.C. § 1819 ..................................................................................................28

22 U.S.C. § 282f ...................................................................................................30

28 U.S.C. § 1291 ...............................................................................................8, 32

28 U.S.C. § 1442 ..........................................................................................*passim*

28 U.S.C. § 1450 ..................................................................................................32

28 U.S.C. § 1455 ..........................................................................................*passim*

28 U.S.C. § 2679 ....................30

52 U.S.C. § 30109 ....................49

52 U.S.C. § 30143 ....................11, 53

N.Y. Election Law § 17-152 ....................*passim*

N.Y. Penal Law § 175.05 ....................10, 11

N.Y. Penal Law § 175.10 ....................*passim*

N.Y. Tax Law § 1801 ....................11

N.Y. Tax Law § 1802 ....................11

Removal Clarification Act of 2011,
Pub. L. No. 112-51, § 2(b)(1)(A), 125 Stat. 545 ....................39

**Other Authorities**

11 C.F.R. § 108.7 ....................53

Fed. R. Civ. P. 16 ....................59, 60, 61

Fed. R. Crim. P. 12 ....................59

Michael Cohen, *When Politics Blind Justice* (Jan. 16, 2026),
https://therealmichaelcohen.substack.com/p/
when-politics-blind-justice ....................6, 37

## INTRODUCTION

This unprecedented criminal prosecution, the first ever of a President of the United States, involves multiple vital issues of federal constitutional and statutory law, including Presidential immunity. As the Supreme Court held in *Trump* v. *United States*, violations of that immunity "threaten the independence or effectiveness of the Executive" and thus pose "unique risks to the effective functioning" of the federal government. 603 U.S. 593, 632 n.3 (2024). This case exemplifies why the Framers created a federal Judiciary: to ensure that the "contours of federal power [are] determined by federal courts," *Harris* v. *U.S. Dep't of Transp. FMCSA*, 122 F.4th 418, 423 (D.C. Cir. 2024), rather than potentially "hostile state courts," *Willingham* v. *Morgan*, 395 U.S. 402, 405 (1969).

President Trump has been pressing for a federal forum since his 2023 indictment, when he first sought to remove this case from the New York courts under the federal-officer removal statute. The Manhattan District Attorney (DANY) defeated President Trump's first removal attempt by claiming (as it turned out, falsely) that its prosecution was based solely on his private acts. At trial one year later, however, DANY rested its case on testimony probing President Trump's official acts during his first term, and on a flawed legal

theory that would improperly turn any federal-campaign-law violation into a state-law crime. Then, one month after trial concluded, the Supreme Court decided *Trump* v. *United States*. That landmark decision clarified the law of Presidential immunity, and recognized a new evidentiary immunity that bars the "use of evidence about" a President's official acts. 603 U.S. at 631. These developments left no doubt that this case belongs in federal court.

Therefore, in September 2024, President Trump sought leave from the district court (Hellerstein, J.) to file a second, post-trial removal notice, which the statute expressly permits "for good cause shown." 28 U.S.C. § 1455(b)(1). The court denied President Trump's motion in a three-page perfunctory order just hours after President Trump filed it. The President appealed. Late last year, this Court vacated and remanded, holding that Judge Hellerstein had failed to "grapple with *any* of the central issues" here, and recognizing that President Trump has "viable arguments" in favor of removal to this Court. *New York* v. *Trump*, 158 F.4th 458, 464-466, 469 (2d Cir. 2025). But on remand, the district court largely ignored this Court's analysis and erroneously denied leave to remove again, this time taking over nine months to issue its decision. The court below got it badly wrong.

*First*, the district court erred in holding that post-judgment removal is never permitted under the federal-officer removal statute. The district court cited the state trial court's sentencing and entry of judgment against President Trump, which took place in January 2025. But that does not bar removal. As relevant here, the federal-officer removal statute authorizes removal of any "pending" "criminal prosecution" that meets the removal criteria at "any time before trial, except that for good cause shown the United States district court may enter an order granting the defendant or defendants leave to file the notice ***at a later time***." 28 U.S.C. §§ 1455(a), (b)(1) (emphasis added). That provision could not be clearer: while pre-trial removal is as of right, removal is still permitted "at a later time" while the case remains "pending"—including after judgment is entered—upon a showing of "good cause."

Indeed, the D.C. Circuit has squarely held that "a federal defendant may remove a case" to federal court "from state appellate court" under the federal-officer removal statute. *Harris*, 122 F.4th at 424. The D.C. Circuit recognized that numerous decisions "have interpreted" both the federal-officer removal statute and similarly worded removal statutes "to allow removal after final judgment at the state trial court level," so long as the case is still pending on

appeal, as it is here. *Id.* Such removal moves a pending appeal from the state appellate courts to the federal appellate courts. That is what should happen in this case.

*Second*, this case plainly satisfies the required elements for federal-officer removal. The statute authorizes removal of any prosecution of a federal officer that is "for or relating to any act under color of [federal] office." 28 U.S.C. § 1442(a)(1). This case plainly counts as one "relating to" President Trump's official acts as President, because DANY introduced, and heavily relied on, evidence of those official acts during the 2024 trial. Indeed, in its closing, DANY even referred to that official-acts evidence as "damaging," "utterly devastating," and "critical piece[s] of the puzzle." J.A. 848.

The statute also requires President Trump to show that he has at least one colorable federal defense. *Mesa* v. *California*, 489 U.S. 121, 129 (1989). President Trump has at least two such defenses that are not just colorable but compelling. First, DANY violated the Presidential evidentiary immunity recognized by the Supreme Court in *Trump* by introducing at least four different kinds of official-acts evidence at the President's trial. As just one example, DANY compelled President Trump's White House Communications Director to testify about what she and the President discussed, *in the Oval*

*Office*, about her official duties, including what she would say to the press in response to allegations regarding the President's integrity and fitness for office. Second, DANY separately violated principles of preemption because its case rests on an application of New York law that is squarely preempted by the Federal Election Campaign Act (FECA), which expressly forbids state and local prosecutors from enforcing federal campaign-finance rules.

*Third*, President Trump plainly had "good cause" to raise these arguments for removal after his 2024 trial, because he could not reasonably have raised them before trial. It was not until the middle of trial that the state court judge erroneously permitted the testimony about President Trump's official acts. It was not until the very end of trial that DANY finally settled on its state-law theory that is preempted under FECA. And it was not until a month *after* trial that the Supreme Court handed down its watershed decision on Presidential immunity in *Trump*.

Indeed, when President Trump first sought to file a timely, pre-trial removal notice shortly after his indictment in this case in 2023, DANY successfully persuaded Judge Hellerstein to deny removal by obscuring the key federal aspects of its prosecution. DANY told the district court that its prosecution was based solely on private acts and did not "touch[]," "relate[]

to," or have "any other connection to" President Trump's official conduct in office. J.A. 115-117. DANY also insisted that it would not necessarily target campaign-finance-related conduct regulated by FECA. On the basis of those representations, which turned out to be inaccurate, the district court found that the case had no relation to official Presidential acts and involved no colorable federal defense.

By the time the 2024 trial ended, it was clear that DANY's representations were false: DANY had invited the jury to scrutinize a number of President Trump's official acts, and it had presented to the jury a preempted legal theory that squarely targeted alleged violations of FECA. These inaccurate pre-trial representations themselves provide ample good cause for removal post-trial. DANY's improper tactics embody the very state hostility that led Congress to create federal-officer removal in the first place. And there is more: earlier this year, Michael Cohen, DANY's star trial witness, stated that DANY wrongly "pressured and coerced [him] to only provide information and testimony" "that would enable them to convict President Trump." Michael Cohen, *When Politics Blind Justice* (Jan. 16, 2026).[1]

[1] https://therealmichaelcohen.substack.com/p/when-politics-blind-justice.

President Trump acted diligently in seeking to remove. He sought to file his 60-page second removal notice on August 29, 2024, less than two months after *Trump*. Dozens of decisions by district courts in this Circuit have concluded that such timing in seeking relief based on new grounds reflects sufficient diligence. *See infra*, p. 59. Nor did the timing of President Trump's motion for leave to remove cause any prejudice to DANY or the state courts. Tellingly, neither DANY nor the district court raised prejudice below.

Instead, the district court wrongly found that President Trump lacked good cause solely because, before seeking leave to remove, he briefed the impact of *Trump* to the state trial court. The district court described that as an improper attempt to hold removal in reserve, with the goal of using it only if necessary to "seek[] a second bite at the apple." S.A. 9-11. But that is not what happened. When *Trump* was decided, the state trial court was scheduled to impose sentence—and potentially incarcerate President Trump—just ten days later, in the middle of the 2024 Presidential campaign. President Trump had no practical choice but to raise the Supreme Court's decision with the state trial court to try to forestall that imminent and irreparable harm. He could not assume that the federal district court would have granted an opposed, second motion for leave to remove, and thereby blocked sentencing, within the

span of a week. Once it became clear that the state court would not timely rule—and, more importantly, that the court might rule and then impose sentence immediately, preventing any interlocutory appeal—President Trump sought to remove. That sort of "compel[led]" action in state court, done in order to avoid "potential harm," does not waive the right to remove. *Albuquerque* v. *Soto Enterprises, Inc.*, 864 F.3d 1089, 1099 (10th Cir. 2017).

This Court should reverse and remand with instructions to the district court to grant removal, and allow President Trump to pursue his appeal before this federal appellate court.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction to consider President Trump's motion for leave to file a second removal notice under 28 U.S.C. §§ 1442(a)(1) and 1455(b)(1)-(2). The court denied President Trump's motion on August 28, 2026. President Trump filed a notice of appeal that same day. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in holding that the federal-officer removal statute, 28 U.S.C. § 1442(a), does not permit removal of a criminal case that is pending in the state appellate courts.

2. Whether the district court erred in holding that this prosecution does not relate to official Presidential acts or implicate any colorable federal defense, even though DANY introduced substantial evidence of President Trump's official acts in violation of Presidential evidentiary immunity, and rested its case on an interpretation of New York law that would allow local district attorneys to prosecute alleged violations of FECA.

3. Whether the district court erred in holding that President Trump lacked "good cause" to file a second, post-trial removal notice, even though DANY did not introduce the prohibited official-acts evidence or identify its FECA-based theory until trial, and even though the Supreme Court did not decide *Trump* v. *United States* until one month after trial.

## STATEMENT OF THE CASE

### A. The New York State Criminal Indictment

This anomalous case began when, after years of fruitless investigation into decade-old, baseless allegations—and under immense political pressure to criminally charge President Donald J. Trump for *something*—the Manhattan District Attorney finally decided to move forward, shortly after President Trump announced his candidacy in the 2024 Presidential election. *See* J.A. 1389-1393 (recounting this background). On March 30, 2023, a New

York grand jury indicted President Trump on 34 counts of falsification of business records under N.Y. Penal Law § 175.10. J.A. 974.

Each count related to one of three kinds of documents—invoices, ledger entries, and checks—associated with payments made during 2017 to Michael Cohen, a former Trump Organization attorney. DANY wrongly alleged that these internal records were false because the records stated that the payments to that attorney were for "legal services rendered" pursuant to a "retainer agreement." DANY claimed that the payments were instead intended to reimburse Cohen for a $130,000 payment he had made to Stephanie Clifford (a/k/a Stormy Daniels) as part of a non-disclosure agreement (NDA) preventing Clifford from discussing an alleged 2006 encounter between her and President Trump. J.A. 50.

Falsification of business records is ordinarily a misdemeanor under New York law, *see* N.Y. Penal Law § 175.05, and any misdemeanor charge against President Trump was time-barred. To charge President Trump with a felony, DANY had to allege that he falsified records *and* did so with the intent to "commit another crime or to aid or conceal the commission thereof." N.Y. Penal Law § 175.10. But DANY refused to specify during pre-trial proceedings, and throughout nearly all of trial, what the alleged underlying

“[]other crime” was. Instead, DANY offered a menu of potential predicates without committing to any: N.Y. Election Law § 17-152, N.Y. Tax Law §§ 1801(a)(3) and 1802, N.Y. Penal Law §§ 175.05 and 175.10, and FECA. One of those possible predicates, N.Y. Election Law § 17-152, prohibits conspiring to promote or prevent a person’s election to public office by “unlawful means.” DANY also declined to specify what those “unlawful means” were.

### B. President Trump’s First Removal Notice

On May 4, 2023, President Trump filed a notice of removal with the district court, invoking the federal-officer removal statute. J.A. 14. That statute expressly permits removal by a federal officer of any prosecution that is “for or relating to any act under color of [their] office,” 28 U.S.C. § 1442(a)(1), and for which the officer has at least one “colorable defense under federal law,” *Mesa*, 489 U.S. at 129. President Trump explained that the prosecution was “for or relating to” his official acts as President, and that he had multiple colorable federal defenses to the charges. Among them, President Trump argued that he had a preemption defense to any charge based on alleged violations of FECA, which has a broad preemption provision that “supersede[s] and preempt[s] any provision of State law with respect to election to Federal office.” 52 U.S.C. § 30143(a).

DANY moved to remand. In doing so, DANY represented to the district court (inaccurately, it would turn out) that its prosecution did not "touch[], relate[] to," was not "associated with," and had no "other connection to" official Presidential acts. J.A. 116. DANY also wrongly asserted that President Trump had not raised a colorable preemption defense because, despite the indictment's reliance on election-law violations as potential predicate crimes, it was somehow "speculative" to assume that DANY would rely on those alleged predicates at trial. J.A. 125-126. DANY also claimed that the "charges here do not relate to the specific disclosures mandated by FECA." J.A. 123.

On July 19, 2023, the district court granted DANY's motion to remand. On the basis of DANY's (false) representations, the court held that the prosecution was not "for or relating to any act performed by or for the President under color of the official acts of a President," and that there was no colorable preemption defense. J.A. 246.

### C. The State Trial And Post-Trial Proceedings

President Trump's state-court trial began on April 22, 2024. Over the next six weeks, DANY introduced significant testimony and documentary evidence concerning President Trump's official acts while serving as President. That evidence included (i) testimony from President Trump's

White House Communications Director recounting her discussions with the President about press coverage of negative stories and the White House's official response to those stories; (ii) official statements on matters of public concern made by President Trump on a Twitter account that he consistently used for official communications; (iii) testimony concerning an alleged discussion between President Trump and Attorney General Jeff Sessions regarding the federal government's handling of a pending complaint before the Federal Election Commission; and (iv) testimony by President Trump's Director of Oval Office Operations regarding how the President performed his duties. J.A. 995-997.

At the end of trial, in its proposed jury instructions, DANY finally revealed how it would elevate the alleged falsification of business records from a time-barred misdemeanor to a felony. Despite DANY's earlier representation to the district court that its case would stand up "even if you take the election law out of the picture," J.A. 209, DANY asked the trial court to instruct the jury on only one predicate "other crime": "a violation of New York Election Law section 17-152." J.A. 673. For the "unlawful means" required under Section 17-152, DANY identified three possibilities: alleged FECA violations, the falsification of other business records, and violations of

tax laws. J.A. 674-676. In its summation, DANY focused almost entirely on the alleged FECA violation, based on the $130,000 payment from Cohen to Clifford. J.A. 428-432. DANY argued that the Cohen payment constituted a campaign contribution to a federal candidate (then-candidate Trump) that exceeded FECA's $2,700 limit. At DANY's urging, the trial court instructed the jury on the elements of a FECA violation, and defined "the term[] contribution" as used by FECA. J.A. 469.

DANY's ultimate and deeply flawed theory of felony liability therefore placed one alleged offense inside another. According to DANY, President Trump allegedly falsified certain business records—an offense that becomes a felony under Section 175.10 only if the intent to defraud includes an intent to commit, aid, or conceal "another crime." DANY identified that "[]other crime" as a conspiracy under Section 17-152 to influence an election by some other "unlawful means." And one of the three "unlawful means" on which that state-law conspiracy could rest was a violation of FECA's contribution restrictions. Thus, DANY's convoluted theory was that President Trump committed a felony because he supposedly acted with the intent to commit or conceal a

campaign contribution that was unlawful (under Section 17-152, a state law) *because* it violated FECA.[2]

On May 30, 2024, the jury returned a verdict of guilty. J.A. 981. Just over one month later, on July 1, 2024, the Supreme Court decided *Trump*, 603 U.S. 593. The Court held that a former President is at least presumptively immune from prosecution for official Presidential acts, and that the Constitution also bars any "use of evidence about such conduct" to obtain a conviction, "even when [the] indictment alleges only unofficial conduct." *Id.* at 630-631.

At that time, sentencing was scheduled for July 11, 2024—just ten days after *Trump* was decided. To prevent that sentencing, President Trump immediately notified the state trial court that he would seek relief based on the Supreme Court's decision. The next day, July 2, the trial court agreed to adjourn sentencing until September 18. J.A. 792. Briefing concluded on July 31. On August 5, the state court announced that it would not issue its ruling until September 16, only two days before the new sentencing date of

[2] DANY appears to have relied on this nested-predicate theory because, under Penal Law § 175.10, the predicate "[]other crime" at issue must be a *state* crime under New York law, not a federal violation. DANY got around that by claiming that Section 17-152 duplicates FECA's substantive prohibitions.

September 18, which the court warned would "*remain[] unchanged.*" J.A. 946. That would not have left President Trump sufficient time to take an interlocutory appeal on Presidential immunity. President Trump then moved to adjourn sentencing to allow sufficient time for such an appeal. J.A. 990. On August 19, the trial court informed the parties that it would not even rule on that adjournment request for several more weeks. J.A. 990.

### D. President Trump's Second Removal Notice

Ten days later, on August 29, 2024, President Trump filed a second notice of removal in federal court. J.A. 7. The clerk did not accept the filing because President Trump had not first obtained leave of court under Section 1455(b)(1)-(2). J.A. 7.

President Trump filed a motion seeking such leave on September 3, 2024. J.A. 961. President Trump stated that, by introducing his official Presidential acts into evidence at trial, DANY had rendered this prosecution into one "relating to" such official acts under the federal-officer removal statute. President Trump also identified at least two colorable defenses: (i) the Presidential evidentiary immunity recognized by *Trump*; and (ii) preemption under FECA. President Trump further explained that he had

"good cause" because he could not reasonably have raised these arguments until his second, post-trial notice.

The district court wrongly denied President Trump's motion for leave to remove in a cursory, three-page order issued hours after the motion was filed. J.A. 1027. As relevant here, the court stated that the Supreme Court's decision in *Trump* did not "affect[] [its] previous conclusion" that this case does not relate to official Presidential acts. J.A. 1029. The court offered no further explanation for its erroneous conclusion. It also said nothing about President Trump's preemption argument. President Trump appealed to this Court.

While that removal appeal was pending, on January 10, 2025, the state trial court sentenced President Trump to an unconditional discharge and entered judgment against him. J.A. 1334-1335. President Trump appealed to the Appellate Division, First Department, the intermediate New York appellate court. That merits appeal is still being briefed, with oral argument currently noticed for November 2026.

### E. This Court's Decision To Vacate And Remand

On November 6, 2025, this Court vacated the federal district court's September 3, 2024, order denying leave to remove. 158 F.4th at 458. This Court remanded for the district court to consider whether President Trump

should be permitted to remove, and thus to effectively transfer the state-court appeal of his conviction from the state appellate court to this Court. As relevant, this Court held that the district court "did not grapple with *any* of the central issues" bearing on removal, *id.* at 469, including "whether *Trump* v. *United States* represented a change in controlling law that could support a finding of good cause." *Id.* at 466-467. This Court also stated that whether the federal-officer removal statute authorizes post-judgment removal "is an open question in our Court." *Id.* at 464.

Rather than address those legal questions in the first instance, the Court remanded for the district court to do so. It explained that, on remand, the district court should

> closely review[] the … categories of evidence that Trump claims relate to official acts and determin[e] whether in fact the State's use of such evidence means that his prosecution relates to acts taken under color of the Presidency as contemplated by *Trump* v. *United States*. If the District Court finds that the prosecution is related in this way, it should evaluate both whether Trump has a colorable federal defense and whether he diligently sought removal. The District Court should also determine whether removal under § 1442(a)(1) and § 1455(b)(1) is even available at this stage of the state court proceedings.

*Id.* at 469. Recognizing the need for urgency, this Court granted President Trump's motion to expedite issuance of the mandate. Order, *Trump*, No. 24-2299 (2d Cir. Nov. 21, 2025), Dkt. 109.

### F. The District Court's Order After Remand

On remand, the district court set an expedited briefing schedule and held oral argument on February 4, 2026, at which it promised to rule "in as short of time as I can." J.A. 1569. But the court did not issue a decision for another seven months, despite President Trump's repeated letters urging the court to rule as promptly as possible. *See* ECF Nos. 80, 84, 88. Finally, on August 28, 2026, the court issued a 35-page decision wrongly "reaffirm[ing] [its] former decision" to deny removal. S.A. 1.

The district court offered three erroneous reasons for its decision. *First*, the court held that President Trump had "failed to show good cause." S.A. 8. The court wrongly faulted the President for making a supposedly "strategic decision" not to try to remove in March 2024, at the time of pretrial motions practice in state court—over a month before any evidence had been introduced at trial, and three months before *Trump* was decided. S.A. 8. The court also erroneously concluded that President Trump had "violate[d] the spirit of the removal acts" by first briefing the impact of *Trump* to the state court, rather

than immediately moving in federal court. S.A. 9-11. The court further held (also incorrectly) that taking 59 days after *Trump* to seek removal was too long *per se* to be consistent with good cause. S.A. 11.

*Second*, the district court wrongly held that "there is no statutory basis for removal after verdict, sentencing, and judgment." S.A. 11. Calling President Trump's contrary argument "specious," S.A. 14, the court held that removal under the federal-officer statute is only "for trial, to shift the venue of trial from State to Federal Court." S.A. 12.

*Third*, the district court mistakenly held that President Trump had not shown that this prosecution relates to his official acts or that he has a colorable federal defense. S.A. 20-34. The court wrongly found that none of the official-acts evidence raised by President Trump "involve[d] [his] discharging any of the president's constitutional or statutory duties or speaking with the public on a matter of national importance." S.A. 20, 25. The court also incorrectly concluded that "there is no preemption," reasoning that "violations of FECA and [N.Y. Election Law] § 17-152 are not elements of the crime charged." S.A. 34.

### G. The Pending State Court Appeal

While the district court was considering removal, the state appellate proceedings continued. That merits appeal is currently mid-briefing, with President Trump's reply brief due on October 16, 2026. Argument is currently noticed for the First Department's November Term.

## SUMMARY OF ARGUMENT

I. The federal-officer removal statute permits removal after judgment so long as the prosecution remains on direct appeal and good cause is shown.

The plain text of the statute authorizes removal of a "pending" "criminal prosecution from a State court" "at a later time" than the default, as-of-right window for removal of "before trial." 28 U.S.C. §§ 1442(a), 1455(a), (b)(1). Interpreting that language, the D.C. Circuit held that a case remains "pending" "as long as the parties are still actively contesting [it]," whether "in the state trial court or on appeal." *Harris*, 122 F.4th at 424. By contrast, when Congress intends to limit removal to suits pending in the state trial court only, it knows how to do so expressly. *E.g.*, 12 U.S.C. § 632 (allowing removal "any time before the trial"). Other courts of appeals have unanimously permitted appellate removal under similar statutes. That proper result serves the

federal-officer removal statute's central purpose: ensuring that federal courts decide important questions of federal authority and immunity, even when such vital questions do not arise until after trial. Following removal here, the district court would adopt the state court's judgment, President Trump would file a notice of appeal, and this Court would "take[] the case up where the State court left it off." *Granny Goose Foods, Inc.* v. *Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 436 (1974).

II. President Trump's second removal notice satisfies the threshold requirements of the removal statute.

A. By electing to introduce evidence of President Trump's official acts at trial, DANY made this prosecution into one "relating to" those acts, 28 U.S.C. § 1442(a)(1). The Supreme Court recently held that this language "sweeps broadly," requiring only some "association" or "connection" between the suit and the federal defendant's official acts that is more than "tenuous, remote, or peripheral." *Chevron USA Inc.* v. *Plaquemines Parish*, 608 U.S. 1, 11-12 (2026). Introducing official acts into evidence establishes a clear and direct (not remote or tenuous) connection between those acts and the prosecution, triggering the right to remove. That is especially clear where the defendant is the President. If the use of official-acts evidence is damaging

enough to warrant a constitutional evidentiary immunity, it must be important enough to entitle the President to a federal forum to press and protect that immunity.

President Trump made the necessary "adequate threshold showing" that DANY introduced evidence of his official acts. *Jefferson Cnty.* v. *Acker*, 527 U.S. 423, 431-432 (1999). DANY presented testimony regarding President Trump's Oval Office discussions with his White House Communications Director about the White House's official response to false allegations wrongly impugning the President's fitness for office; his official public statements made on Twitter; his alleged discussions with the Attorney General about a law-enforcement matter; and the President's practices in and approach to running the government. At a minimum, there is a colorable argument that this evidence concerned acts that were not "manifestly or palpably beyond [Presidential] authority," and thus are official acts under *Trump*, 603 U.S. at 618.

B. President Trump has also asserted two federal defenses that are at least colorable, which is all that is required for removal. *First*, he has a defense of Presidential evidentiary immunity for the reasons given above. *Second*, President Trump has a defense of FECA preemption. DANY's theory

of liability was that President Trump acted with the intent to conceal or commit a Section 17-152 conspiracy to influence the 2016 election through the supposed "unlawful means" of making campaign contributions that violate FECA. That FECA-duplicative application of Section 17-152 is null and void under FECA's sweeping preemption provision. It therefore could not serve as the predicate "[]other crime" that President Trump allegedly intended to conceal or commit, and the conviction must be overturned.

III. Finally, President Trump established good cause to file a second, post-trial removal notice.

A. President Trump had good cause to remove *after* trial because he could not have pressed the above grounds for removal *before* trial. DANY did not introduce his official acts as evidence until the trial itself. And the law did not clearly recognize an evidentiary immunity for those acts until the Supreme Court decided *Trump*, one month *after* his trial concluded. DANY also did not settle on its preempted, FECA-based theory until the very end of trial, after having previously defeated removal by misrepresenting that the charges did "not relate to the specific disclosures mandated by FECA," J.A. 123.

B. President Trump then acted with sufficient diligence in seeking to remove less than two months after *Trump* made removal possible. That is well

within the period that courts applying analogous good-cause standards routinely find sufficiently diligent. DANY has never claimed otherwise, or argued that the short delay caused any prejudice.

C. President Trump did not seek two bites at the apple or waive removal by first raising *Trump* to the state trial court, as the district court wrongly concluded. Facing sentencing (and possible incarceration) only ten days after *Trump* was decided, President Trump was compelled to raise *Trump* to the state trial court to try and prevent imminent and irreparable harm. Once it became apparent that the state court would not rule quickly—and would likely deny President Trump his right to a pre-sentencing interlocutory appeal by imposing sentence immediately after denying immunity—he then quickly sought to remove. It is black-letter law that this sort of "compel[led]" action in state court does not waive the right to remove. *Albuquerque*, 864 F.3d at 1099. Far from manifesting any intent to remain in state court, President Trump has been pressing his (increasingly obvious) right to a federal forum since the outset of this case.

## STANDARD OF REVIEW

This Court "review[s] questions of statutory interpretation *de novo*." *United States* v. *Epskamp*, 832 F.3d 154, 160 (2d Cir. 2016). It reviews the

denial of leave to file a removal notice for abuse of discretion. *Trump*, 158 F.4th at 465. A district court abuses its discretion when "its decision rests on an error of law." *Id.*

## ARGUMENT

President Trump is entitled to a federal forum in this unprecedented case, the first criminal prosecution of a President of the United States in our Nation's history. Removal is legally available at this stage; President Trump's removal notice satisfies the removal statute's requirements; and President Trump has shown good cause for seeking to remove when he did. The district court's contrary conclusions all rest on clear legal errors. President Trump's appeal belongs in this federal Court, not the New York appellate courts.

### I. THE FEDERAL-OFFICER REMOVAL STATUTE PERMITS REMOVAL POST-JUDGMENT FOR "GOOD CAUSE."

#### A. The District Court Erred In Holding That The Federal-Officer Removal Statute Does Not Permit Removal While A Criminal Prosecution Is Pending On Direct Appeal.

The federal-officer removal statute provides that any "civil action or criminal prosecution that is commenced in State court" against a federal officer "for or relating to any act under color of [federal] office" "may be removed by them to the [United States] district court … embracing the place wherein it is pending." 28 U.S.C. § 1442(a), (a)(1). Section 1455 governs the

procedure in criminal cases. It states that defendants may remove any "pending" "criminal prosecution from a State court" "not later than 30 days after the arraignment … or at any time before trial, whichever is earlier, *except that for good cause shown* the United States district court may enter an order granting" "leave to file the notice ***at a later time***." *Id.* § 1455(a), (b)(1) (emphasis added).

1. By its plain terms, the federal-officer removal statute permits removal while a case remains pending on direct appeal. The statute authorizes removal from any "State court" where the prosecution is "pending." 28 U.S.C. §§ 1442(a), 1455(b). It also permits a defendant to seek leave, for "good cause," to remove "at a later time" than the default window of "before trial." 28 U.S.C. § 1455(b). That provision imposes no limit on the back end, nor any bar on removal after a trial court has entered judgment and the case has proceeded to appeal. "Where the statutory text is unambiguous" in that way, "no further inquiry is necessary." *United States* v. *Edwards*, 834 F.3d 180, 192 (2d Cir. 2016).

The one court of appeals to address this question has confirmed that the statute allows removal in a case like this one. In *Harris*, the D.C. Circuit held that the federal-officer removal statute permits "a federal defendant [to]

remove a case from state appellate court." 122 F.4th at 424. It explained that, under the "plain meaning of the word," a state action is "pending" and "therefore removable" "as long as the parties are still actively contesting the case in the state court system," regardless of "whether they are contesting the case in the state trial court or on appeal." 122 F.4th at 422-423. Although *Harris* was a civil (not criminal) case, the D.C. Circuit interpreted the exact same statutory language at issue here, which authorizes removal of a "pending" "civil action or criminal prosecution" against a federal officer.

2. The other courts of appeals have unanimously interpreted parallel statutes to embrace the same result. For example, the FDIC may "remove any action, suit, or proceeding from a State court to the appropriate United States district court" within 90 days from when the "action, suit, or proceeding is filed against the [FDIC] or [it] is substituted as a party." 12 U.S.C. § 1819(b)(2)(B). Several courts have held that this statute "permit[s] appellate removal," as its "plain language" "does not limit removable actions to those that have not yet reached a state trial court judgment." *Matter of Meyerland Co.*, 960 F.2d 512, 515-517 (5th Cir. 1992); *see FDIC* v. *Keating*, 12 F.3d 314, 316 (1st Cir. 1993); *In re Savers Fed. Sav. & Loan Ass'n*, 872 F.2d 963, 966 (11th Cir. 1989) (predecessor statute).

Applying the same reasoning, five other courts of appeals have also unanimously interpreted 12 U.S.C. § 1441a, which had similar language (before its repeal), to authorize the Resolution Trust Corporation (RTC) to "remove a case from state court" "even after judgment has been entered there and an appeal in state court is pending." *Resolution Tr. Corp.* v. *BVS Development, Inc.*, 42 F.3d 1206, 1211 (9th Cir. 1994); *see Lester* v. *Resolution Tr. Corp.*, 994 F.2d 1247, 1252 (7th Cir. 1993); *Resolution Tr. Corp.* v. *Allen*, 16 F.3d 568, 572 n.4 (4th Cir. 1994); *Resolution Tr. Corp.* v. *Nernberg,* 3 F.3d 62, 67 (3d Cir. 1993); *Ward* v. *Resolution Tr. Corp.*, 972 F.2d 196, 198 (8th Cir. 1992). Courts have also similarly construed 12 U.S.C. § 1789(a)(2), which authorizes the National Credit Union Administration to remove "any … action, suit, or proceeding from a State court." *Putnam* v. *DeRosa*, 963 F.2d 480, 483 (1st Cir. 1992). On the other hand, President Trump is not aware of any court of appeals that has construed one of these removal statutes (or any analogous one) to bar removal of a state-court case pending on appeal.

By contrast, when Congress "intend[s] to limit the removal power … to suits pending before a state trial court," it knows how to "explicitly state[] as much." *Savers*, 872 F.2d at 966. For example, the Federal Reserve removal statute allows removal of a qualifying case "any time *before the trial thereof*."

12 U.S.C. § 632 (emphasis added). Several other statutes use similar language. *See, e.g.*, *id.* § 1452(f) (cases in which Freddie Mac is a party); 22 U.S.C. § 282f (cases against International Finance Corporation); 28 U.S.C. § 2679(d)(2) (removal by Attorney General under the Westfall Act). That kind of limiting provision is not present in Section 1442(a) or Section 1455, because Congress did not impose such a limit on a federal officer seeking to remove a prosecution.

3. Interpreting the federal-officer removal statute to permit post-judgment removal also reflects the fundamental purpose of that statute: to "ensure a federal forum" so that "the contours of federal power [are] determined by federal courts," *Harris*, 122 F.4th at 423, "free from local interests or prejudice," *Arizona* v. *Manypenny*, 451 U.S. 232, 242 (1981). If the need for a federal forum becomes clear only during or after trial, then a federal forum must be made available at that point. As this case demonstrates, not every federal defense is evident before trial. The prosecution might reveal or change its theory during trial and give rise to a new (or previously rejected) federal defense, as occurred here, *see infra*, pp. 57-58. The Supreme Court may issue a decision during or after trial with new rules and/or guidance relevant to a federal defense, as also occurred here, *see infra*, pp. 55-57. Or Congress might enact a new statute to similar effect.

Post-judgment removal is also critical to prevent gamesmanship by prosecutors intent on avoiding federal jurisdiction. If removal were unavailable once judgment is entered, a prosecutor could defeat removal by manipulating the timing of evidentiary submissions or obscuring key elements of the prosecution until the last minute. Congress could not "have intended such an obvious end-around." *Harris*, 122 F.4th at 423. It created federal-officer removal specifically to guard against state and local "hostil[ity]" to "federal officers." *Willingham*, 395 U.S. at 405. That "policy should not be frustrated by a narrow, grudging interpretation" of the removal statute. *Id.* at 407.

4. DANY has claimed that it would be "anomalous" to use removal to effectively "transfer[]" President Trump's "direct appeal of his criminal conviction from state court to the federal district court." Brief of Appellee at 26, *Trump*, 158 F.4th 458 (2d Cir. 2025) (No. 24-2299). But that is not what President Trump seeks to have happen, or what any court that has approved post-judgment removal has stated should happen. The basic principle is that "[a]fter removal, the federal court takes the case up where the State court left it off." *Granny Goose*, 415 U.S. at 436. Thus, a case that is removed while pending in a state *appellate* court belongs in the relevant federal *appellate*

court, as other courts have unanimously concluded. *See Meyerland*, 960 F.2d at 520; *Harris*, 122 F.4th at 428 (Henderson, J., concurring) (collecting cases). Following that procedure here, President Trump's pending appeal of his conviction—currently mid-appeal before the First Department—would move from that state court to this Court.

As Judge Henderson explained in *Harris*, the district court would play a facilitating role for that federal appeal. Specifically, after granting removal, the district court would "adopt the state court's judgment as its own." *Harris*, 122 F.4th at 426 (Henderson, J., concurring); *see* 28 U.S.C. § 1450 (recognizing district court's authority to determine whether prior state-court orders remain in effect); *see, e.g.*, *Butner* v. *Neustadter*, 324 F.2d 783, 786 (9th Cir. 1963) (state-court judgment "should be treated as though it had been validly rendered in the federal [removal] proceeding"). President Trump would then be entitled to file a notice of appeal under 28 U.S.C. § 1291.[3]

[3] As Judge Henderson explained, "different circuits" have taken different approaches under statutes that authorize appellate removal. 122 F.4th at 428 (Henderson, J., concurring). The Fifth Circuit, for example, has held that a district court can simply "take the state judgment as it finds it, prepare the record as required for appeal, and forward the case to a federal appellate court." *Meyerland*, 960 F.2d at 520. President Trump takes no position as to what precise steps should be followed.

### B. The District Court's Reading Of The Federal-Officer Removal Statute Is Wrong.

None of the district court's reasons for interpreting the statute to bar post-judgment removal withstands scrutiny.

*First*, the district court wrongly accused President Trump of arguing "for a silent right to remove," based on the fact that "the statute does not explicitly state an outside time limit" on removal. S.A. 13, 17. That is not the argument. The statute *does* explicitly state an outside time limit: it allows the removal of any "*pending*" case. 28 U.S.C. § 1455(a). The statute also explicitly authorizes removal "at a later time" than "before trial." *Id.* § 1455(a), (b)(1). By contrast, many other removal statutes (discussed above) expressly impose the very "before the trial" deadline, 12 U.S.C. § 632, that the district court erroneously inferred here.

*Second*, the district court pointed out that the statute refers to removal "not to *a* 'federal court,' but to 'the United States district court.'" S.A. 12. From that, the court concluded that the statute "presupposes that there is something yet to be done" by the district court after removal. *Id.*; *see* S.A. 19-20. There actually is something to be done. The district court plays the initial gatekeeping role of determining whether there is good cause for removal. Then, if removal is appropriate (as it is here), the district court adopts the state

court's judgment, exercising its post-removal power to "continue the execution of [state court] order[s]." *Ex parte Fisk*, 113 U.S. 713, 730 (1885).

The district court scoffed at the supposedly "specious" notion that district courts can ever act as mere "certifying clerks." S.A. 14. But such courts often perform assigned, mechanical tasks. That is what happens, for example, whenever an appellate court remands "with instructions to take a prescribed action, such as enter judgment for a specified party." *Meyerland*, 960 F.2d at 520. For that reason, multiple courts of appeals have blessed President Trump's exact argument. *See Nernberg*, 3 F.3d at 68-69; *Allen*, 16 F.3d at 572-573; *Harris*, 122 F.4th at 428 (Henderson, J., concurring).

*Third*, the district court erroneously stated that its interpretation better serves the purpose of federal-officer removal, which the court claimed to be "for trial, to shift the venue of trial from State to Federal Court." S.A. 12. The statutory text plainly refutes that argument. It expressly contemplates removal *after trial*—at "a later time" than the default "before trial" deadline. 28 U.S.C. § 1455(b)(1). Congress would have had no reason to create that safety valve if the only purpose of removal was to "shift the venue of trial." Congress was concerned about "hostile state courts" unfairly adjudicating federal defenses. *Willingham*, 395 U.S. at 405; *see Manypenny*,

451 U.S. at 242. That concern applies just as much (if not more) to legal issues decided on appeal as it does to the conduct of the trial.

*Fourth*, the district court unsuccessfully tried to distinguish the many cases unanimously recognizing post-judgment removal. Start with *Harris*, which the court wrongly sought to limit to its facts. There, at the time of removal, the plaintiff had appealed to the state (D.C.) appellate court after the trial court dismissed the case *sua sponte*. 122 F.4th at 420-421. Noting that posture, the D.C. Circuit recognized that it "would be odd if a federal agency or officer lost the opportunity to remove" "simply because the state trial court dismissed the case." *Id.* at 423. Judge Hellerstein cited that part of *Harris* as if it supplied the opinion's only reasoning. But that was only one of many points *Harris* offered in support of its holding. As noted, *Harris* began with the "statutory language." *Id.* at 422. The D.C. Circuit also recognized that the federal-officer removal statute is "to be liberally construed in light of its purpose." *Id.* (citation omitted). And *Harris* further explained that its "interpretation" "align[ed] with other cases that have addressed removal from a state appellate court," citing many of the above cases. *Id.* at 424. All of those points fully apply here.

The district court employed the same failing maneuver to try to sidestep the decisions of eight courts of appeals that have "all held that the FDIC's" "or the RTC's … removal powers extend to cases pending appeal," *BVS Development*, 42 F.3d at 1211. Ignoring the on-point textual analysis in those decisions, the court skipped right to purpose. It asserted that Congress gave the RTC and FDIC appellate removal power because those entities might be substituted for a bank in litigation at any point, even on appeal, and "oversight by the district court of [such] litigation … is crucial to the legislative scheme." S.A. 16. But that does not distinguish the federal-officer removal statute. As explained above (at 30-31), Congress also had very good reasons to want federal court "oversight" of state prosecutions of federal officers who can show good cause for removing after trial.

The district court insisted that state courts must "assure that the law is applied equally to federal officers as to all other litigants." S.A. 13. But again, the whole reason for federal-officer removal is that state courts and state prosecutors may violate those obligations, particularly during "periods of national stress." *Willingham*, 395 U.S. at 405. Indeed, the improper actions of both DANY and the state trial court in this unprecedented case confirm that such concerns are warranted here. As one egregious example, the trial court

declined to recuse from this case, which took place in the heat of the 2024 Presidential election, despite, among other conflicts, having made prohibited political contributions to the Biden campaign and to a group called "Stop Republicans" during the 2020 general election. J.A. 985-989. No federal judge would have continued to preside in light of such disqualifying conflicts. In addition, DANY's star witness Michael Cohen has now publicly stated that both DANY and other New York officials "pressured and coerced [him] to only provide information and testimony" "that would enable them to convict President Trump," and "frequently asked inappropriate leading questions to elicit answers that supported their narrative." Cohen, *supra*, p. 6.

## II. PRESIDENT TRUMP'S SECOND REMOVAL NOTICE EASILY SATISFIED THE REQUIREMENTS OF THE FEDERAL-OFFICER REMOVAL STATUTE.

Because federal-officer removal remains available, the Court must determine whether President Trump has made a colorable showing that (i) the prosecution relates to official acts, and (ii) he has at least one federal defense. He has done both.

### A. This Prosecution "Relates To" President Trump's Official Acts.

The first element imposes a low bar to removal: the federal officer must make only "an adequate threshold showing that the suit is" for or relating to

any act taken under color of federal office. *Acker*, 527 U.S. at 431-432. In evaluating that question, this Court "construe[s] the statute liberally." *Badilla* v. *Midwest Air Traffic Control Serv., Inc.*, 8 F.4th 105, 120 (2d Cir. 2021). The Court must also "credit [President Trump's] theory of the case" at this jurisdictional stage, so long as it is "colorable." *Acker*, 527 U.S. at 431-432. Under that standard, DANY's baseless prosecution of President Trump more than plausibly qualifies as "for or relating to any act" that he took "under color" of the Presidency.

#### 1. A prosecution "relates to" a President's official acts if the government uses such acts as evidence.

The federal-officer removal statute applies to cases in which the prosecution uses "any act under color of [the President's] office" as evidence at a criminal trial of the President, 28 U.S.C. § 1442(a)(1), regardless of whether the charged conduct itself qualifies as official. By using such evidence, the prosecution makes the case into one "relating to" official Presidential acts.

Consider the plain language of the statute. In ordinary English, a prosecution that uses a federal officer's official acts against him as evidence is a prosecution "relating to" those acts. The "ordinary meaning" of "relating to" "is broad": it means "to stand in some relation; to have bearing or concern;

to pertain; refer; to bring into association with or connection with." *Morales* v. *Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). For example, a state law "'relates to' an employee benefit plan" if it has any effect on such plans, "even if the law is not specifically designed to affect such plans, or the effect is only indirect." *Ingersoll-Rand Co.* v. *McClendon*, 498 U.S. 133, 139 (1990).

The Supreme Court's recent decision in *Plaquemines* confirmed that the phrase "relating to" in the federal-officer removal statute carries that same expansive meaning. The Court held that the phrase "sweeps broadly," requiring only some "association" or "connection" between the suit and official acts that is more than "tenuous, remote, or peripheral." 608 U.S. at 11-12. The prosecutor's use of official acts as evidence easily satisfies that capacious standard. By putting such acts before the jury, the prosecutor creates a clear and direct (not tenuous or remote) association between the acts and the prosecution, and thus triggers the federal officer's right to remove.

The history of the statute confirms the point. In 2011, Congress added the "*or relating to*" language; before that, the statute had allowed removal only in cases against "any officer of the United States … *for* any act under color of such office." Removal Clarification Act of 2011, Pub. L. No. 112-51, § 2(b)(1)(A), 125 Stat. 545 (emphasis added). A prosecution is "for" an official

act if there is some "nexus" "between the charged conduct" itself "and asserted official authority." *Acker*, 527 U.S. at 431. A prosecution is thus one "relating to" official acts if it has some other kind of "association with or connection with" such acts, *Morales*, 504 U.S. at 383, such as where official acts are introduced as evidence by the prosecution. Indeed, in *Plaquemines*, the Supreme Court recognized that the 2011 amendment eliminated the previous requirement to "show a nexus" between the "charged conduct and asserted official" acts. 608 U.S. at 11 n.3; *see id.* at 17 (Jackson, J., concurring in the judgment).

The connection between DANY's prosecution and official Presidential acts is particularly obvious here, where a former (and current) President asserts that such acts were impermissibly introduced in violation of Presidential immunity. That defense theory plainly brings DANY's prosecution "into association with or connection with" the relevant Presidential acts, *Plaquemines*, 608 U.S. at 11, and thus justifies removal. Again, "one of the most important reasons for [federal-officer] removal is to have the validity of the defense of official immunity tried in a federal court." *Willingham*, 395 U.S. at 407. Under *Trump*, all Presidents have just that: a

defense of official immunity that protects them from having their official acts used against them as evidence at trial. 603 U.S. at 631-632.

Presidential immunity would be eviscerated if it were not able to be pressed and protected in federal court. Congress created federal-officer removal to "guard[] against a state court adjudication of a federal defense 'paralyz[ing] the operations of the government.'" *County of Westchester* v. *Express Scripts, Inc.*, 2026 WL 2589574, at *5 (2d Cir. Sep. 2, 2026) (quoting *Tennessee* v. *Davis*, 100 U.S. 257, 263 (1879)). That concern is also why the Constitution confers a special Presidential evidentiary immunity: to guard against the "unique risks to the effective functioning of government" that "might result when a President is making decisions" under the threat that his "official conduct … may be scrutinized to help secure [a criminal] conviction." *Trump*, 603 U.S. at 613, 631. It would be illogical for the federal-officer removal statute not to provide a federal forum to address those "peculiar constitutional concerns." *Id.* at 631.

In wrongly denying that DANY's prosecution relates to official acts, the district court disregarded all of these key points. S.A. 31-32. Instead, the court merely asserted, tracking its faulty reasoning in rejecting President Trump's first effort to remove, that DANY's "prosecution arises from

President Trump's private conduct surrounding the reimbursement of hush money payments to an adult film star," and that this "conduct, and the challenged evidence, bears no substantive relation to his position in federal office." S.A. 32. But the "challenged evidence" obviously has a "substantive relation" to President Trump's official position. The evidence is literally of his alleged actions and statements while he was serving as President. And it is irrelevant whether the charged conduct itself was official. As just explained, when the prosecution uses official acts—even to prove charges based on unofficial acts—it necessarily transforms the case into one "relating to" the official acts and thus triggers removal. The district court appears to have overlooked or misunderstood this argument.

#### 2. DANY used President Trump's official acts as evidence at trial.

President Trump has made the required "adequate threshold showing" that DANY introduced evidence about his official acts, *Acker*, 527 U.S. at 432. Indeed, as detailed below, several categories of DANY's trial evidence were clearly (not just colorably) official acts.

In concluding otherwise, the district court made two overarching errors. *First*, the court did not apply the low "colorable" standard for removal, and failed to "credit [President Trump's] theory of the case for purposes of … [its]

jurisdictional inquiry." *Acker*, 527 U.S. at 432. Instead, the court erroneously resolved disputed immunity questions on the merits. That "defeat[ed] the purpose of the removal statute," which does not "require the officer virtually to win his case before he can have it removed." *Id.* at 431-432. *Second*, the district court ignored the Supreme Court's instruction that Presidential immunity extends to a President's "actions so long as they are 'not manifestly or palpably beyond [his] authority.'" *Trump*, 603 U.S. at 618 (citation omitted). Once these two basic errors are corrected, it is clear that President Trump has established his right to a federal forum.

**Discussions With White House Communications Director**. DANY subpoenaed Hope Hicks, White House Communications Director during the first Trump Administration, to testify about certain conversations she had with President Trump in the Oval Office in early 2018. J.A. 995. Hicks testified that she had discussed with the President "how he would like a [White House] team to respond to" a forthcoming news article about the Clifford NDA. J.A. 286. She testified that she discussed with the President the content of specific statements to be attributed to a "White House official." J.A. 287-288. Hicks also testified that she and President Trump discussed how a different New York Times article "was playing," as well as Hicks's "thoughts and opinion

about th[e] story." J.A. 290. DANY emphasized that testimony in its closing, calling Hicks's testimony "devastating," and claiming that she had "put[] the nail in Mr. Trump's coffin." J.A. 373.

All of this testimony is prohibited by *Trump*, which squarely held that a President's "discussions with" government officials about "their official responsibilities," or that "concern [the official's] role," "are readily categorized" as "official conduct." 603 U.S. at 617, 622-624, 637. Hicks's official responsibilities as White House Communications Director required her to interact with and provide information to the press, so it was plainly an official act for the President to discuss her execution of those duties with her.

The district court held in error that Hicks's "conversations with President Trump related to unofficial conduct" because they somehow "did not involve discharging any of the president's constitutional or statutory duties or speaking with the public on a matter of national importance." S.A. 25. The court mischaracterized the Oval Office discussions as "efforts to develop a coordinated response" to a "personally damaging story" that was "best understood as affecting a president's electoral-facing role and his political standing and personal reputation." S.A. 25.

That reasoning fails. *Trump* made clear that "a long-recognized aspect of Presidential power is using the office's 'bully pulpit' to persuade Americans, including by speaking forcefully or critically," on "matters of public concern." 603 U.S. at 629. Accusations of wrongdoing that could "affect[] a president's … political standing" (in the district court's own words) are unquestionably matters of public concern—hence the press's intense interest in the alleged "hush money" story. To perform his constitutional duties effectively, every President "need[s] to maintain [his] prestige as an element of Presidential influence." *Nixon* v. *Fitzgerald*, 457 U.S. 731, 757 (1982). A President is thus "carrying out [his] responsibilities," *Trump*, 603 U.S. at 642—or, at least, not manifestly exceeding them—when he discusses with his advisers how the White House should respond to allegations of wrongdoing.

Indeed, the Supreme Court itself has recognized that when "persons authorized to speak for the President publicly … deny[]" allegations of pre-inauguration personal misconduct, such denials "*may* involve conduct within the outer perimeter of the President's official responsibilities." *Clinton* v. *Jones*, 520 U.S. 681, 685-686 (1997) (emphasis added). An argument that the Supreme Court has said "may" be right is by definition at least colorable.

Both the Supreme Court and D.C. Circuit have also held that similar conduct by other, lower-level governmental actors was official in nature. *See Barr* v. *Matteo*, 360 U.S. 564, 574-575 (1959) (plurality opinion) (agency head acted "within the outer perimeter of [his] line of duty" when he publicly denied allegations impugning his "integrity"); *see id.* at 576-577 (Black, J., concurring) (same); *Council on American Islamic Relations* v. *Ballenger*, 444 F.3d 659, 661, 664-666 (D.C. Cir. 2006) (Congressman was protecting his "ability to carry out his representative responsibilities effectively," and thus acting "within the scope of [his] authorized duties," "when he discussed his marital status in his office" "in response to a reporter's inquiries").

**Official Presidential Statements On Twitter**. DANY also introduced several sets of posts by President Trump, made while in office, on a Twitter (now "X") account that he consistently used for official communications. J.A. 996. One post criticized the New York Times for "going out of their way to destroy Michael Cohen and his relationship with [President Trump] in the hope that he will 'flip.'" J.A. 952. In another, President Trump shared facts that he had learned about the Clifford NDA and the way in which Cohen had been reimbursed. J.A. 954-956. Two other posts criticized Cohen in connection with his decision to falsely accuse President Trump of wrongdoing.

J.A. 958, 960. DANY pointed to these official statements in its closing as supposedly key evidence of President Trump's knowledge and intent. J.A. 382, 391-392.

*Trump* makes clear that these statements were official acts: "most of a President's public communications," including "*in the form of Tweets*," "are likely to fall comfortably within the outer perimeter of his official responsibilities." 603 U.S. at 629 (emphasis added). Although the format, content, and style of these statements may have differed from official statements made by earlier Presidents, that is irrelevant. President Trump used an official communications channel to "speak[] forcefully or critically, in ways that [he] believe[d] would advance the public interest." *Id.* That is more than enough to make the statements, at the very least, colorably official acts.

In rejecting that argument, the district court made the same basic error it had made in analyzing Hicks's testimony. The court wrongly concluded that President Trump's statements "cannot be seen as 'advanc[ing] the public interest'" because they "relate to personal matters and to campaign issues." S.A. 28-29. Again, the exact same could have been said of Congressman Ballenger's statements about his "separation from his wife," which the D.C. Circuit held to be part of his official duties. 444 F.3d at 661. What the district

court here called a "campaign issue after the fact" (whatever that means), S.A. 29, was a matter of intense public concern bearing on the sitting President's ability to effectively carry out his duties. At a minimum, President Trump's statements cannot "reasonably be understood *only* as re-election campaign activity." *Blassingame* v. *Trump*, 87 F.4th 1, 21-22 (D.C. Cir. 2023) (emphasis added).

**The President's Alleged Discussion With The Attorney General**. Next, DANY elicited testimony from Michael Cohen about a conversation he had with David Pecker, then-publisher of the National Enquirer, whose company had received an FEC complaint alleging violations of FECA. J.A. 811, 997. According to Cohen, he assured Pecker that "[i]t's going to be taken care of." J.A. 321. Cohen then elaborated that "the person … who [was] going to be able to do it [was] Jeff Sessions," and that Cohen had "previously been told … by President Trump" that the FEC complaint would "be taken care of" by Attorney General Sessions. J.A. 321-324. DANY emphasized this testimony, too, in its summation. J.A. 374-375.

President Trump denies that the interaction described by Cohen occurred. But DANY introduced evidence that it did, and Presidential evidentiary immunity plainly "extends to official discussions between the

President and his Attorney General." *Trump*, 603 U.S. at 637. Cohen's false testimony "plainly implicate[d]" President Trump's "conclusive and preclusive authority" under the Constitution "to decide how to prioritize and how aggressively to pursue legal actions against defendants who [allegedly] violate the law." *Id.* at 620 (internal quotation marks omitted).

The district court's reasons for rejecting that argument make no sense. *First*, the court stated that the alleged conversation "concerned the FEC, an independent agency," rather than "Sessions exercising Department of Justice criminal-enforcement authority." S.A. 26-27. But the FEC can refer matters to the Justice Department for criminal enforcement. *See* 52 U.S.C. § 30109(a)(5)(C). Also, vitally, in our constitutional system, there is no such thing as an "independent agenc[y]" that is "free of the President['s]" oversight and control. *Trump* v. *Slaughter*, 146 S. Ct. 2283, 2303 (2026). *Second*, the district court stated that "the evidence at issue is not evidence of a President-Attorney General conversation," and that immunity "does not automatically extend to the President's recounting of such alleged discussions to a private third party." S.A. 27. It is not clear what that means. Cohen's testimony obviously *was* evidence, elicited by DANY, that a "President-Attorney General conversation" took place, and no such evidence may be introduced.

**Exercise Of Article II Authority And Operation Of The White House**. DANY also subpoenaed Special Assistant to the President and Director of Oval Office Operations Madeleine Westerhout to testify at length about President Trump's "work habits," "preferences," "practices," and "contacts" while serving as President. J.A. 299-305; *see* J.A. 828-829. Westerhout testified about "calls made by the situation room" to President Trump, and how President Trump "often brought things back and forth to his residence or Air Force 1 or Marine 1" to review. J.A. 299-302. She also testified in detail about how President Trump crafted his official statements on Twitter. J.A. 304-305. All of this testimony, too, improperly invited the jury to scrutinize the "President's exercise of his official duties" in a "highly intrusive" manner. *Trump*, 603 U.S. at 632 n.3 (citation omitted).

The district court ignored the relevant testimony from Westerhout. President Trump cited her testimony at pages 2985-2996 of the trial transcript, concerning Oval Office operations and the President's work practices. The district court's opinion instead cited pages 3010-3017, which concerned Westerhout's assistance with personal checks. S.A. 25-26. But that was not the official-acts testimony that President Trump raised as grounds for

removal. Rather than grappling with the improper testimony at hand, the district court simply sidestepped the issue.

### B. President Trump's Second Removal Notice Asserted Colorable Federal Defenses.

The President's second removal notice also "allege[d] a colorable defense under federal law." *Mesa*, 489 U.S. at 129. Again, the Court must "credit" President Trump's "theory of the case for purposes of" its limited "jurisdictional inquiry." *Acker*, 527 U.S. at 432. Here, at least two federal defenses—Presidential immunity and FECA preemption—are colorable and indeed meritorious.

#### 1. President Trump asserted a colorable defense of Presidential immunity.

To start, President Trump has a defense of Presidential immunity for the reasons explained. *Trump* did not "decide whether [Presidential] immunity is presumptive or absolute" in a criminal case. 603 U.S. at 615. If such immunity is absolute, as is overwhelmingly likely (and as it is in civil damages cases, *see Fitzgerald*, 457 U.S. at 754-755), then the judgment must be set aside without any further analysis. Even if the immunity is only presumptive, DANY still was required to show that using the proffered evidence "pose[d] no dangers of intrusion on the authority and functions of the

Executive Branch." *Trump*, 603 U.S. at 615. But the state trial court did not require DANY to make such a showing before erroneously allowing the official-acts evidence.

DANY has wrongly claimed that President Trump's immunity arguments are meritless because they were somehow not preserved (they were), and because any violations of the Presidential evidentiary immunity were harmless (they were not harmless). The district court did not rely on those counterarguments in denying removal. And in addition to being wrong, both of DANY's counterarguments are for the merits stage on appeal; they cannot defeat removal at the jurisdictional plausibility threshold. Again, a federal officer "need not win his case before he can have it removed." *Willingham*, 395 U.S. at 407.

#### 2. President Trump asserted a colorable defense of federal preemption.

As explained above (at 10-11), to transform President Trump's alleged falsification of business records from a time-barred misdemeanor into a felony, DANY had to identify "another crime" that President Trump allegedly intended to "conceal" or "commit." N.Y. Penal Law § 175.10. Remarkably, only at the very end of trial did DANY finally reveal its proposed predicate crime: N.Y. Election Law § 17-152, which prohibits conspiracies to "promote

or prevent the election of any person to a public office by unlawful means." According to DANY, the principal "unlawful means" was a violation of FECA's prohibition on contributions to Presidential candidates in excess of $2,700. J.A. 674-676; J.A. 468. DANY's flawed theory was that President Trump had falsified business records to conceal the fact that Cohen's payment to Stormy Daniels was, in reality, an "unlawful means" of influencing the 2016 Presidential election under N.Y. Election Law § 17-152—allegedly unlawful because it was an excessive contribution under FECA. *See* J.A. 681-684; J.A. 901-902.

FECA preempts that application of Section 17-152. By its terms, FECA expressly "preempt[s] *any* provision of State law with respect to election to Federal office." 52 U.S.C. § 30143(a) (emphasis added). That broad language plainly covers any state "regulation of the conduct and financing of campaigns for Federal elective office." *Holtzman* v. *Oliensis*, 91 N.Y.2d 488, 495 (1998); *see* 11 C.F.R. § 108.7(b)(3) (similar interpretation by FEC). If making a contribution prohibited by FECA amounts to an "unlawful means" of influencing an election under Section 17-152, then Section 17-152 necessarily "regulate[s] … the conduct and financing of [federal] campaigns" and is therefore preempted in that application. *Holtzman*, 91 N.Y.2d at 495. Were

it otherwise, any district attorney in New York (or any other State) could prosecute any alleged violation of FECA by cynically packaging it as a violation of a state law like Section 17-152, even where, as here, federal authorities declined to pursue the alleged violation. That cannot be right.

The district court wrongly concluded that "there is no preemption" because, in its view, all DANY had to show is that President Trump *intended* to commit or conceal a violation of Section 17-152, not that he "actually violated NYEL § 17-152 or FECA." S.A. 34. That misunderstands how preemption operates as a defense in this case. An application of a state law that is preempted by a federal statute is "rendered invalid by the Supremacy Clause." *Perez* v. *Campbell*, 402 U.S. 637, 649, 652 (1971). Thus, if Section 17-152 is preempted as applied to conspiracies to violate FECA (it is), then that application of Section 17-152 is null and void, and such agreements do not violate Section 17-152 in the first place. Accordingly, even if President Trump had the intent to commit or conceal an agreement to violate FECA (as DANY wrongly alleges), that was not "intent to commit [or conceal] another *crime*" under New York law, Penal Law § 175.10. It is not a felony under New York law to allegedly falsify business records with the intent to commit or conceal

lawful activity. The district court below simply ignored that argument in wrongly denying removal.

## III. PRESIDENT TRUMP HAD GOOD CAUSE TO FILE A SECOND REMOVAL NOTICE AFTER TRIAL AND DID SO DILIGENTLY.

This Court has already defined the requirements of "good cause" under Section 1455. *Trump*, 158 F.4th at 466. A defendant must show that "circumstances outside of [the movant's] control, including new grounds for removal that could not reasonably have been raised prior to the expiration of the thirty-day default statutory deadline, prevented [the defendant] from timely seeking relief; and that he acted with reasonable diligence and without undue delay to remove." *Id.* President Trump satisfied both requirements here.

### A. President Trump Could Not Have Filed This Removal Notice Before Trial Or Before *Trump* v. *United States*.

The arguments for removal discussed above are new grounds that President Trump could not reasonably have raised prior to trial.

1. Before trial, President Trump could not have made the same argument he makes now that his prosecution "relates to" official acts. Nor could he have raised the federal defense of Presidential evidentiary immunity. Both arguments stemmed from the Supreme Court's post-trial decision in

*Trump*. Even DANY recognized during this litigation that *Trump* "announced *new rules* for determining whether a President is immune from criminal prosecution." Brief of Appellee at 32, *Trump*, 158 F.4th 458 (2d Cir. 2025) (No. 24-2299) (emphasis added). Those rules included both a new evidentiary immunity and new "guidance on" the "unprecedented and momentous question[]" of how to separate a President's "official from unofficial actions." *Trump*, 603 U.S. at 616-617.

The district court suggested that President Trump should have sought to remove in March 2024, a month before trial and three months before *Trump* was decided. S.A. 8. The court wrongly reasoned that, at that time, President Trump filed an (unsuccessful) pre-trial motion in state court seeking to preclude official-acts evidence. That is irrelevant for two reasons. *First*, in March 2024, the President's evidentiary-immunity defense was not ripe for removal, as the state trial court had not yet permitted DANY to introduce evidence in violation of the immunity. Indeed, DANY had not "yet specified" what evidence it planned to introduce, J.A. 737, and the state trial court instructed President Trump to "wait until trial" and "make [his] objections at that time." J.A. 275.

*Second*, before the Supreme Court's landmark decision in *Trump*, "[n]either the existence nor the parameters of [a former President's] special evidentiary immunity were established." Statement of Interest of the United States of America at 15, ECF No. 70. Indeed, at the time, Second Circuit law *denied the existence* of that kind of evidence-specific immunity, and permitted prosecutors to introduce evidence of immunized conduct to prove "charged non-immune conduct." *United States* v. *Zhong*, 26 F.4th 536, 553 n.9 (2d Cir. 2022) ("[T]here is no per se bar on the use of immune behavior in completing the story—or proving a defendant's knowledge, intent, or planning—of charged non-immune conduct."). Under that binding precedent, any pre-*Trump* motion to remove based on evidentiary immunity would have been futile. *Trump* was thus the kind of "intervening change in the law" that can appropriately "justif[y] a successive removal petition." *Fritsch* v. *Swift Transp. Co. of Arizona, LLC*, 899 F.3d 785, 789 (9th Cir. 2018).

2. Circumstances beyond President Trump's control likewise prevented him from successfully removing based on FECA preemption during the initial pre-trial removal window. President Trump argued in his first removal notice, filed shortly after his indictment, that DANY's possible reliance on N.Y. Election Law § 17-152 created a preemption defense.

J.A. 19-20. But DANY persuaded the district court to reject that argument by obscuring the very FECA-based theory of Section 17-152 that DANY eventually submitted to the jury. DANY represented that it might not "rely on Election Law § 17-152 at trial," and argued that "the mere possibility that a verdict here [could] rely on Election Law § 17-152" was "too speculative a basis on which to rest a finding of pre-emption." J.A. 125-126. DANY also claimed that the "charges here do not relate to the specific disclosures mandated by FECA." J.A. 123.

In denying President Trump's first attempt at removal in July 2023, the district court relied on those inaccurate representations by DANY. The court explained that Section "17-152 [was] not preempted by FECA" because its "application" by DANY in these circumstances did not "target campaign contributions and expenditures." J.A. 243-245. But that is exactly the application of Section 17-152 that DANY later sprang at the very end of the President's trial in 2024. President Trump therefore had good cause to return to federal court after DANY finally laid its cards on the table. The district court did not engage with this argument in its most recent rejection of removal, S.A. 33-34, contradicting this Court's direction to do so, *Trump*, 158 F.4th at 468.

### B. President Trump Acted Diligently By Seeking To Remove Within Two Months Of The Supreme Court's Decision In *Trump*.

By any measure, President Trump also "acted diligently and without undue delay to remove the case based on th[e]se new grounds." *Trump*, 158 F.4th at 468.

In "defining 'good cause' within the meaning of § 1455(b)(1)," this Court saw "no reason to diverge from … past interpretations of the same term in analogous contexts." *Trump*, 158 F.4th at 465-466. The Court "dr[e]w on" two "similar 'good cause' provisions in the federal rules," *id.* at 465: Federal Rule of Civil Procedure 16(b) and Federal Rule of Criminal Procedure 12(c). Applying both rules, courts in this Circuit "commonly find" that "a party acts diligently if it seeks leave … within approximately two months of acquiring information" that provides good cause. *AT&T Corp.* v. *Atos IT Sols. & Servs., Inc.*, 714 F. Supp. 3d 310, 326 n.14 (S.D.N.Y. 2024) (Rule 16(b)); *see United States* v. *Bongiovanni*, 2023 WL 3723265, at *1-2 (W.D.N.Y. May 30, 2023) (Rule 12(c)); *see also* Post-Remand Memorandum of Law In Support of Removal at 34 & n.7, ECF No. 69 (collecting 15 additional cases).

Under these precedents—which the district court ignored—President Trump acted with more than sufficient diligence and speed by filing his

60-page second removal notice (plus 38 exhibits) on August 29, 2024, less than two months after the Supreme Court issued its decision in *Trump*. There is no justification for fashioning an unwritten "good cause" deadline for President Trump that has not been applied to any other litigant. Beyond being unjust, such a maneuver would run counter to the Supreme Court's repeated instructions (i) not to "frustrate[]" the goals of the federal-officer removal statute with a "narrow, grudging interpretation," *Manypenny*, 451 U.S. at 242, and (ii) to give "special solicitude" to claims of a "breach of essential Presidential prerogatives under the separation of powers," *Fitzgerald*, 457 U.S. at 743.

The short time after *Trump* also caused no prejudice to either DANY or the New York courts, another "relevant factor[]" in assessing good cause. *Kassner* v. *2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007) (interpreting Rule 16(b)); *see McGucken* v. *Content IQ LLC*, 2021 WL 5357473, at *1 (S.D.N.Y. Nov. 16, 2021) (collecting cases finding good cause "where the amendment is not prejudicial" "even where the moving party has not shown diligence"). The timing of President Trump's motion did not prejudice DANY. It did not affect the state court proceedings in any respect. And it had no

impact on the substantive issues in this case. DANY has never contested any of these points.

The only relevant prejudice is that caused *by* DANY *to* President Trump, when DANY prevented him from initially removing before trial in 2023 by obscuring critical aspects of its prosecution. That too establishes good cause for removal now. *See McKay* v. *Triborough Bridge & Tunnel Auth.*, 2007 WL 3275918, at *1 (S.D.N.Y. Nov. 5, 2007) ("in assessing good cause" under Rule 16(b), court may consider "bad faith *vel non*" of opposing party); *United States* v. *Elias*, 2022 WL 805334, at *3-5 (E.D.N.Y. Mar. 16, 2022) (finding "good cause" to file untimely motion to suppress evidence that government had "led the defense and the court to believe" it would not introduce).

### C. President Trump Did Not Waive His Right To Remove By First Raising *Trump* To The State Trial Court In An Effort To Prevent His Sentencing Ten Days Later.

The district court said almost nothing about any of the above critical points. Instead, the court wrongly found that President Trump lacked good cause to remove for one reason: before seeking to remove, President Trump raised the impact of *Trump* with the state trial court. S.A. 9-11. The district court claimed that this was an improper attempt to "play one court against

another" and use removal to "seek[] a second bite at the apple." S.A. 10-11. That, too, was error. The district court ignored both the applicable legal framework and the unique reasons why President Trump was practically *forced* to immediately raise immunity in the state court to avoid imminent irreparable injury.

Start with the legal framework. The district court's mistaken reasoning resembles a waiver analysis. Indeed, during the proceedings below, both DANY and the court recognized that the issue was whether President Trump had "affirmatively waived [his] right to removal." Memorandum of Law In Opposition to Removal at 20, ECF No. 72; *see* J.A. 1477 (hearing transcript) (court inviting argument "on the issue of waiver"); J.A. 1483 (Court: "That doesn't indicate anything but waivers in my mind."). Courts have recognized that a defendant "may waive the right to remove to federal court where, after it is apparent that the case is removable, the defendant takes actions in state court that manifest his or her intent to have the matter adjudicated there." *Kenny* v. *Wal-Mart Stores, Inc.*, 881 F.3d 786, 790 (9th Cir. 2018); *see Northrop Grumman Tech. Servs., Inc.* v. *DynCorp Int'l LLC*, 865 F.3d 181, 187-188 (4th Cir. 2017) (movant "waived" removal "by its litigation conduct in the state court" because the "removal rules do not permit … 'strategic delay'").

The district court, however, did not mention the term "waiver" in its analysis—likely because President Trump's actions plainly do not constitute waiver. To waive, a defendant must "take[] actions in state court that manifest his or her intent to have the matter adjudicated there, and to abandon his or her right to a federal forum." *Kenny*, 881 F.3d at 790. The "defendant's intent to remain in state court must be clear and unequivocal." *Abraham Watkins Nichols Agosto Aziz & Stogner* v. *Festeryga*, 155 F.4th 456, 460 (5th Cir. 2025). In addition, waiver "is no casual affair," *id.*—"a finding of waiver is appropriate only in extreme situations, when judicial economy, fairness, and comity demand it." *Northrop Grumman*, 865 F.3d at 186.

President Trump's actions do not come close to clearly and unequivocally manifesting an "intent to have [this] matter adjudicated" by the state courts, let alone an intent to "abandon his … right to a federal forum." *Kenny*, 881 F.3d at 790. Just the opposite: President Trump pressed his right to a federal forum at the first opportunity by removing in 2023. That alone distinguishes the handful of cases cited by the district court, *see* S.A. 10-11.

The district court ignored President Trump's sound explanation for why he had no practical choice but to raise his *Trump*-based evidentiary immunity to the state court immediately after the Supreme Court ruled on July 1, 2024.

At that time, President Trump was under pressure to "forestall an[] unprecedented development: the criminal sentencing of a Presidential candidate weeks before the general election," Reply Brief at 32, *Trump*, 158 F.4th 458 (2d Cir. 2025) (No. 24-2299). That sentencing was scheduled for July 11. J.A. 981. Faced with the prospect of possible incarceration *in just ten days*, President Trump could not rest on the faint hope that the district court would grant an opposed motion for leave to remove—and thus divest the state court of jurisdiction in time—in a little over one week. President Trump had to raise the *Trump* decision with the state court to try to stave off imminent and irreparable injury.

Litigating in state court does not waive removal when the posture of the case effectively "compel[s] [the] defendant's state-court participation" to avoid "potential harm." *Albuquerque*, 864 F.3d at 1099; *see Yusefzadeh* v. *Nelson, Mullins, Riley & Scarborough, LLP*, 365 F.3d 1244, 1246 (11th Cir. 2004) (no waiver if state "place[s] [the] state court defendant in a quandary" that requires state-court participation); *see, e.g.*, *Kenny*, 881 F.3d at 791 (no waiver where defendant filed demurrer before removal because it "had to respond in some manner to the [complaint], or risk entry of default judgment").

President Trump explained this to the district court, but the court did not address this point or the authorities just cited.

Instead, the district court erroneously claimed that President Trump's real strategy must have been to file in state court, wait to see if he prevailed, and if not, try again in federal court. But that is not what happened. President Trump did not even take a first supposed bite—he sought to remove *weeks before* the state trial court ruled. "Filing a motion that sits idle" and does not actually result in a "hearing or ruling" before removal "does not trigger waiver." *Abraham Watkins*, 155 F.4th at 461.

The district court wrongly faulted President Trump for not removing until after it had "become[] apparent that the [state] court [would] rule against him." S.A. 10. That is misleading. The problem was not that the state court might deny immunity. As President Trump has explained all along, the problem was that the court also made clear that it would not "allow adequate time for the interlocutory appellate review" of a denial of immunity "that *Trump* v. *United States* mandated." J.A. 973. The Supreme Court was clear in *Trump* that the "President's Executive branch authority [is] significantly undermined if appellate review" of immunity issues is "postponed until after conviction and sentence." 603 U.S. at 654 (Barrett, J., concurring in part); *see*

*id.* at 635-636 (majority opinion). That is, of course, precisely what has happened in this case, and what President Trump tried to prevent by removing when he did.

Consider the timeline in state court. The post-*Trump* briefing was complete on July 31, 2024. On August 5, the state trial court informed the parties that it would decide President Trump's motion on September 16, only two days before the sentencing date of September 18, which the court warned would "*remain[] unchanged.*" J.A. 946. President Trump then moved to adjourn at least the sentencing date to allow for sufficient time for his constitutionally required appeal. J.A. 990. The court effectively denied that request on August 19, by informing the parties that it would not rule even on adjournment for several weeks. J.A. 990. President Trump filed his 60-page removal notice ten days later, on August 29.[4] In doing so, the President did not waive the right to a federal forum, which he has been pressing all along—just the opposite, he enforced that right.

---

[4] The state trial court eventually did inform the parties, on September 6, that it would postpone decision on immunity until November. J.A. 1302. President Trump obviously was not aware of that development when he sought to remove on August 29, nor did it affect his right to remove.

## CONCLUSION

The Court should reverse the district court's order denying President Trump leave to file a removal notice, and remand with instructions to grant leave to remove and adopt the state trial court's judgment, thereby enabling appellate review by this Court.

Respectfully submitted,

/s/ *Robert J. Giuffra, Jr.*
ROBERT J. GIUFFRA, JR.
JOHN L. WARDEN
MAXWELL F. GOTTSCHALL
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

BRENDAN P. CULLEN
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California 94301
(650) 461-6500

DIANE L. MCGIMSEY
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California 90067
(310) 712-6600

*Counsel for Defendant-Appellant President Donald J. Trump*

SEPTEMBER 22, 2026

## CERTIFICATE OF COMPLIANCE

This Brief complies with the word limit of Second Circuit Rule 32.1(a)(4)(A) because it contains 14,000 words. This Brief also complies with the requirements of Federal Rule of Appellate Procedure 32(a) because it was prepared in 14-point font using a proportionally spaced typeface, CenturyExpd BT.

/s/ *Robert J. Giuffra, Jr.*
ROBERT J. GIUFFRA, JR.

SEPTEMBER 22, 2026

## CERTIFICATE OF SERVICE

I hereby certify that, on this 22nd day of September, 2026, I electronically filed the foregoing Brief with the Clerk of Court using the ACMS system. I certify that service will be accomplished by the ACMS system for all participants in this case who are registered ACMS users.

/s/ *Robert J. Giuffra, Jr.*
ROBERT J. GIUFFRA, JR.