# 26-2427

## United States Court of Appeals
## For the Second Circuit

**PEOPLE OF THE STATE OF NEW YORK,**

*Plaintiff-Appellee,*

*- against -*

**DONALD J. TRUMP,**

*Defendant-Appellant.*

**On Appeal from the United States District Court for the Southern District of New York**

## BRIEF FOR APPELLEE PEOPLE OF THE STATE OF NEW YORK

ALVIN L. BRAGG, JR.
*District Attorney*
*New York County*
One Hogan Place
New York, NY 10013
(212) 335-9000
danyappeals@dany.nyc.gov

STEVEN C. WU
*Chief, Appeals Division*
JOHN T. HUGHES
*Deputy Chief, Appeals Division*
Of Counsel

OCTOBER 22, 2026

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

QUESTIONS PRESENTED ........ 4

STATEMENT OF THE CASE ........ 4

A. The Charges Against Defendant ........ 4

B. Pre-Trial Proceedings ........ 6

1. The first removal proceeding ........ 6

2. The state jury trial and defendant's conviction ........ 7

C. Post-Trial Proceedings Through Sentencing ........ 8

1. Defendant's post-trial motion to dismiss in state court ........ 8

2. Defendant's motion for leave to file a second notice of removal ........ 10

3. Defendant's unsuccessful efforts to stay sentencing ........ 10

D. Post-Sentencing Proceedings ........ 11

1. This district court's decision on remand ........ 11

2. Defendant's direct appeal to the Appellate Division ........ 12

SUMMARY OF ARGUMENT ........ 13

ARGUMENT ........ 16

POINT I ........ 16

DEFENDANT'S STRATEGIC DELAY AND THE LATE STAGE OF THE STATE PROCEEDING PRECLUDE A FINDING OF GOOD CAUSE FOR A SECOND, UNTIMELY NOTICE OF REMOVAL ........ 16

A. Defendant Failed to Act with Reasonable Diligence When He Chose to Litigate His Evidentiary Claim in State Court and Delayed Seeking Removal Until He Believed He Would Lose.............................. 16

B. There Is No Good Cause to Revisit Defendant's Preemption Claim. ........................................................................................ 23

C. The Late Stage of This Proceeding Also Weighs Heavily Against Removal. ................................................................................... 24

POINT II ................................................................................................ 26

DEFENDANT HAS NOT MET THE STATUTORY REQUIREMENTS FOR REMOVAL ............................................................. 26

A. Defendant's Falsification of Private Business Records Did Not Relate to Any Acts Under Color of Federal Office. ................................ 26

B. Defendant's Evidentiary Claim Is Not a "Defense." ............................... 33

C. Defendant's Evidentiary Claim Is Not "Colorable." ............................... 36

1. Defendant's statements on Twitter ............................................... 36

2. Testimony by Hope Hicks............................................................. 39

3. Testimony by Michael Cohen........................................................ 42

4. Testimony by Madeleine Westerhout............................................. 44

D. Defendant's Preemption Claim Is Not "Colorable." ............................... 45

POINT III............................................................................................... 48

DEFENDANT'S SENTENCING PRECLUDES REMOVAL ...................... 48

CONCLUSION ........................................................................................ 56

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Allen v. McCurry*, 449 U.S. 90 (1980) .......... 45

*Arizona v. Folio*, No. CR-19-08056-001-PCT-DJH, 2019 WL 1643720 (D. Ariz. Apr. 16, 2019) .......... 51

*Arizona v. Manypenny*, 451 U.S. 232 (1981) .......... 54

*Arizona v. Meadows*, No. 24-02063, 2024 WL 4198384 (D. Ariz. Sept. 16, 2024) .......... 17

*Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023) .......... 36-37, 41

*Buljic v. Tyson Foods, Inc.*, 22 F.4th 730 (8th Cir. 2021) .......... 35

*Callahan v. Cnty. of Suffolk*, 96 F.4th 362 (2d Cir. 2024) .......... 18

*Carroll v. Trump*, 148 F.4th 110 (2d Cir. 2025) .......... 37

*Carroll v. Trump*, 151 F.4th 50 (2d Cir. 2025) .......... 37

*Carroll v. Trump*, 66 F.4th 91 (2d Cir. 2023) .......... 25

*Chevron USA Inc. v. Plaquemines Parish, Louisiana*, 608 U.S. 1 (2026) .......... 2, 29-30

*City of Albuquerque v. Soto Enters., Inc.*, 864 F.3d 1089 (10th Cir. 2017) .......... 13, 20, 22

*City of Brunswick by & through Mayor & Bd. of Comm'rs v. Honeywell Int'l, Inc.*, 184 F.4th 1230 (11th Cir. 2026) .......... 14, 29

*Clinton v. Jones*, 520 U.S. 681 (1997) .......... 41

*Cnty. of Westchester v. Express Scripts, Inc.*, No. 24-1639, 2026 WL 2589574 (2d Cir. Sept. 2, 2026) .......... 32

*Council on American Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006) .......... 38

*Covington Indus., Inc. v. Resintex A.G.*, 629 F.2d 730 (2d Cir. 1980) .......... 50

*D.C. v. Exxon Mobil Corp.*, 89 F.4th 144 (D.C. Cir. 2023) .......... 30

*DeFiore v. SOC LLC*, 85 F.4th 546 (9th Cir. 2023) .......... 29

*Dewald v. Wriggelsworth*, 748 F.3d 295 (6th Cir. 2014) .......... 45-46

*FDIC v. Keating*, 12 F.3d 314 (1st Cir. 1993) .......... 53

*Fed. Election Comm'n v. Nat'l Right to Work Comm.*, 459 U.S. 197 (1982) .......... 43

*Fed. Election Comm'n v. NRA Political Victory Fund*, 513 U.S. 88 (1994) .......... 43

*Fritsch v. Swift Transp. Co. of Arizona, LLC*, 899 F.3d 785 (9th Cir. 2018) .......... 18

*Harris v. U.S. Dep't of Transportation FMCSA*, 122 F.4th 418 (D.C. Cir. 2024) .......... 49, 52

*Hawaii v. Thronas-Kahoonei*, No. 19-00683, 2020 WL 118251 (D. Haw. Jan. 10, 2020) .......... 51

*Hudak v. Elmcroft of Sagamore Hills*, 58 F.4th 845 (6th Cir. 2023) .......... 32

*Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975) .......... 52

*Hussein v. Maait*, 129 F.4th 99 (2d Cir. 2025) .......... 16

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 488 F.3d 112 (2d Cir. 2007) .......... 28

*In re Meyerland Co.*, 960 F.2d 512 (5th Cir. 1992) .......... 53

*In re Savers Fed. Sav. & Loan Assoc.*, 872 F.2d 963 (11th Cir. 1989) .......... 53

*Isaacson v. Dow Chem. Co.*, 517 F.3d 129 (2d Cir. 2008) .......... 29, 31

*Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185 (5th Cir. 2013) .......... 45-46

*Jefferson Cnty. v. Acker*, 527 U.S. 423 (1999) .......... 14, 28

*Johnson v. Heublein Inc.*, 227 F.3d 236 (5th Cir. 2000) .......... 21

*Johnson v. Washington*, No. C07-0696-MJP, 2007 WL 2377141 (W.D. Wash. Aug. 15, 2007) .......... 51

*Jones v. Clinton*, 72 F.3d 1354 (8th Cir. 1996) .......... 41

*K&D LLC v. Trump Old Post Off. LLC*, 951 F.3d 503 (D.C. Cir. 2020) .......... 29

*Kenny v. Wal-Mart Stores, Inc.*, 881 F.3d 786 (9th Cir. 2018) .......... 20, 22

*Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020) .......... 29

*Martinez v. Ct. of Appeal of California, Fourth App. Dist.*, 528 U.S. 152 (2000) ........ 12, 48

*Maryland v. Soper (No. 1)*, 270 U.S. 9 (1926) ........ 28

*Minnesota by Ellison v. Am. Petroleum Inst.*, 63 F.4th 703 (8th Cir. 2023) ........ 30

*Mizuna, Ltd. v. Crossland Fed. Sav. Bank*, 90 F.3d 650 (2d Cir. 1996) ........ 54

*New York v. Tanella*, 239 F. Supp. 2d 291 (E.D.N.Y. 2003) ........ 33

*New York v. Trump*, 158 F.4th 458 (2d Cir. 2025) ........ *passim*

*Northrop Grumman Tech. Servs., Inc. v. DynCorp Int'l LLC*, 865 F.3d 181 (4th Cir. 2017) ........ 2, 19-20

*Papp v. Fore-Kast Sales Co.*, 842 F.3d 805 (3d Cir. 2016) ........ 29

*Pennsylvania v. Maggitti*, No. 24-1702, 2025 WL 869493 (3d Cir. Mar. 20, 2025) (unpublished) ........ 52

*People v. Trump*, No. 23-1085, 2023 WL 9380793 (2d Cir. 2023) ........ 7

*People v. Trump*, No. 23-3773 (S.D.N.Y.) ........ 44

*Putnam v. DeRosa*, 963 F.2d 480 (1st Cir. 1992) ........ 53

*Renteria v. Lumpkin*, No. 23-70007, 2023 WL 7649071 (5th Cir. 2023) (unpublished) ........ 53

*Resol. Tr. Corp. v. Bayside Devs.*, 43 F.3d 1230 (9th Cir. 1994) ........ 21

*Rose v. Clark*, 478 U.S. 570 (1986) ........ 35

*Rosenthal v. Coates*, 148 U.S. 142 (1893) ........ 20

*Ruppel v. CBS Corp.*, 701 F.3d 1176 (7th Cir. 2012) ........ 30

*Russello v. United States*, 464 U.S. 16 (1983) ........ 49

*Sawyer v. Foster Wheeler LLC*, 860 F.3d 249 (4th Cir. 2017) ........ 29

*State v. Meadows*, 88 F.4th 1331 (11th Cir. 2023) ........ 29, 31

*Stern v. Gen. Elec. Co.*, 924 F.2d 472 (2d Cir. 1991) ........ 45

*Tafflin v. Levitt*, 493 U.S. 455 (1990) ........ 55

*Tennessee v. Davis*, 100 U.S. 257 (1879) ........ 29

*Torres v. CBS News*, 854 F. Supp. 245 (S.D.N.Y. 1994) ........ 33

*Trump v. New York*, 145 S. Ct. 1038 (2025) ........ 10, 25

*Trump v. United States*, 603 U.S. 593 (2024) ........ *passim*

*United States v. Haymond*, 588 U.S. 634 (2019) ........ 48

*United States v. Kopp*, 562 F.3d 141 (2d Cir. 2009) ........ 21

*United States v. Pohlot*, 827 F.2d 889 (3d Cir. 1987) ........ 33

*United States v. Sawyer*, 85 F.3d 713 (1st Cir. 1996) ........ 47

*Whitley v. Ercole*, 642 F.3d 278 (2d Cir. 2011) ........ 26

*WinRed, Inc. v. Ellison*, 59 F.4th 934 (8th Cir. 2023) ........ 45-46

*Wong v. Doar*, 571 F.3d 247 (2d Cir. 2009) ........ 51

*Yusefzadeh v. Nelson, Mullins, Riley & Scarborough, LLP*, 365 F.3d 1244 (11th Cir. 2004) ........ 22

## State Cases

*Dynamic Chemicals, Inc. v. Ackerman Mech. Servs., Inc.*, 58 A.D.3d 153 (4th Dep't 2008) ........ 48

*People v. Afflick*, 234 A.D.3d 501 (1st Dep't 2025) ........ 54

*People v. Pymm*, 76 N.Y.2d 511 (1990) ........ 47

*People v. Taveras*, 12 N.Y.3d 21 (2009) ........ 46

*State v. Chappell*, 939 N.E.2d 1234 (Ohio 2010) ........ 47

*Trump v. Carroll*, 292 A.3d 220 (D.C. 2023) ........ 38

## Federal Statutes

11 C.F.R. § 108.7(b) ........ 46

11 C.F.R. § 108.7(c)(4) .......... 46

12 U.S.C. § 1789(a)(2) .......... 54

12 U.S.C. § 1819(b)(2)(A) .......... 54

12 U.S.C. § 1819(b)(2)(B) .......... 53

18 U.S.C. § 1952(a)-(b) .......... 47

28 U.S.C. § 1292(b) .......... 51

28 U.S.C. § 1442(a)(1) .......... *passim*

28 U.S.C. § 1450 .......... 50

28 U.S.C. § 1455(a) .......... 15, 48, 51

28 U.S.C. § 1455(b)(1) .......... 10, 13, 16, 30

28 U.S.C. § 1455(b)(2) .......... 10, 23

28 U.S.C. § 1455(b)(3) .......... 49

28 U.S.C. § 1455(b)(3)-(5) .......... 49

28 U.S.C. § 1963 .......... 50

Federal Rule of Civil Procedure 16(b) .......... 19

Federal Rule of Criminal Procedure 12(c) .......... 19

Removal Clarification Act of 2011, Pub. L. No. 112-51, § 2(b)(1)(A), 125 Stat. 545 .......... 28

## STATE STATUTES

N.Y. CPL 1.20(16)(c) .......... 48

N.Y. CPL 120.90 .......... 52

N.Y. CPL 140.20 .......... 52

N.Y. CPL 180.80 .......... 52

N.Y. CPL 245.10 .......... 30

N.Y. CPL 245.10(1) .......... 53

N.Y. CPL 255.20(1) .......... 53

N.Y. CPL 330.30 .......... 9-10, 22, 53

N.Y. CPL 330.30(1) .......... 8

N.Y. CPL 390.20(1) .......... 53

N.Y. Election Law § 17-152 .......... *passim*

N.Y. Penal Law § 175.10 .......... *passim*

## OTHER AUTHORITIES

Black's Law Dictionary (12th ed. 2024) .......... 33

## INTRODUCTION

In May 2024, defendant Donald J. Trump was convicted in New York state court of 34 felonies based on his wholly private, unofficial misconduct. His direct appeal to the Appellate Division, First Department has been fully briefed and, by the time this Court hears this appeal, will already have been argued. Before trial, the district court rejected defendant's effort to remove his then-pending state prosecution to federal court under the federal-officer removal statute, 28 U.S.C. § 1442(a)(1), and defendant voluntarily abandoned his appeal of that ruling to this Court. Now, nearly two years after his sentencing concluded the state prosecution, defendant seeks to wrench his pending appeal from the Appellate Division to this Court. The U.S. District Court for the Southern District of New York (Hellerstein, J.), applying the criteria in *New York v. Trump*, 158 F.4th 458 (2d Cir. 2025), found no good cause to allow this extraordinary interference with a pending state criminal appeal. This Court should affirm.

First, a defendant seeking leave to file a late notice of removal must prove both that "circumstances outside of his control . . . prevented him from timely seeking relief" and that "he acted with reasonable diligence and without undue delay to remove the case." *Id.* at 466. Defendant can satisfy neither factor. He sought leave to file a second, untimely removal notice in September 2024 based on the purported admission of official-acts evidence in violation of *Trump v. United States*, 603 U.S. 593, 631 (2024). But nothing prevented defendant from seeking removal six months earlier, when he first raised the exact same issue in state court. And defendant has admitted that, at the very

latest, he could have sought removal "immediately following the Supreme Court's decision" in July 2024. *New York*, 158 F.4th at 468; *see also id.* at 468 n.2 (quoting defense counsel's concession that "[w]e could have come up immediately"). Defendant's unjustified delay by itself forecloses good cause.

Even worse, before seeking leave to remove, defendant filed a lengthy motion asking the state court to dismiss the charges based on *Trump v. United States*. Under well-settled law, a defendant waives removal by invoking a state court's jurisdiction to resolve the merits of a case. Defendant's "strategic delay . . . in an effort to determine the state court's receptivity to his litigating position," *Northrop Grumman Tech. Servs., Inc. v. DynCorp Int'l LLC*, 865 F.3d 181, 187 (4th Cir. 2017), independently precludes any finding of good cause.

Second, this case does not meet the standards for federal-officer removal. The state prosecution was not "for or relating to any act under color" of federal office, 28 U.S.C. § 1442(a)(1), because, as defendant does not contest, the state criminal charges arose from entirely private conduct. Defendant insists that he can seek removal because the People purportedly introduced evidence of official presidential acts. But the removal statute requires that the "challenged conduct"—i.e., the acts underlying the criminal charges—have some nexus with an official act. *Chevron USA Inc. v. Plaquemines Parish, Louisiana*, 608 U.S. 1, 12 (2026). The mere introduction of evidence of official acts would not transform the nature of state charges based on unofficial conduct.

This state prosecution also cannot be removed because defendant's evidentiary claim is not a "defense" at all. The sole effect of the claim would be to exclude certain evidence, not to dismiss or reduce any of the state charges. Moreover, as the state trial court found, defendant's guilt was overwhelmingly proven without considering the contested evidence—thus preventing his evidentiary claim from being a "defense" to his guilt on appeal. Defendant's claim is also not "colorable" because none of the trial evidence contravened the evidentiary rule in *Trump v. United States*. Rather, all of the contested evidence concerned defendant's unofficial conduct of paying hush money to an adult film actress.

As for defendant's preemption claim under the Federal Election Campaign Act (FECA), the district court already found that claim to be not colorable under federal cases rejecting FECA preemption claims against state anti-fraud laws like New York's falsified-business-records statute. Defendant ignores these cases and improperly focuses his preemption claim on a different statute, N.Y. Election Law § 17-152, that was relevant only to his criminal intent. But defendant's challenge fundamentally misunderstands how FECA violations factored into his convictions.

Finally, removal was not available at all after defendant's sentencing. The statute does not contemplate or authorize the removal of state criminal cases after final judgment—let alone when a case has been fully briefed and argued and is awaiting decision from a state appellate court.

## QUESTIONS PRESENTED

1. Whether defendant's strategic delay and the late stage of this criminal proceeding preclude a finding of good cause to file a second, untimely notice of removal?

2. Whether defendant has identified a basis for federal-officer removal when (a) the state criminal charges indisputably arose from wholly unofficial conduct, (b) defendant's evidentiary claim based on *Trump v. United States* is neither a defense to those charges nor a colorable claim, and (c) defendant's federal-preemption claim remains meritless?

3. Whether federal-officer removal is available at all after a state criminal defendant has been sentenced?

## STATEMENT OF THE CASE

### A. The Charges Against Defendant

On March 30, 2023, a New York County grand jury charged defendant with 34 felony counts of Falsifying Business Records in the First Degree, in violation of N.Y. Penal Law § 175.10 (Joint Appendix (JA) 26-41). That provision makes it a felony for any person to make or cause a false entry in the business records of an enterprise with an intent to defraud that includes an intent "to commit another crime or to aid or conceal the commission thereof." Penal Law § 175.10.

From 2016 to 2017, defendant and his coconspirators orchestrated a scheme to interfere with the 2016 presidential election by suppressing negative information that

could damage defendant's campaign (JA50; *see generally* JA1649-1685). They executed the scheme through various means, including by purchasing the rights to, and then refusing to publish, a story about an extramarital affair between defendant and Stormy Daniels, an adult film actress (JA52-56). To effect this "catch and kill" scheme, defendant's personal attorney, Michael Cohen, paid $130,000 to acquire the publication rights to Daniels's story, and defendant reimbursed Cohen an amount calculated to mask the true nature of the reimbursement (JA56-57). Defendant then concealed the nature of the payments to Cohen by falsely recording them in the records of a New York enterprise as attorneys' fees for services rendered pursuant to a retainer agreement (JA56-59).

The characterization of those payments in these records was false because the payments to Cohen were to reimburse him for the $130,000 paid to Daniels, not to pay him for legal services (JA56-59). And defendant falsified these business records with the intent to commit and conceal a violation of Election Law § 17-152, which prohibits "two or more persons" from "conspir[ing] to promote or prevent the election of any person to a public office by unlawful means." "[U]nlawful means" pervaded the catch-and-kill scheme: the hush-money payments to Daniels and others violated FECA; the banking documents that Cohen submitted to effect these payments constituted false

business records; and the mischaracterization of the reimbursements to Cohen violated state and federal tax laws (JA1727-1728).[1]

### B. Pre-Trial Proceedings

#### 1. The first removal proceeding

Defendant was arraigned in state court on April 4, 2023. On May 4, he filed a notice of removal in the U.S. District Court for the Southern District of New York under 28 U.S.C. § 1442(a)(1) (JA3, 14-24). After an evidentiary hearing, the district court remanded the case (JA222-246).

*First*, the court concluded that the charges against defendant were not "for or relat[ed] to" any official presidential act (JA232-236). The evidence "overwhelmingly suggests that the matter was a purely . . . personal item of the President—a cover-up of an embarrassing event." "Hush money paid to an adult film star is not related to a President's official acts" and did not reflect "the color of the President's official duties" (JA234).

*Second*, the court concluded that defendant had failed to identify a colorable federal defense. He had "expressly waived" any defense of "absolute presidential immunity" (JA237). His claim that the prosecution was based on official acts failed

[1] Defendant repeatedly describes the People's charging theory as "convoluted" and "deeply flawed" (Defendant's Brief (DB) 14). But the jury, the state court, and the district court had no difficulty understanding the charges. And, tellingly, defendant has not challenged the People's theory on this basis in his pending state-court appeal. Nor would he have any ground to do so, as the People have explained (JA1789).

because there was "[n]o evidence" that the reimbursements to Cohen constituted official presidential acts (JA238). And there was no colorable preemption defense: defendant conceded that FECA did not directly preempt Penal Law § 175.10, and the district court held that FECA also did not preempt Election Law § 17-152, the crime that defendant sought to commit or conceal by falsifying business records (JA238-245).

Defendant filed a notice of appeal but later moved to dismiss his appeal. This Court granted the motion. *People v. Trump*, No. 23-1085, 2023 WL 9380793 (2d Cir. 2023).

### 2. The state jury trial and defendant's conviction

In state court, the parties engaged in extensive pretrial motion practice. Among other issues, on March 7, 2024, defendant filed a motion seeking "to preclude evidence of President Trump's official acts at trial based on presidential immunity" (JA735-760). The motion discussed testimony by Hope Hicks and defendant's "social media posts"; it did not mention testimony from Madeleine Westerhout or the Cohen testimony at issue here (JA740, 758-759, 1219 n.9). Defendant also asked the state court to adjourn the trial until after the Supreme Court's ruling in *Trump v. United States* (JA754-755). The court denied defendant's motion as untimely because he could have sought such relief months earlier (JA780-782) but instructed defendant to "make [his] objections" at trial (JA275).

During the trial, defendant objected to testimony about official acts only twice: once prior to Hicks's testimony (JA283); and again in response to a government form that is no longer at issue here (JA292-293). The state court overruled those objections.

On May 30, 2024, the jury found defendant guilty of all 34 felony counts (JA499). Defendant's sentencing was originally scheduled for July 11 (JA499).

### C. Post-Trial Proceedings Through Sentencing

#### 1. Defendant's post-trial motion to dismiss in state court

On July 1, 2024—after the jury verdict, but before defendant's scheduled sentencing—the Supreme Court decided *Trump v. United States*. As relevant here, the Court held that certain evidence of a President's official acts may be inadmissible at trial, even as to charges based on unofficial conduct. 603 U.S. at 630-32.

As defendant has conceded, he "could have sought removal immediately following the Supreme Court's decision." *New York*, 158 F.4th at 468. Instead, on the same day that the Court issued its decision, defendant requested permission from the state court to file a post-trial motion to dismiss the indictment under N.Y. Criminal Procedure Law (CPL) 330.30(1) and further requested an adjournment of the sentencing pending such briefing (JA789-790). The next day, the state court granted the motion and adjourned defendant's sentencing to September 18, 2024 (JA792-793).

On July 10, defendant filed his motion, arguing that the People had improperly introduced evidence of official presidential acts in violation of *Trump v. United States*

(JA795-849). The People opposed (JA851-919), and defendant filed a reply on July 31 (JA921-943).

On August 5, the trial court indicated it would issue its decision by September 16 and reiterated that sentencing was still scheduled for September 18 (JA945-946). On August 14, defendant objected to the sentencing date since he would not have time to pursue an interlocutory appeal of any denial of his motion (JA948; DB: 16). On August 16, the People submitted a letter "identify[ing] several reasons why an adjournment would be appropriate," which the state court construed as "a joinder of the motion" to adjourn (JA1299-1300; *see* ADD11-12). On September 6, the state court agreed to adjourn sentencing until after the presidential election (JA1302).

On December 16, 2024, the state court denied defendant's CPL 330.30 motion (JA1209-1249). The court initially found that defendant had failed to preserve his objections based on official acts to any of the challenged evidence except certain testimony from Hicks and four Twitter posts from defendant (JA1217-1224). On the merits, the court found that none of the disputed proof concerned a "core official act," nor did any of it "fall within the outer perimeter" of defendant's "official duties" (JA1224-1243). In the alternative, the court found that any presumption of immunity would be rebutted because the challenged evidence did not pose "any danger of intrusion on the authority and function of the Executive Branch" (JA1230). Finally, the court ruled that any error was "harmless in light of the overwhelming evidence of guilt" (JA1243-1246, 1249).

**2. Defendant's motion for leave to file a second notice of removal**

A "notice of removal of a criminal prosecution shall be filed not later than 30 days after the arraignment in the State court," and "a second notice may be filed only on grounds not existing at the time of the original notice." A district court may excuse a defendant from these limitations "[f]or good cause shown." 28 U.S.C. § 1455(b)(1)-(2).

On September 3, 2024—while the state trial court was still considering defendant's CPL 330.30 motion—defendant filed a motion in federal district court for leave to file a second notice of removal (JA505-508; JA961-1026). The district court denied the motion, ruling that defendant had failed to establish good cause because *Trump v. United States* had not altered or affected the court's "previous conclusion that the hush money payments were private, unofficial acts, outside the bounds of executive authority" (JA1029).

**3. Defendant's unsuccessful efforts to stay sentencing**

On November 5, 2024, defendant was reelected as President. In the week leading up to his sentencing, which was scheduled for January 10, 2025, defendant unsuccessfully sought stays of his sentencing from the Appellate Division; the New York Court of Appeals; and the U.S. Supreme Court (JA1307-1311). The Supreme Court's denial noted that defendant's "alleged evidentiary violations" based on presidential immunity "can be addressed in the ordinary course on appeal." *Trump v. New York*, 145 S. Ct. 1038 (2025).

On January 10, 2025, the trial court sentenced defendant to an unconditional discharge, thereby ending the state criminal prosecution (JA1312-1335).

**D. Post-Sentencing Proceedings**

**1. This district court's decision on remand**

On November 6, 2025, this Court vacated the district court's order denying leave and remanded for reconsideration. *New York*, 158 F.4th at 461. The Court instructed the district court to "consider [several] factors relevant to determining good cause." *Id.* at 469. On August 28, 2026, after considering the factors outlined by this Court, the district court again denied defendant's motion for leave to file a second notice of removal (SA1-35).

*First*, the court ruled that defendant had failed to demonstrate good cause for his delay. The court noted that on March 7, 2024, defendant had already "moved [in state court] to preclude evidence allegedly infringing on his presidential immunity" but, rather than seeking leave to remove, instead "made a strategic decision to defend" in state court (SA8). Nor did defendant request leave to remove immediately after *Trump v. United States*, ultimately doing so two months later only when "it became apparent" that the state court "likely intended to deny" his motion to dismiss (SA9).

*Second*, the court ruled that removal was unavailable because defendant had already been "convicted, sentenced, judgment entered, and appeal noticed" (SA11-14). The plain text of the removal statutes only provided for removal of state trial proceedings to federal district courts (SA12-14, 17). And defendant's cited cases

involved civil rather than criminal proceedings in contexts far afield from the one here (SA14-20).

*Third*, the district court held that the evidence at defendant's state criminal trial did not infringe on presidential immunity since all of the challenged evidence concerned private matters rather than any official presidential act (SA20-30).

*Fourth*, the court found that the criminal charges did not relate to acts under color of office, since defendant's "attempts to cover up his private, meretricious, pre-presidential acts" bore "no substantive relation to his position in federal office" (SA32).

*Fifth*, the court noted that the parties had "extensively argued the issue of preemption" during the first removal proceeding and found no basis to revisit that determination (SA33). The court found that no "intervening Supreme Court decisions" changed its prior preemption analysis, and it rejected defendant's claim that the People had changed their theory of the case (SA33-34). Defendant had "dismissed his appeal" of the district court's "initial remand order" resolving the preemption issue and "should not be allowed now to argue points he could have raised then" (SA34).

### 2. Defendant's direct appeal to the Appellate Division

On October 27, 2025, defendant perfected his appeal to the Appellate Division (JA1363-1474). On July 29, 2026, the People filed their response (JA1627-1793). On October 16, defendant filed a reply (ADD13-108). The Appellate Division has scheduled argument for November 5, 2026.

## SUMMARY OF ARGUMENT

I. Defendant failed to establish good cause to file a second notice of removal because he did not diligently pursue removal. Nothing prevented him from seeking leave to remove as early as March 2024, when he first raised his evidentiary claim based on presidential immunity in state court. At latest, as he has conceded, he could have sought removal immediately after *Trump v. United States* was decided on July 1, 2024. Instead, he waited for months—until September 2024—to seek leave to remove.

That delay by itself forecloses a finding of good cause. The criminal-removal statute requires defendants to act within thirty days of arraignment. *See* 28 U.S.C. § 1455(b)(1). Even assuming that some subsequent event revived the opportunity to seek removal, a defendant should still be required to act within thirty days of that intervening event. Defendant's disregard of that thirty-day limit evinces his lack of due diligence.

Beyond his delay, defendant also waived removal by his strategic litigation choices. After the Supreme Court's decision, defendant chose to file an extensive motion in state court to dismiss the charges based on evidentiary immunity. But a defendant "waives removal" when he "files a motion to dismiss seeking disposition, in whole or in part, on the merits in state court." *City of Albuquerque v. Soto Enters., Inc.*, 864 F.3d 1089, 1099 (10th Cir. 2017). Defendant's claim that he was compelled to file that motion is specious: the state court had already adjourned sentencing by more than two months, and New York law imposes no deadlines for post-trial motions before

sentencing. Defendant thus freely chose to invoke the state court's jurisdiction to resolve his evidentiary claim. That choice waives removal; at minimum, it forecloses any finding of good cause.

As for preemption, defendant cannot establish good cause to raise the exact same preemption claim that the district court previously rejected. Defendant has identified no "intervening Supreme Court decisions" that would warrant revisiting preemption, *New York*, 158 F.4th at 468. And the district court has decisively rejected defendant's continued and false complaint that the People misrepresented or changed their legal position.

II. Good cause also does not exist because defendant fails to satisfy the prerequisites for federal-officer removal. First, the underlying prosecution is not "for or relating to any act under color" of federal office, 28 U.S.C. § 1442(a)(1), because the criminal charges here were based on wholly private and unofficial conduct—a fact that defendant does not contest.

Defendant's attempt to justify removal based on the introduction of evidence of purportedly official acts during the trial misunderstands the statutory test. That test requires "a nexus . . . between the *charged conduct* and asserted official authority." *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999) (emphasis added). The 2011 amendment to the removal statutes altered the strength of the required "nexus," but it did not alter the requirement that the necessary connection, however defined, be to "the activities for which [the defendant] was being prosecuted." *City of Brunswick by & through Mayor &*

*Bd. of Comm'rs v. Honeywell Int'l, Inc.*, 184 F.4th 1230, 1249 (11th Cir. 2026). Here, the absence of *any* connection between the conduct underlying the criminal charges and an official act forecloses removal.

Second, defendant's evidentiary claim is not a colorable defense. It is not a "defense" because its sole effect would be to keep some evidence out of the trial, not to defeat or limit state criminal liability. And the claim is not "colorable" because all of the challenged evidence concerned defendant's unofficial acts as President—acts for which "there is no immunity" and thus no evidentiary bar. *Trump*, 603 U.S. at 615.

Third, defendant's FECA preemption claim is also not colorable. Under consistent case law that defendant simply ignores, FECA does not preempt state anti-fraud laws like Penal Law § 175.10, even when they apply to federal campaigns. Defendant's separate claim that Election Law § 17-152 is preempted is beside the point, since defendant was not convicted under that statute, and meritless, since preemption does not prevent a state from deeming a federal-law violation to be relevant evidence for a state-law crime.

III. Removal is unavailable given defendant's sentencing. Removal is limited to a "criminal prosecution," 28 U.S.C. § 1455(a), which ends with the imposition of sentence. Consistent with this understanding, the removal statute assumes that only criminal trials will be removed and that a district court, not a circuit court, will adjudicate a removed case. Defendant does not cite a single criminal case that was removed as late as the current proceeding. And the civil cases he cites are inapposite, since they do not

implicate the uniquely strong state interest in criminal enforcement and instead involve heightened federal interests, such as federal takeovers of financial institutions.

## ARGUMENT

## POINT I

### DEFENDANT'S STRATEGIC DELAY AND THE LATE STAGE OF THE STATE PROCEEDING PRECLUDE A FINDING OF GOOD CAUSE FOR A SECOND, UNTIMELY NOTICE OF REMOVAL

To establish good cause under 28 U.S.C. § 1455(b)(1), defendant must "demonstrate that circumstances outside of [his] control prevented [him] from timely seeking relief and that [he] diligently sought relief within a reasonable period." *New York*, 158 F.4th at 466. This Court reviews a district court's finding of lack of good cause for abuse of discretion. *Id.* at 469. Under that deferential standard, the district court's determination should be upheld even if this Court were to believe that the court "could perhaps have relied on [different] evidence to justify a different decision." *Hussein v. Maait*, 129 F.4th 99, 123 (2d Cir. 2025). Here, the district court did not abuse its discretion in finding lack of good cause.

#### A. Defendant Failed to Act with Reasonable Diligence When He Chose to Litigate His Evidentiary Claim in State Court and Delayed Seeking Removal Until He Believed He Would Lose.

Defendant did not seek leave to file a second notice of removal until September 3, 2024. Nothing prevented him from pursuing this course of action months earlier. His failure to do so was not due to "circumstances outside of his control," *New York*, 158 F.4th at 466, but rather due to his own "strategic decision" to present his claim of

presidential evidentiary immunity in state court (SA8). Defendant thus failed to act with reasonable diligence.

First, nothing prevented defendant from seeking removal as early as March 7, 2024, before the start of his criminal trial. On that day, defendant raised his evidentiary claim in state court and identified much of the same evidence at issue here (JA737, JA739-740, 1219 n.9). But defendant did not seek leave to remove.

The fact that the Supreme Court had not yet decided *Trump v. United States* did not excuse defendant's inaction. The absence of a favorable precedent is not a barrier to raising a legal claim—as defendant's own actions confirmed, since he pressed this evidentiary claim in both his state and federal prosecutions. Under comparable circumstances, a district court found that there was no good cause for defendant Mark Meadows to delay seeking removal of his state-court prosecution to "await[] the United States Supreme Court's decision in *Trump*"; regardless of whether that forthcoming decision would "strengthen [the defendant's] claim," "he was aware of [the] existence" of an immunity defense much earlier because "he in fact contemplated raising immunity before the opinion in *Trump* issued." *Arizona v. Meadows*, No. 24-02063, 2024 WL 4198384, at *4 (D. Ariz. Sept. 16, 2024). So too here.

Defendant's assertion that the evidentiary issue "was not ripe for removal" because the People "had not 'yet specified' what evidence it planned to introduce" (DB56) is specious. The truth is exactly the opposite: in response to defendant's March 2024 motion, the state court expressly found that defendant "had ample notice that the

People were in possession of, and intended to use, the various statements" at issue here, and that defendant's claim of being unaware of the proffered evidence "test[ed] [the] Court's credulity" (JA780; *see also* JA764-765). In other words, the state court's conclusion was that it was *already* inexcusable for defendant to wait until March 2024 to raise his evidentiary claim for the first time. It is even less justifiable for defendant to then wait an *additional six months* to seek federal removal when "he was in possession of, and aware that, the People intended to offer the relevant evidence at trial that entire time" (JA780).

Defendant's further assertion that it would have been "futile" to seek removal given then-"binding precedent" against his evidentiary claim (DB57) misunderstands the purposes of federal removal. As defendant elsewhere insists, the purpose of removal is only to provide a federal forum (DB30; U.S. Amicus 22), not to guarantee a victory. A defendant is not "prevented" from seeking removal simply because the federal court might reject his claim.[2] *See Callahan v. Cnty. of Suffolk*, 96 F.4th 362, 370-71 (2d Cir. 2024) (no good cause for late amendment of complaint when "nothing as a matter of law barred plaintiffs from including [a] claim," even if "the claim would have been dismissed"). And it is not credible for defendant to assert that "futility" prevented him

[2] The only case cited by defendant in support of his futility argument (DB57) was one where an "intervening change in the law" conferred "subject-matter jurisdiction" on the federal courts for the first time. *Fritsch v. Swift Transp. Co. of Arizona, LLC*, 899 F.3d 785, 789 (9th Cir. 2018). Lack of subject-matter jurisdiction makes a federal forum unavailable in a way that a merely losing argument does not.

from raising presidential immunity in federal court here when he was simultaneously pressing the same argument in the federal courts presiding over his federal prosecution.

Second, even after *Trump v. United States*, defendant still did not act with reasonable diligence because he waited more than two months before filing his initial motion for leave in this proceeding—and did so for concededly strategic reasons. There was no barrier to defendant seeking removal more promptly: as defense counsel admitted to this Court, defendant "could have sought removal immediately following the Supreme Court's decision." *New York*, 158 F.4th at 468.

The two months that defendant waited by itself evinces a lack of due diligence (SA10). Defendant cites cases under Federal Rule of Civil Procedure 16(b) and Federal Rule of Criminal Procedure 12(c) to suggest that a two-month delay should be acceptable (DB59). But neither of those federal rules includes the removal statute's "default statutory deadline" of thirty days to seek relief after a triggering event (which, initially, is arraignment). *New York*, 158 F.4th at 466. Even if there were good cause for restarting the thirty-day clock due to some intervening event, a defendant should still identify a concrete barrier to seeking removal within thirty days of that new event. *See Northrop*, 865 F.3d at 187 (thirty-day period for civil removal restarted with "receipt of the amended counterclaims," but defendant failed to timely seek removal within the renewed deadline). As defendant has conceded, there was no such barrier here.

Independent of the inexcusable two-month delay, defendant's strategic decision to present his evidentiary claim to the state court first also precludes any finding of

good cause. The purpose of removal is to make a *threshold* choice about the forum to resolve federal defenses—not to serve as a form of pseudo-interlocutory federal appeal of a state court's initial adverse rulings. The removal statutes thus "do not contemplate that a party may experiment on his case in the state court, and, upon an adverse decision, then transfer it to the Federal court." *Rosenthal v. Coates*, 148 U.S. 142, 147 (1893) (*see also* SA10). But defendant adopted exactly this strategy here: he first filed a motion to dismiss with the state court and "sought removal to federal court only after the state trial court suggested that it was likely to reject [his] immunity argument." *New York*, 158 F.4th at 468; *see also id.* at 468 n.2 (quoting counsel's concession that defendant sought leave to remove only when "it sure look[ed] like [the trial court was] going to deny" the motion). "[R]emoval rules do not permit . . . strategic delay interposed by a defendant in an effort to determine the state court's receptivity to his litigating position." *Northrop*, 865 F.3d at 187 (quotation marks omitted).

Under similar circumstances, courts have found that defendants affirmatively waive their "right to removal by demonstrating a 'clear and unequivocal' intent to remain in state court," such as by "engaging in 'substantial defensive action' in state court before filing a notice of removal." *Northrop*, 865 F.3d at 186. Such "substantial defensive action" includes "a motion to dismiss seeking disposition, in whole or in part, on the merits in state court." *City of Albuquerque*, 864 F.3d at 1099. Defendant's protests about waiver (DB62-63) ignore the dispositive facts: his obvious awareness of his evidentiary claim meant that he was "on notice of the case's removability," *Kenny v. Wal-*

*Mart Stores, Inc.*, 881 F.3d 786, 791 (9th Cir. 2018); and his extensive post-trial motion to dismiss (JA794-849, JA920-943) explicitly "invok[ed] the jurisdiction of the state court" to resolve the evidentiary claim in his favor, *Johnson v. Heublein Inc.*, 227 F.3d 236, 244 (5th Cir. 2000). Unlike in cases where courts have found "mere procedural skirmishing," *id.*, insufficient to waive removal, defendant's motion was not filed "solely for the defensive purpose of preserving the status quo pending removal." *Resol. Tr. Corp. v. Bayside Devs.*, 43 F.3d 1230, 1240 (9th Cir. 1994). To the contrary, as defense counsel has conceded, the purpose of the motion was to obtain a state-court victory; it was not until briefing was done, when defendant became concerned that he would lose, that he finally "sought removal to federal court" again. *New York*, 158 F.4th at 468.

In any event, this Court need not find that defendant's conduct rose to the level of a formal waiver to deem his choices inconsistent with good cause. At minimum, as the district court found (SA10-11), defendant was aware that he could raise his evidentiary claim in either state court or federal court and was not prevented from seeking leave to remove. By choosing to test the waters in state court first, defendant made "a quintessential strategic decision." *United States v. Kopp*, 562 F.3d 141, 143 (2d Cir. 2009). "The fact that he later came to view that decision as a poor one is not sufficient, by itself, to establish cause." *Id.*

Defendant asserts that he was "compel[led]" to file more than seventy pages of briefing on his evidentiary claim in state court because sentencing was originally scheduled for July 11, 2024 (DB8, 63-65). But that argument misleadingly omits the fact

that, on July 2—just one day after the Supreme Court's decision—the state court granted his request to adjourn sentencing until September 18 (JA792-793). Moreover, the type of compelled "state-court participation" that federal courts have understood not to waive removal is limited to compliance with procedural deadlines that, if not followed, would lead to a default. *See, e.g.*, *City of Albuquerque*, 864 F.3d at 1099; *Yusefzadeh v. Nelson, Mullins, Riley & Scarborough, LLP*, 365 F.3d 1244, 1246 (11th Cir. 2004); *Kenny*, 881 F.3d at 791. There was no similar deadline or threat of default here: defendant could have filed his post-trial motion "[a]t any time after rendition of a verdict of guilty and before sentence," CPL 330.30.

Defendant separately attempts to justify his belated removal by complaining that the trial court's announced decision date of September 16, 2024, for the immunity ruling did not give him enough time to pursue interlocutory appellate review through the state courts (DB65-66). He seriously exaggerates the urgency: more than a month before the rescheduled sentencing, the trial court agreed to a further adjournment until November 26, 2024 (JA1300, 1302). More fundamentally, by the time the trial court announced its decision date (on August 5, 2024), defendant had *already* fully briefed his motion on presidential immunity, thereby submitting the "merits to the state court for adjudication" in a way that foreclosed removal. *City of Albuquerque*, 864 F.3d at 1098. And defendant's admission here that he sought removal as a substitute for interlocutory appellate review confirms that his original intent was to invoke the state court's jurisdiction to rule on the merits of his claim (JA1485 (defense counsel explaining that

in "August," when the state court announced a decision date that would not give "time for an interlocutory appeal," defendant decided "now we have to go seek a federal forum")). That type of strategic choice is incompatible with the due diligence required for good cause.

**B. There Is No Good Cause to Revisit Defendant's Preemption Claim.**

Defendant also asserts that there is good cause to remove based on FECA preemption (DB57-58), but his arguments are meritless. "[A] second notice may be filed only on grounds not existing at the time of the original notice." 28 U.S.C. § 1455(b)(2). As the district court found, defendant's renewed preemption arguments are no different from the claims the court rejected in the first remand order (SA33). Although this Court remanded for the district court to determine "whether intervening Supreme Court decisions" would provide good cause to revisit preemption, *New York*, 158 F.4th at 468, defendant identified no such decision below (SA33 n.9).

Instead, his claim is that he was "prevented" from raising FECA preemption in the first removal proceeding because the People purportedly "obscur[ed] the . . . FECA-based theory of [Election Law] Section 17-152" that was ultimately "submitted to the jury" (DB57-58). The district court correctly rejected this argument, finding that "there was no change of prosecution theory by the District Attorney, between the argument in support of its motion to remand and the trial," and that the court had fully understood and resolved defendant's current preemption claim in the remand order (SA34).

The record fully supports the district court's conclusion. A bill of particulars served shortly after the indictment identified both Election Law § 17-152 and FECA as the "[]other crime[s]" that supported the charges under Penal Law § 175.10 (JA95; ADD5). The People's briefing before the district court in the original removal proceeding expressly argued that FECA did not preempt reliance on Election Law § 17-152 in any way (JA95-96; JA126). And the district court's thorough decision squarely addressed and rejected FECA preemption without relying on any assumptions about the People's theory at trial (JA238-245).[3]

Even if it were true that the district court misunderstood the People's theory of liability, defendant would still not have good cause for his delay in seeking removal on preemption grounds. At the very latest, by the time of his conviction on May 30, 2024, defendant knew precisely the People's theory of criminal liability. Defendant has offered no reason for waiting three more months to seek leave to remove based on preemption. That unexplained delay precludes any finding of good cause.

### C. The Late Stage of This Proceeding Also Weighs Heavily Against Removal.

Good cause is a "flexible standard that requires consideration of all interests in the particular case." *New York*, 158 F.4th at 466. Here, the advanced stage of the state

[3] Defendant fixates (DB58) on the People's separate (and correct) argument in reply that defendant's preemption claim was speculative because it would depend on how the People relied on Election Law § 17-152 at trial (JA125-126). But he ignores the People's separate, broader arguments against preemption, which were the grounds that the district court accepted in its remand order.

proceedings further weighs against a finding of good cause. Defendant seeks removal at an extraordinarily late stage—not just after his sentencing, which already precludes removal (*infra* Point III), but also after his state-court appeal has been fully briefed and is awaiting decision. Allowing defendant to file a notice of removal now would interrupt the state-court appeal, waste valuable state judicial resources, and interpose additional removal proceedings, including a new remand motion in the district court and further interlocutory appeals to this Court. All of that additional process would serve little purpose when defendant's challenges "can be addressed in the ordinary course on appeal" in the state courts, *Trump*, 145 S. Ct. at 1038.

In addition, as defendant's state appellate brief makes clear, he raises a host of purely state-law issues in addition to the federal defenses at issue here (JA1443-1471). These state-law issues provide compelling reason to allow his appeal to proceed as normal through the state courts. Indeed, if this case were removed, this Court would likely choose to certify some or all of those state-law questions to the New York Court of Appeals. But certification is an unnecessarily circuitous way to elicit the Court of Appeals' views when that court could simply review the Appellate Division's forthcoming decision directly. *Cf. Carroll v. Trump*, 66 F.4th 91, 92-93 (2d Cir. 2023) (describing complex procedural history of certified questions in a removed case).

Even defendant's purported federal defenses are intertwined with state-law issues in a way that should weigh heavily against removal at this late stage. Defendant's evidentiary claim may be defeated by lack of preservation or harmless error, both of

which the state courts are better equipped to resolve. *Cf. Whitley v. Ercole*, 642 F.3d 278, 285-86 (2d Cir. 2011) (failure to preserve is independent and adequate state ground). And, as defendant's state-court reply makes clear (ADD38-39), his federal preemption claim turns on a threshold dispute over the nature of the state-law charges. The fact that state-law issues may obviate or affect the resolution of defendant's purported federal defenses provides further ground for finding lack of good cause.[4]

## POINT II

## DEFENDANT HAS NOT MET THE STATUTORY REQUIREMENTS FOR REMOVAL

The district court also correctly denied leave here because defendant failed to satisfy the statutory prerequisites for federal-officer removal (SA31-34). Although these issues can and should be more fully briefed upon the People's motion to remand—which would need to be filed in the district court only if this Court were to find good cause—the facial inadequacy of defendant's theory of removal would also support an affirmance.

### A. Defendant's Falsification of Private Business Records Did Not Relate to Any Acts Under Color of Federal Office.

Defendant may only remove this state-court proceeding if the criminal charges are "for or relating to any act under color" of the office of the President. 28 U.S.C.

---

[4] Defendant bizarrely suggests that certain post-trial comments by Michael Cohen could also support good cause (DB6, 37). But such unsworn, extra-record evidence could not be considered by the Appellate Division—or, by extension, by this Court if removal were granted. It is thus categorically irrelevant for good cause.

§ 1442(a)(1). This test requires a "connection between the charged conduct and asserted official authority." *New York*, 158 F.4th at 467 (quotation marks omitted).

The district court found no connection whatsoever between the charged conduct and any official authority—"[w]hatever the standard [for removal under § 1442(a)(1)], and whether it is high or low" (JA233). Defendant was charged with creating false entries in the business records of a private enterprise to conceal an illegal pre-election scheme to suppress information about a private sexual affair (JA52-61). The underlying scheme and much of the charged conduct took place before defendant became a federal official (JA232-236). And the charged conduct that did occur while defendant was President—signing personal checks that drew on personal accounts, and creating records maintained by a private corporation—all related to defendant's private affairs, not to his duties as President.

Defendant has never asserted otherwise. Indeed, he conceded in the first removal proceeding that, during his presidency, he made the 2017 payments to "Cohen to act as his personal lawyer" and "to handle his personal affairs" (JA18-19). The unofficial nature of the 2017 payments to Cohen was further supported by other uncontested facts, including that the records at issue were held by private enterprises and that the payments were drawn from entirely unofficial accounts (JA50-59). The district court thus rightly found that "[t]he People's prosecution arises from [defendant's] private

conduct" bearing "no substantive relation to his position in federal office" (SA32; *see also* JA234).[5]

Rather than contesting these facts, defendant instead asserts that removal is available here under the 2011 amendment to 28 U.S.C. § 1442(a)(1), which replaced the phrase "*for* any act under color of office" with "for *or relating to* any act under color of office." Removal Clarification Act of 2011, Pub. L. No. 112-51, § 2(b)(1)(A), 125 Stat. 545 (emphasis added). According to defendant, the mere introduction of evidence of an official act "makes the case into one 'relating to' official Presidential acts," "regardless of whether the charged conduct itself qualifies as official" (DB38).

Defendant is wrong (SA31-32). Federal-officer removal has always required "a nexus . . . between the *charged conduct* and asserted official authority." *Acker*, 527 U.S. at 431 (emphasis added). The analysis thus starts with "the charged conduct," *id.*—i.e., "the acts that form the basis for the state civil or criminal suit," *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 488 F.3d 112, 124 (2d Cir. 2007)—with the subsequent question being whether there is a connection (however defined) between this conduct and some official act. *See also Maryland v. Soper (No. 1)*, 270 U.S. 9, 33 (1926) (removal must be

---

[5] Defendant is wrong to accuse the People of "falsely" claiming in the first removal proceeding that the "prosecution was based solely on his private acts" (DB1). The People accurately argued in its remand papers that "the conduct charged in the People's indictment" bore no relationship to any official act (JA113). And the district court has now twice agreed that the criminal charges here arose from unofficial conduct (SA32; JA233-234).

based on acts that "constitute the basis, though mistaken or false, of the state prosecution"); *Tennessee v. Davis*, 100 U.S. 257, 261 (1879) (examining "the acts of the defendant complained of"); *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008) (removal looks to "the acts for which [the defendants] are being sued").

The 2011 amendment altered the strength of the connection that must be proven—from "actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office." *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (en banc); *see also Plaquemines*, 608 U.S. at 11. But the amendment did not alter the things that had to be connected. Thus, the relevant analysis must still begin with the conduct giving rise to the criminal charges. Indeed, every court to consider federal-officer removal since 2011—no matter how that court has resolved the 2011 amendment's effect on the strength of the required nexus—has confirmed that an official act has to have the relevant connection to "the activities for which [the defendant] was being prosecuted." *City of Brunswick*, 184 F.4th at 1249.[6]

---

[6] *See, e.g.*, *State v. Meadows*, 88 F.4th 1331, 1344 (11th Cir. 2023) ("the 'act' anchoring removal must be defined by the 'claim' brought against the defendant"); *DeFiore v. SOC LLC*, 85 F.4th 546, 557 (9th Cir. 2023) (removal based on "the actions [defendants] took which gave rise to the guards' claims"); *K&D LLC v. Trump Old Post Off. LLC*, 951 F.3d 503, 507 (D.C. Cir. 2020) ("[t]he circumstances that gave rise to the . . . liability must 'encompass' the defendant's conduct in office") (quotation marks omitted); *Latiolais*, 951 F.3d at 296 ("the charged conduct is connected or associated with an act pursuant to a federal officer's directions"); *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 257-58 (4th Cir. 2017) ("sufficient connection between the charged conduct and asserted official authority"); *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 813 (3d Cir. 2016) ("connection or association between the acts complained of . . . and the federal

(Continued…)

The Supreme Court's recent decision in *Plaquemines* confirms this focus. The Court found the state case there to be removable because "Chevron has plausibly alleged a close relationship between its *challenged conduct* and the performance of its federal duties." 608 U.S. at 12 (emphasis added). The Court cited favorably to two circuit decisions (*see id.*) that also stated that federal-officer removal is appropriate only if "the *charged conduct* has a 'connection' or 'association' with the federal action." *Minnesota by Ellison v. Am. Petroleum Inst.*, 63 F.4th 703, 715 (8th Cir. 2023) (emphasis added); *see also D.C. v. Exxon Mobil Corp.*, 89 F.4th 144, 155-56 (D.C. Cir. 2023) (looking to "the basis for the action" or the plaintiff's "theory of liability"). And Justice Jackson's concurrence likewise agreed that federal removal requires a "nexus between the *targeted conduct* and the federal duties." 608 U.S. at 16 (Jackson, J., concurring in the judgment) (emphasis added).

Requiring federal-officer removal to be based on the conduct underlying the criminal charges rather than on the trial evidence is consistent with the procedures for removal. Defendants are required to file notices of removal within thirty days of arraignment. 28 U.S.C. § 1455(b)(1). At that stage, a defendant will likely only have notice of the charges, but not of the trial evidence. *See* CPL 245.10 (discovery deadlines).

---

government"); *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) ("the gravamen of Ruppel's complaint").

Given this fact, it makes sense that the "accused's removal theory must accord with a claim—a criminal charge—brought against him." *Meadows*, 88 F.4th at 1344.

Defendant's focus on the "expansive meaning" of "relating to" (DB39; U.S. Amicus 16-17) thus misses the point. As the district court held in its first remand order, the precise *degree* of connection between the charged conduct here and an official act is immaterial because there was no such connection *whatsoever*.

Contrary to defendant's claim, the People's use of purportedly "official acts" evidence (DB38; U.S. Amicus 16) would not satisfy the standard for federal-officer removal because none of that evidence constituted the charged criminal conduct. As noted, the charges here were based on defendant's falsification of business records between February and December 2017 (JA26-40). As discussed in more detail below, none of the challenged evidence was part of the underlying crimes. To be sure, that evidence was *relevant* to defendant's criminal liability. But criminal trials often involve evidence that may be probative of a defendant's guilt without constituting the charged crime itself: for example, a defendant's confession to a friend, or hotel records indicating the defendant's proximity to the crime. So too here: much of the purportedly "official acts" evidence was relevant because it involved defendant talking *about* his previously completed crimes, but the evidence was not part of "the acts for which [defendant is] being sued." *Isaacson*, 517 F.3d at 137. Put simply, defendant's crime was falsifying business records—not speaking to Hope Hicks or posting on Twitter.

Defendant's contrary argument would impermissibly eliminate any nexus requirement for federal-officer removal. Defendant claims that he is entitled to a federal forum solely because he has a colorable argument for excluding official-acts evidence (DB22-23, 40-41; U.S. Amicus 16). But the mere existence of a purported federal claim, even if it rose to the level of a "defense," is not enough for removal; a defendant must still meet the separate requirement that the basis for the criminal action be "an act taken 'for or relating to any act under color of such office.'" *Cnty. of Westchester v. Express Scripts, Inc.*, No. 24-1639, 2026 WL 2589574, at *4 (2d Cir. Sept. 2, 2026); *see also Hudak v. Elmcroft of Sagamore Hills*, 58 F.4th 845, 858-60 (6th Cir. 2023) (removal not available for assisted-living facility whose challenged actions had no connection to federal authority, despite potential preemption defense).

Defendant's contention that the "for or relating to" standard is met any time a state prosecution involves evidence of official acts would also have absurd consequences. For example, there should be no dispute that federal removal would be unavailable for a postal employee who commits a residential burglary while off the job. Under defendant's position, however, that state prosecution would "relat[e] to" an official act, 28 U.S.C. § 1442(a)(1), if any evidence of that wholly unofficial crime intersected with the employee's federal employment—for example, if the employee confessed the crime to his supervisor during a performance review, or if the employee stored the proceeds of the burglary in his office. Such a result would make no sense. That certain relevant evidence may be associated with official acts would not alter the

fact that the burglary itself lacked any connection to the employee's federal responsibilities.

**B. Defendant's Evidentiary Claim Is Not a "Defense."**

Defendant also fails to establish that *Trump v. United States* afforded him a federal "defense."

1. In *Mesa v. California*, the Supreme Court explained that a federal claim is "defensive" if it asserts that federal law either "does *not* impose certain obligations whose alleged existence forms the basis of a civil suit" or "*does* impose other obligations that may shield the federal officer against civil suits." 489 U.S. 121, 130 (1989). In other words, a federal defense must directly defeat the criminal charges or civil claims at issue. *See* Black's Law Dictionary (12th ed. 2024) (defining "defense" as a "defendant's stated reason why the plaintiff or prosecutor has no valid case"). That principle is confirmed by the many cases cited by *Mesa*, each of which involved federal-law claims that, if accepted, would lead to the dismissal or reduction of the charges against the defendant. *See* 489 U.S. at 125-34; *see, e.g.*, *New York v. Tanella*, 239 F. Supp. 2d 291, 296 (E.D.N.Y. 2003) (self-defense and immunity); *Torres v. CBS News*, 854 F. Supp. 245, 247-248 (S.D.N.Y. 1994) (congressional immunity).

By contrast, the sole effect of defendant's evidentiary claim would be to prevent certain evidence from being admitted at trial. That result would not defeat liability in the same way as a defense like justification or immunity. Instead, it would merely alter the mix of evidence considered by the jury. *Cf. United States v. Pohlot*, 827 F.2d 889, 897

(3d Cir. 1987) ("diminished capacity" claim that would "not provide any grounds for acquittal not provided in the definition of the offense" is "not a defense at all but merely a rule of evidence").

For this reason, at least one federal court has denied removal when a defendant's federal claim would lead only to the exclusion of evidence. In *New York v. De Vecchio*, the defendant (an FBI agent) sought removal because he claimed that a federal statute required the suppression of certain inculpatory evidence. The district court rejected this argument, finding that this evidentiary claim was "not a federal defense supporting Article III removal jurisdiction; rather, it is simply a vehicle for the suppression of immunized evidence or the dismissal of an indictment based on such evidence, be it in a federal or state criminal proceeding." 468 F. Supp. 2d 448, 463-64 (E.D.N.Y. 2007). By contrast, defendant has not cited a single case where a court found that an evidentiary claim like the one he relies on here constituted a federal "defense" for purposes of removal.

2. Independently, defendant's evidentiary claim would not support removal because, as the state trial court found, any error in admitting the challenged evidence was "harmless in light of the overwhelming evidence of guilt" (JA1249). When harmless error means that a federal evidentiary claim is immaterial to a defendant's guilt, that claim cannot provide the "shield" against criminal liability that is necessary to qualify as a "federal defense." *Mesa*, 489 U.S. at 130.

The state trial court's harmless-error finding is well-supported by the record. As the People have explained in detail in their direct appeal brief (JA1722-1729), the People proved defendant's guilt by introducing extensive documentary and testimonial evidence that was "separate and apart from that evidence and select testimony which defendant challenges on presidential immunity grounds" (JA1246). Not a single element of the criminal charges depended solely on the challenged evidence. There is thus no reasonable possibility that defendant's evidentiary claim would provide a basis for reversing his criminal conviction.

Defendant's only response on harmless error is to claim that this counterargument is "for the merits stage" and thus "cannot defeat removal at the jurisdictional plausibility threshold" (DB52). But the existence of a federal defense *is* a threshold question. *See Buljic v. Tyson Foods, Inc.*, 22 F.4th 730, 738 (8th Cir. 2021).

In the district court, though not here, defendant also asserted that harmless-error review is unavailable for evidentiary claims based on presidential immunity (JA1434-1437). He is wrong (JA1718-1722). The Supreme Court "repeatedly has held" that "errors such as mistaken admission of evidence" are not "immune from harmless-error analysis." *Rose v. Clark*, 478 U.S. 570, 582 n.11 (1986). And the United States has acknowledged in its state-court amicus brief that comparable immunity claims based on the Speech or Debate Clause are "susceptible to harmless error review" (JA1720). The harmlessness of any evidentiary error thus further demonstrates that defendant has failed to raise a "defense" warranting removal.

### C. Defendant's Evidentiary Claim Is Not "Colorable."

Removal is also not warranted because defendant has no "colorable" claim that any evidence was admitted in violation of *Trump v. United States*. The Supreme Court's restriction on admissible evidence of presidential acts was itself limited in three ways relevant here. First, there is no evidentiary bar for unofficial acts. 603 U.S. at 631. Second, outside of the President's execution of an explicit constitutional commitment of exclusive authority, official acts are entitled only to presumptive immunity, which can be rebutted (thereby lifting any evidentiary bar) if considering such evidence "would pose no dangers of intrusion on the authority and functions of the Executive Branch." *Id.* at 615 (quotation marks omitted). Third, even as to official acts for which the President is immune, "of course the prosecutor may point to the public record to show the fact that the President performed the official act." *Id.* at 632 n.3. As the district court correctly found (SA20-30), and as the People have argued in greater detail to the Appellate Division (JA1703-1717), one or more of these factors apply to all of the evidence that defendant challenges here.

#### 1. Defendant's statements on Twitter

Defendant objected to the admission of four statements (Tweets) from his Twitter account (DB46-48; JA951-960). The district court correctly found that "each of the tweets was an unofficial communication" (SA28).

First, the four Tweets were all issued in defendant's "unofficial, private capacity," rather than as part of "carrying out the official duties of the presidency." *Blassingame v.*

*Trump*, 87 F.4th 1, 4 (D.C. Cir. 2023). The Supreme Court specifically recognized that a President could make public statements—including Tweets—"in an unofficial capacity." *Trump*, 603 U.S. at 629. Here, three Tweets reflected defendant's personal opinion about Cohen, his personal attorney both before and during his presidency (JA952, JA958, JA960). The fourth contained defendant's observations about "a private contract between two parties" (JA954-956). Defendant was "speak[ing] in an unofficial capacity," *Trump*, 603 U.S. at 629, when he commented on his private attorney and on a private contract between private individuals that was signed before his presidency.

Defendant's only argument in response is that the Tweets constituted official acts because they concerned "a matter of intense public concern bearing on the sitting President's ability to effectively carry out his duties" (DB48). But both the Supreme Court and the D.C. Circuit have rejected a categorical rule deeming all of a President's communications on matters of public concern to be official conduct. *See Trump*, 603 U.S. at 629; *Blassingame*, 87 F.4th at 15. And, as the district court noted (SA24-25), this Court has upheld a jury verdict against defendant that was premised on the determination that, for Westfall Act purposes, defendant was not "acting within the scope of his office and employment as President" when, during his Presidency, he made public statements to the press about his private sexual misconduct. *Carroll v. Trump*, 148 F.4th 110, 114 (2d Cir. 2025); *see also Carroll v. Trump*, 151 F.4th 50, 59 (2d Cir. 2025), *cert. pending*, No. 26-141. Here too, the "content, form, and context" of the Tweets confirm their unofficial nature. *Trump*, 603 U.S. at 629 (quotation marks omitted).

Defendant posted these Tweets in response to a federal investigation and later prosecution into Cohen's role in the concededly private hush-money scheme (JA1683-1685; JA234). And the content of the Tweets did not refer to or carry out any official duty; rather, defendant was commenting in his personal capacity on a "purely . . . personal item" (JA234).

Defendant misplaces his reliance on *Council on American Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006) (DB47). Although that decision, applying D.C. law, found that the defendant there was acting "within the scope of a congressman's 'authorized duties'" in speaking to the press about his marital status, *id.* at 664, the D.C. Court of Appeals subsequently clarified that *Ballenger*'s holding "rested on undisputed, affirmative evidence in the record that [the defendant's] purpose behind making the allegedly defamatory statements was to serve his constituents and otherwise carry out his legislative responsibilities." *Trump v. Carroll*, 292 A.3d 220, 239 (D.C. 2023). Here, by contrast, both the state court and the district court have made the opposite finding that defendant's Tweets concerned purely "personal matters" unconnected to any official presidential duty (SA28-30; *see also* JA1242-1243).

Second, even assuming that the Tweets constituted official conduct, they at most gave rise to a presumption of immunity that was easily rebutted here. *See Trump*, 603 U.S. at 614, 629. There was no "danger[] of intrusion on the authority and functions of the Executive Branch," *id.* at 624-25, because defendant was not performing, or even

describing, any official presidential act in conveying his personal opinions about his personal attorney and a private contract signed prior to his presidency.

Finally, the Tweets would be admissible in any event because the People admitted nothing more than the "public record" of those Tweets "to show the fact that the President" made those statements on Twitter. *Trump*, 603 U.S. at 632 n.3. The admission of those Tweets did nothing more than give the jury the same information that had been publicly available for years.

### 2. Testimony by Hope Hicks

There is no colorable claim that the state court erred in admitting testimony from former White House employee Hope Hicks. Defendant asserts that this testimony should have been excluded because it concerned his official duty "to interact with and provide information to the press" (DB44). This argument fails for several reasons.

First, as a threshold matter, nearly all of the challenged testimony from Hicks did not involve any description of *defendant's* actions—the only conduct that would be subject to immunity (JA1710-1711). *See Trump*, 603 U.S. at 619-30 (focusing on "Trump's communications," "Trump's interactions," and "Trump's conduct"). For example, when the *Wall Street Journal* published an article in January 2013 about Stormy Daniels, Hicks explained that she discussed with defendant "how to respond to the story, how he would like a team to respond to the story" (JA286). But she provided no details about defendant's statements or the substance of those conversations. Later, Hicks quoted a published statement from a White House official (JA287), but that

statement did not come from defendant; and although Hicks noted that she had discussed this statement with defendant (JA287-288), she again was describing her own conduct rather than defendant's (JA1227-1228).

The only incident where Hicks described defendant's own words came in a wholly private conversation that was *not* connected to any effort "to interact with and provide information to the press" (DB44) and thus did not involve any official presidential duty. After the *New York Times* quoted Michael Cohen in February 2018, defendant had a private conversation with Cohen (who, again, was acting as his personal attorney at the time) (JA288). In recounting that conversation to Hicks, defendant told Hicks that he thought "it was better to be dealing with [the Daniels story] now, and that it would have been bad to have that story come out before the election" (JA290). Conspicuously absent from this testimony—in contrast to the other incidents described by Hicks—is any evidence that Hicks and defendant were discussing an official statement from the White House. Rather, defendant was having a private conversation where he was recounting another private conversation and where the subject was a purely private payoff that did "not reflect in any way the color of the President's official duties" (JA234). No official-acts immunity attaches to such discussions.

Second, even assuming that defendant's discussions with Hicks concerned communications to the press, there would still be no colorable basis for claiming immunity. Hicks's identity as White House Communications Director would not be dispositive. *See Trump*, 603 U.S. at 623-24. The question, then, is whether the particular

public communications discussed between defendant and Hicks implicated any official presidential duty. The district court correctly held that the answer was "no" (SA21). The subject matter of the discussions involved "hush money payments to cover up the President's relations with Stormy Daniels" (SA21). As defendant has never disputed, both the underlying sexual relationship and the ensuing cover-up scheme had no relationship to any official duty of the presidency. This unofficial character necessarily extended to any "efforts to develop a coordinated response to a personal story about [defendant's] unofficial acts" (SA25), because those efforts lacked any "connection with the general matters committed by law to [the President's] control or supervision," *Blassingame*, 87 F.4th at 13 (quotation marks omitted).

Defendant's contrary argument (DB45-46) would make *any* public communications by the President "official," even if they involved purely private matters. Again, that categorical rule has been rejected by the Supreme Court, this Court, and the D.C. Circuit.[7]

Finally, even assuming that Hicks's testimony concerned official acts, any presumption of immunity would be rebutted. There is no danger that consideration of

---

[7] Defendant's continued reliance on *Clinton v. Jones*, 520 U.S. 681 (1997) (DB45), is misplaced, since both the Eighth Circuit and the Supreme Court *declined* to address whether a President engages in official conduct when he directs White House officials to make public statements about a private sexual affair. *See id.* at 686 n.3 (expressly "not address[ing] the question"); *Jones v. Clinton*, 72 F.3d 1354, 1359 n.7 (8th Cir. 1996) (finding claim unpreserved).

this testimony would interfere with the functions of the Executive Branch when defendant's discussions with his Communications Director concerned a purely private matter and—for the one conversation involving defendant's own words—did not involve any discussions about official acts to be done in response to that private matter.

### 3. Testimony by Michael Cohen

Defendant's challenge to Cohen's testimony is limited to one narrow exchange. Cohen testified that he told David Pecker that a Federal Election Commission (FEC) complaint against Pecker's company would "be taken care of" because the President would have then-Attorney General Jeff Sessions handle it (JA321). The district court correctly found no colorable claim of immunity based on this testimony (SA26-27).

First, as the state court has already held, defendant failed to preserve his objection to this testimony (JA1221-1223). This lack of preservation means that defendant's evidentiary objection presents no "colorable" defense to liability.

Second, defendant's objection assumes that the purpose of this testimony was to establish that defendant *in fact* had a discussion with the Attorney General. But defendant has consistently "denie[d] that the interaction described by Cohen occurred" (DB48), and he cannot assert immunity for Cohen's recounting of a nonexistent act. More important, whether such a conversation actually happened was immaterial. Cohen's testimony recounted a conversation he had with another private party—conduct that, in and of itself, involved no official presidential conduct. Although Cohen did purport to reference something that defendant had said, the purpose of this

testimony was solely to explain Cohen's conduct and Pecker's reaction at a time when both co-conspirators were under heat for their role in the catch-and-kill scheme. That point is confirmed by the trial court's instruction to the jury—at the defense's request—that they were to consider this specific testimony only "in assessing David Pecker's credibility and to help provide context for some other surrounding events," and not for purposes of determining defendant's guilt (JA323). In other words, the only conduct at issue here was Cohen's recounting of a (perhaps empty) promise from defendant to reassure a private third party (Pecker). That purely private conversation reflected no exercise of actual presidential responsibilities.

Third, even assuming that defendant did in fact speak to then-Attorney General Sessions, official-acts immunity still would not apply. Each of the FEC investigations at issue arose out of pre-election, campaign-related conduct that was indisputably personal and that involved no official act—i.e., the payments to Daniels and others. Defendant's intercession was thus a continuation of his "personal and private arrangements with Cohen and Pecker" (SA27). Moreover, although defendant asserts that "the FEC can refer matters to the Justice Department for criminal enforcement" (DB49), the pending investigations fell under the FEC's "exclusive jurisdiction over civil enforcement of [FECA]," *Fed. Election Comm'n v. Nat'l Right to Work Comm.*, 459 U.S. 197, 199 n.2 (1982); *see also* 52 U.SC. § 30106(b)(1), which is not "subject to control of the Attorney General," *Fed. Election Comm'n v. NRA Political Victory Fund*, 513 U.S.

88, 92 n.1 (1994). Defendant's supposed conversation with the then-Attorney General thus could not invoke any official presidential authority (SA26).

#### 4. Testimony by Madeleine Westerhout

Defendant has presented no colorable evidentiary objection to testimony from Madeleine Westerhout about certain White House procedures and defendant's work habits as President (DB50-51). As a threshold matter, defendant missteps in criticizing the district court for "ignor[ing] the relevant testimony from Westerhout" (DB50). Defendant's post-remand briefing cited no such testimony, instead mentioning Westerhout in a total of two conclusory sentences lacking any record citations. *See* Mem. in Support 26 (ECF 69) & Reply 14 (ECF 73), *People v. Trump*, No. 23-3773 (S.D.N.Y.).

In any event, defendant's evidentiary objection here would not provide a colorable defense because it was entirely unpreserved below (JA1223-1224, JA1699-1700). In addition, as defendant concedes, Westerhout provided valid testimony about the handling of defendant's "personal checks" during his presidency (DB50)—the actual unofficial conduct underlying his felony convictions. What defendant ignores is that the sole purpose of Westerhout's other testimony about White House practices was to provide background and lay a foundation for establishing that defendant received and responded to personal papers and other private correspondence while he was President (JA298-309). This background testimony accordingly did not identify any particular action by defendant (or anybody else), but rather provided general descriptions of White House operations (JA1716-1717). Westerhout's testimony thus

permissibly provided context for understanding the "unofficial, personal matters" that defendant continued to handle in the White House (SA25).

**D. Defendant's Preemption Claim Is Not "Colorable."**

The district court found in its initial remand order that defendant did not raise a colorable FECA preemption claim (JA238-245). Since defendant abandoned his own appeal from this ruling and has not identified intervening law that would warrant a different result (SA33 n.9), he is barred from relitigating this claim now. *See Allen v. McCurry*, 449 U.S. 90, 94 (1980).

In any event, as the People have explained to the Appellate Division (JA1730-1748), defendant's express-preemption claim is meritless. Defendant's claim focuses on Election Law § 17-152 (DB53-54), but he was not convicted under that statute. Instead, he was convicted of falsifying business records under Penal Law § 175.10. And courts—including this Court—have uniformly rejected FECA preemption challenges to general state laws like Penal Law § 175.10 that prohibit fraud, deception, and similar misconduct, even as applied to federal elections or campaigns. *See Stern v. Gen. Elec. Co.*, 924 F.2d 472, 474-75 (2d Cir. 1991); *see also, e.g.*, *WinRed, Inc. v. Ellison*, 59 F.4th 934, 942-44 (8th Cir. 2023); *Dewald v. Wriggelsworth*, 748 F.3d 295, 302-03 (6th Cir. 2014); *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 200-01 (5th Cir. 2013).

This result is supported by the FEC's regulation defining the scope of FECA preemption. Under that regulation, preemption is limited to three narrowly defined categories of state laws concerning (a) the "[o]rganization and registration of political

committees supporting Federal candidates"; (b) the "[d]isclosure of receipts and expenditures by Federal candidates and political committees"; and (c) the "[l]imitation on contributions and expenditures regarding Federal candidates and political committees." 11 C.F.R. § 108.7(b). None of these categories apply to Penal Law § 175.10 because that statute does not "specifically regulate[]" the listed activities. *Janvey*, 712 F.3d at 201. Instead, general anti-fraud statutes like Penal Law § 175.10 fall under the regulation's savings clause, which exempts from preemption state laws that prohibit "false registration, voting fraud, theft of ballots, *and similar offenses*." 11 C.F.R. § 108.7(c)(4) (emphasis added). Courts have "broadly" construed the "similar offenses" language to hold that preemption does not apply to state "anti-deceptive-practices laws," even when they are applied to federal campaigns. *WinRed*, 59 F.4th at 943; *see also Dewald*, 748 F.3d at 303.

Defendant provides no answer to this uniform federal precedent. Instead, without making any arguments about Penal Law § 175.10, he instead asserts that FECA would prevent the People from relying on Election Law § 17-152 as the underlying crime that defendant intended to conceal or commit by falsifying the relevant business records (DB53-54).

This argument is misguided because defendant was not convicted of violating Election Law § 17-152, and his convictions under Penal Law § 175.10 did not require the jury to find that he had violated Election Law § 17-152. *See People v. Taveras*, 12 N.Y.3d 21, 27 (2009). In any event, defendant's preemption claim against § 17-152 also

fails on its own terms because it mistakenly assumes that § 17-152 was simply a proxy for finding a FECA violation (DB53). Defendant is incorrect. Section 17-152 prohibits "two or more persons" from "conspir[ing] to promote or prevent the election of any person to a public office by unlawful means." Under the plain text, FECA violations were relevant as one of several circumstances that collectively established the "unlawful means" pursued by defendant's conspiracy to promote his election. Federal preemption did not prevent the jury from considering the fact of a FECA violation, among other illegal activities, to support their finding about the nature of the prohibited conspiracy.

Under analogous circumstances, courts have recognized that federal prosecutors may pursue federal claims (such as for mail or wire fraud) that are predicated on state-law violations or on intent to commit some separate state crime, even when the Constitution would bar Congress from directly regulating those violations. *See United States v. Sawyer*, 85 F.3d 713, 722-23 (1st Cir. 1996); 18 U.S.C. § 1952(a)-(b). Similarly here, state prosecutors may pursue state anti-fraud claims that depend (in part) on findings of federal-law violations (or the intent to commit or conceal such violations), even when preemption would bar the state from directly enforcing the federal regime. *See, e.g.*, *People v. Pymm*, 76 N.Y.2d 511, 522 (1990) (no preemption even though prosecution "will necessarily touch upon conduct that is already subject to Federal regulation"); *State v. Chappell*, 939 N.E.2d 1234, 1238 (Ohio 2010) (upholding state conviction for possessing criminal tools to commit federal copyright violations). Defendant has thus failed to present any colorable defense based on FECA preemption.

## POINT III

### DEFENDANT'S SENTENCING PRECLUDES REMOVAL

As the district court correctly held (SA12-13), defendant's sentencing in January 2025 rendered removal unavailable because the removal statute neither contemplates nor authorizes removal after entry of final judgment in a state criminal matter.

For one thing, the statute refers to the removal of a "criminal prosecution." 28 U.S.C. § 1455(a). Although that term is not defined in § 1455, in other contexts the Supreme Court has recognized that "a 'criminal prosecution' continues . . . until a final sentence is imposed." *United States v. Haymond*, 588 U.S. 634, 647 (2019) (plurality op.); *see also id.* at 672 (Alito, J., dissenting) (noting that "the end of criminal prosecutions" is "the entry of final judgment and imposition of sentence"). That principle is why the Sixth Amendment—which regulates "all criminal prosecutions"—"does not apply to appellate proceedings." *Martinez v. Ct. of Appeal of California, Fourth App. Dist.*, 528 U.S. 152, 161 (2000). New York law likewise deems a "criminal action" to "terminate[] with the imposition of sentence," CPL 1.20(16)(c), "rather than upon the exhaustion of appeals," *Dynamic Chemicals, Inc. v. Ackerman Mech. Servs., Inc.*, 58 A.D.3d 153, 156 (4th Dep't 2008). Section 1455(a)'s authorization to remove a "criminal prosecution" thus refers to a pending criminal trial, not one that has already ended in a sentence.

Consistent with this definition, the removal statutes repeatedly assume that pending criminal trials will be removed, while remaining silent on the procedures that

would apply to a pending state-court appeal. For example, the statute provides that, after the filing of a notice of removal, "a judgment of conviction shall not be entered unless the prosecution is first remanded." 28 U.S.C. § 1455(b)(3). But the statute provides no similar stay of any action by a state appellate court, including the final resolution of all appeals. It would make no sense for Congress to be so concerned with preventing the end of a state criminal trial while doing nothing to prevent the end of a state appeal—particularly when even defendant agrees that the exhaustion of state-court appeals would render removal unavailable. *See Harris v. U.S. Dep't of Transportation FMCSA*, 122 F.4th 418, 422 (D.C. Cir. 2024). Congress's provision of a backstop to state criminal trials but not appeals strongly suggests that Congress did not anticipate removal of criminal cases after sentencing at all. *See Russello v. United States*, 464 U.S. 16, 23 (1983).

The removal statute also consistently assumes that post-removal proceedings will take place in federal district court; by contrast, the statute contains no provision authorizing the transfer of a pending appeal from state court to a federal circuit. As the district court found, both § 1442(a) and § 1455(b) refer to removal to "the district court"—reflecting the statutes' purpose "to shift the venue of trial from State to Federal Court" (SA12). The statutes also expect that the district court, not the federal circuit, will take actions such as reviewing the notice of removal, holding an evidentiary hearing, and "mak[ing] such disposition of the prosecution as justice shall require." 28 U.S.C. § 1455(b)(3)-(5).

By contrast, the removal statutes are conspicuously silent about critical procedural questions unique to the post-sentencing context. For example, although defendant argues that, following removal, "the district court would play a facilitating role for [the] federal appeal" by "adopt[ing] the state court's judgment as its own" (DB32), no statutory provision explicitly authorizes this novel "facilitation" procedure. Nor does the statute provide procedures for removal following a decision by the Appellate Division—would the district court "adopt" the appellate decision, and would further review be governed by state law (which requires a discretionary grant of leave to appeal further to the Court of Appeals) or federal law (which generally imposes no such requirement for an appeal to this Court)? The statute's silence is telling, since Congress typically regulates how and when district courts may adopt foreign judgments, and federal courts usually have some role in reviewing those judgments rather than blindly accepting them. *See, e.g.*, 28 U.S.C. § 1450 (in removed cases, allowing district court to "dissolve[] or modif[y]" prior orders); 28 U.S.C. § 1963 (registration of judgments from other federal courts); *Covington Indus., Inc. v. Resintex A.G.*, 629 F.2d 730, 734 (2d Cir. 1980). In the absence of such established procedures, the district court was rightly "reluctant" to accept defendant's request to "rubber stamp" a state criminal judgment in which it had played no role (JA1529).

Similarly, defendant's position would have the anomalous effect of having the district court decide this Court's docket (DB32-34). But Congress has carefully defined the circumstances in which a district court can transfer a case to the circuit, while

making no provision for such a transfer in the criminal removal context. *Compare* 28 U.S.C. §§ 1292(b) (interlocutory orders), 1404 (change of venue), 2112(a)(4)-(5) (multidistrict litigation), 2241(b), (d) (habeas petitions). Defendant's anything-goes approach to post-sentencing removal conflicts with Congress's presumably deliberate decision not to legislate in this area at all. *See Wong v. Doar*, 571 F.3d 247, 260 (2d Cir. 2009) ("we are not inclined to infer from statutory silence a congressional intent to have no rules whatsoever apply").

It is therefore unsurprising that every district court to consider the question has concluded that removal was unavailable after sentencing. *See Hawaii v. Thronas-Kahoonei*, No. 19-00683, 2020 WL 118251, at *2 (D. Haw. Jan. 10, 2020); *Arizona v. Folio*, No. CR-19-08056-001-PCT-DJH, 2019 WL 1643720, at *1 (D. Ariz. Apr. 16, 2019); *Johnson v. Washington*, No. C07-0696-MJP, 2007 WL 2377141, at *2 (W.D. Wash. Aug. 15, 2007). Defendant fails to identify a single counterexample involving a state criminal case.

Instead, defendant argues that the text of the removal statute does not impose any explicit "bar on removal" after sentencing (DB27; U.S. Amicus 11). As explained, the limitation of removal to a "pending" "criminal prosecution," 28 U.S.C. § 1455(a), does provide such a textual bar. More fundamentally, as this Court has already held, "statutory procedures for removal are to be strictly construed" out of "respect for the limited jurisdiction of the federal courts and the rights of states," and any interpretive ambiguity must be resolved "against removability." *New York*, 158 F.4th at 465

(quotation marks omitted). The statute's silence about removal after sentencing thus cannot be read as implicit permission.

Defendant also relies on several civil cases, but the district court correctly found them inapposite (SA14-20). Those cases do not address the distinct procedural requirements and statutory language applicable to the removal of state criminal prosecutions. *See Pennsylvania v. Maggitti*, No. 24-1702, 2025 WL 869493, at *1 (3d Cir. Mar. 20, 2025) (unpublished) (reliance on civil removal rules was "unavailing" where petitioner "sought removal of a criminal prosecution"). Nor do they implicate the "strong judicial policy against federal interference with state criminal proceedings." *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 600 (1975).

For example, in defendant's principal case, *Harris*, the state court had sua sponte dismissed the complaint before the defendant federal agency had been served, and the agency sought to remove the pending appeal still within the original thirty-day deadline for filing a notice of removal. 122 F.4th at 423. The D.C. Circuit reasonably believed that, under § 1442, a federal agency is entitled to at least one opportunity to seek removal and that unusually precipitous state-court proceedings should not deprive the agency of that opportunity. *Id.* at 423-24. But, as the district court explained (SA15), no similar concern would justify allowing post-sentencing removals of state criminal cases because of the impossibility of proceeding in a criminal action without prompt notice to the defendant, *see, e.g.*, CPL 120.90, 140.20, 180.80, and the extensive procedures that

must be followed before sentencing, *see, e.g.*, CPL 245.10(1), 255.20(1), 330.30, 390.20(1).[8]

Defendant's cited cases involving federal takeovers of financial institutions (DB28-30) are even further afield because they involve different statutes and very different parties. In the cases involving the Federal Deposit Insurance Corporation (FDIC), the FDIC did not substitute for the private bank until after an appeal had been filed—meaning that it was impossible to seek removal earlier—and the governing statute, 12 U.S.C. § 1819(b)(2)(B), explicitly authorized the FDIC to seek removal within 90 days of its substitution. *See, e.g.*, *FDIC v. Keating*, 12 F.3d 314, 315 (1st Cir. 1993); *In re Meyerland Co.*, 960 F.2d 512, 513 (5th Cir. 1992) (en banc); *id.* at 521-22 (DeMoss, J., concurring). The cases involving other federal takeovers also involved the relevant agency becoming a party for the first time after final judgment. *See Putnam v. DeRosa*, 963 F.2d 480, 483 (1st Cir. 1992); *In re Savers Fed. Sav. & Loan Assoc.*, 872 F.2d 963, 964 (11th Cir. 1989). No such substitution is available for individual criminal defendants, and § 1455 contains no language authorizing removal after such substitution.

---

[8] Even ignoring *Harris*'s unique facts, the D.C. Circuit's reasoning is too broad for the distinctive context of state criminal proceedings. For example, the court relied on a Seventh Circuit case, *Yassan v. J.P. Morgan Chase & Co.*, which found that even collateral attacks maintain the pendency of a state civil action since "the parties are still actively contesting the case in the state court system." 708 F.3d 963, 968-69 (7th Cir. 2013). But, as even defendant does not contest, removal is not available for collateral attacks on state criminal convictions. *See Renteria v. Lumpkin*, No. 23-70007, 2023 WL 7649071, at *3 (5th Cir. 2023) (unpublished).

More fundamentally, as the district court noted (SA18-19), takeovers of failing financial institutions implicate unique federal interests: Congress mandated the insertion of a federal party into an otherwise private matter, and it conferred federal jurisdiction based purely on the identity of the substituted federal party. *See* 12 U.S.C. §§ 1789(a)(2), 1819(b)(2)(A); *compare Mesa*, 489 U.S. at 139 (mere involvement of federal officer not sufficient for removal under § 1442). It makes sense, in this area of heightened federal involvement and concern, for "the whole purpose of the congressional legislative program" to "require[] the availability of federal jurisdiction." *Mizuna, Ltd. v. Crossland Fed. Sav. Bank*, 90 F.3d 650, 657 (2d Cir. 1996) (quotation marks omitted). But the opposite presumption is in effect for state criminal enforcement. *See Arizona v. Manypenny*, 451 U.S. 232, 243 (1981) ("the regulation of crime is pre-eminently a matter for the States").

Finally, defendant's policy concerns would not justify post-sentencing removal. Defendant asserts that such removal is necessary because "not every federal defense is evident before trial" (DB30-31; U.S. Amicus 13). But there is no stopping point to this reasoning, under which removal would be available even if a state appeal takes years to resolve, *e.g.*, *People v. Afflick*, 234 A.D.3d 501, 501 (1st Dep't 2025) (appeal decided nineteen years after the fact), and even after a ruling by a state's highest court, when ordinarily only Supreme Court certiorari review would be available. Moreover, defendant's policy argument assumes that there is some injustice in having state courts adjudicate federal defenses. But "state courts have inherent authority, and are thus

presumptively competent, to adjudicate claims arising under the laws of the United States." *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990).

Defendant also claims that the unavailability of removal after sentencing would encourage local "gamesmanship" to "avoid[] federal jurisdiction" (DB31; U.S. Amicus 14). But New York's criminal procedures make it effectively impossible for a case to rush to sentencing. A defendant also has the option of seeking adjournments or stays of sentencing, as defendant repeatedly requested here. Given these protections, defendant has no basis to speculate that prosecutors will be able to avoid federal removal by manipulating the sentencing date.

## CONCLUSION

The order of the district court should be affirmed.

Respectfully submitted,

ALVIN L. BRAGG, JR.
District Attorney
New York County

BY: ______________________
JOHN T. HUGHES
Deputy Chief, Appeals Division

STEVEN C. WU
*Chief, Appeals Division*
JOHN T. HUGHES
*Deputy Chief, Appeals Division*
Of Counsel

October 22, 2026

## CERTIFICATE OF COMPLIANCE

The word count for this brief is 13,965, excluding the Table of Contents, Table of Authorities, and signature block. The word processing system used to prepare this brief and to calculate the word count was Microsoft Word. The brief is printed in Garamond, a serifed, proportionally spaced typeface. The type size is 14 points in the text and headings, and 14 points in the footnotes. I certify that the brief complies with Rule 32(a)(5)-(7) and Local Rule 32.1.

John T. Hughes
Attorney for Respondent

October 22, 2026