# 26-2427

## In the United States Court of Appeals for the Second Circuit

PEOPLE OF THE STATE OF NEW YORK,

*Plaintiff-Appellee,*

–v.–

PRESIDENT DONALD J. TRUMP,

*Defendant-Appellant.*

On Appeal from the United States District Court for the Southern District of New York (No. 23-cv-3773)
(Hon. Alvin K. Hellerstein)

**REPLY BRIEF FOR DEFENDANT-APPELLANT PRESIDENT DONALD J. TRUMP**

BRENDAN P. CULLEN
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California 94301
(650) 461-6500

DIANE L. MCGIMSEY
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California 90067
(310) 712-6600

ROBERT J. GIUFFRA, JR.
JOHN L. WARDEN
MAXWELL F. GOTTSCHALL
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*Counsel for Defendant-Appellant President Donald J. Trump*

# TABLE OF CONTENTS

*Page*

**TABLE OF AUTHORITIES** .......... iii

**INTRODUCTION** .......... 1

**ARGUMENT** .......... 5

**I. DANY'S OPPOSITION CONFIRMS THAT THE FEDERAL-OFFICER REMOVAL STATUTE PERMITS REMOVAL AFTER SENTENCING** .......... 5

**II. PRESIDENT TRUMP SATISFIED THE STATUTORY REQUIREMENTS FOR FEDERAL OFFICER REMOVAL** .......... 11

A. DANY Cannot Deny That This Prosecution "Relates To" President Trump's Official Acts .......... 12

1. A prosecution "relates to" a President's official acts if the government uses such acts as evidence against him .......... 12

2. DANY misused President Trump's official acts as evidence at trial .......... 15

B. President Trump's Second Removal Notice Asserted Colorable Federal Defenses .......... 17

1. President Trump asserted a colorable defense of Presidential immunity .......... 17

2. President Trump asserted a colorable defense of federal preemption .......... 20

**III. PRESIDENT TRUMP DID HAVE GOOD CAUSE FOR SEEKING TO REMOVE WHEN HE DID** .......... 23

A. President Trump Could Not Have Filed The Second Removal Notice Before Trial Or Before *Trump* v. *United States* .......... 23

B. President Trump Acted Diligently By Seeking To Remove Within Two Months Of *Trump* .......... 25

C. President Trump Did Not Waive His Right To Remove .......... 27

D. DANY's Other Assorted "Good Cause" Arguments Fail .......... 31

**CONCLUSION** .......... 35

## TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Albuquerque* v. *Soto Enterprises, Inc.*,
864 F.3d 1089 (10th Cir. 2017) .......... 27

*Arizona* v. *Manypenny*,
451 U.S. 232 (1981) .......... 31

*Arizona* v. *Meadows*,
2024 WL 4198384 (D. Ariz. Sep. 16, 2024) .......... 24

*Callahan* v. *County of Suffolk*,
96 F.4th 362 (2d Cir. 2024) .......... 24

*Cheney* v. *U.S. Dist. Ct. for D.C.*,
542 U.S. 367 (2004) .......... 34

*Chevron USA Inc.* v. *Plaquemines Parish*,
608 U.S. 1 (2026) .......... 12

*Clinton* v. *Jones*,
520 U.S. 681 (1997) .......... 16

*Harris* v. *U.S. Dep't of Transp. FMCSA*,
122 F.4th 418 (D.C. Cir. 2024) .......... 8, 9, 11

*Hassoun* v. *Searls*,
976 F.3d 121 (2d Cir. 2020) .......... 33

*Holtzman* v. *Oliensis*,
91 N.Y.2d 488 (1998) .......... 22

*Isaacson* v. *Dow Chemical Co.*,
517 F.3d 129 (2d Cir. 2008) .......... 19

*Jefferson Cnty.* v. *Acker*,
527 U.S. 423 (1999) .......... 3, 11, 15-16

*Kenny* v. *Wal-Mart Stores, Inc.*,
881 F.3d 786 (9th Cir. 2018) .......... 27

*Latiolais* v. *Huntington Ingalls, Inc.*,
951 F.3d 286 (5th Cir. 2020) .......... 16

*Martinez* v. *Court of Appeal of California, Fourth Appellate District*,
528 U.S. 152 (2000) .......... 6

*Mesa* v. *California*,
489 U.S. 121 (1989) .......... 19

*In re Methyl Tertiary Butyl Ether Prods. Liability Litig.*,
341 F. Supp. 2d 351 (S.D.N.Y. 2004) .......... 20

*New York* v. *National Highway Traffic Safety Admin.*,
974 F.3d 87 (2d Cir. 2020) .......... 6

*New York* v. *Trump*,
683 F. Supp. 3d 334 (S.D.N.Y. 2023) .......... 21

*New York* v. *Trump*,
158 F.4th 458 (2d Cir. 2025) .......... 10, 24-26, 31

*Pennacchio* v. *United States*,
263 F. 66 (2d Cir. 1920) .......... 6

*People* v. *Hamlin*,
71 N.Y.2d 750 (1988) .......... 19

*People* v. *Pymm*,
76 N.Y.2d 511 (1990) .......... 22

*Rothner* v. *City of Chicago*,
879 F.2d 1402 (7th Cir. 1989) .......... 28

*State* v. *Chappell*,
939 N.E.2d 1234 (Ohio 2010) .......... 23

*Tennessee* v. *Davis*,
100 U.S. 257 (1879) .......... 15

*Trump* v. *Slaughter*,
609 U.S. 422 (2026) .......... 17

*Trump* v. *United States*,
603 U.S. 593 (2024) .......... *passim*

*United States* v. *Kim Tae Sung*,
114 F.3d 1192 (7th Cir. 1997) .......... 6

*United States* v. *Malenge*,
294 Fed. Appx. 642 (2d Cir. 2008) .......... 6

*United States* v. *Perillo*,
164 F.2d 645 (2d Cir. 1947) .......... 6

*United States* v. *Plugh*,
648 F.3d 118 (2d Cir. 2011) .......... 20

*Willingham* v. *Morgan*,
395 U.S. 402 (1969) .......... 9, 15

**Statutes**

12 U.S.C. § 632 .......... 7

12 U.S.C. § 1452 .......... 7

28 U.S.C. § 1442 .......... *passim*

28 U.S.C. § 1446 .......... 4, 26

28 U.S.C. § 1455 .......... 2, 7, 8

N.Y. Election Law § 17-152 .......... 20-22

**Other Authorities**

Fed. R. Civ. P. 15 .......... 26

Fed. R. Civ. P. 16 .......... 26

## INTRODUCTION

This is an extraordinary case that belongs in federal court under the federal-officer removal statute. Throughout this litigation, both DANY and the district court (Hellerstein, J.) have grasped for different, meritless reasons to wrongly deny President Trump—*the* chief federal officer—a federal forum to adjudicate his substantial federal defenses. In erroneously denying removal in September 2024, the district court said nothing about President Trump's supposed delay or any purported waiver of removal. In defending that decision before this Court last year, DANY devoted just 1.5 pages to those unpersuasive points. DANY's lead argument was instead that the federal-officer removal statute categorically prohibits removal of a prosecution that is pending in a state appellate court. This Court was not persuaded, and vacated and remanded to the district court to consider the question in light of its guidance. But the district court got it wrong again, this time after taking ten months to issue its decision.

In trying to defend that most recent opinion, DANY now runs away from its earlier (groundless) statutory argument and instead focuses on good cause. DANY wrongly claims that President Trump somehow waived removal when he raised the Supreme Court's precedent-setting decision in *Trump* v. *United*

*States*, 603 U.S. 593 (2024), in state court in order to try to avoid his imminent sentencing during the 2024 Presidential election. DANY further asserts—going beyond the district court's reasoning—that the slow progress of the state-court appeal itself somehow prevents President Trump from showing "good cause," even though he has consistently pressed (over DANY's objection) for expedited resolution of the validity of his removal over the past eighteen months.

In the end, the district court's and DANY's ever-shifting justifications for keeping this case in state court cannot obscure what has always been clear: the President of the United States may invoke the federal forum that Congress expressly authorized for precisely these extraordinary circumstances. The district court erred in concluding otherwise.

*First*, removal is plainly available at this stage. Congress broadly authorized removal of a "pending" criminal prosecution, and expressly permitted removal *after* the default pre-trial deadline for "good cause." 28 U.S.C. §§ 1442(a), 1455(b)(1). Nothing in the statute's text bars removal after sentencing. As DANY does not dispute, Congress has repeatedly limited post-judgment removals in other statutes, but did not do so in the federal-officer removal statute. DANY's mistaken position—that a federal officer may

*never* remove a criminal case post-judgment for *any* reason—also cannot be reconciled with the unanimous body of appellate precedent interpreting both this statute and other similarly worded removal statutes. DANY also offers no answer to the sound policy concerns that led Congress to create the post-trial "good cause" safety valve.

*Second*, this prosecution plainly "relates to" President Trump's official Presidential acts, and implicates at least one colorable federal defense. DANY does not dispute that President Trump must make only an "adequate threshold showing" that both arguments are "colorable." *Jefferson Cnty.* v. *Acker*, 527 U.S. 423, 431-432 (1999). Instead, DANY spends much of its opposition deep in the weeds on the many "unprecedented and momentous questions" implicated by the prosecution of a former, and now-sitting, President. *Trump*, 603 U.S. at 616. But President Trump is not required "to win his case before he can have it removed," because that would "defeat the purpose of the removal statute": to ensure that a federal court decides those federal questions. *Acker*, 527 U.S. at 431-432. At any rate, DANY's merits arguments are wrong for the reasons explained in full in the state-court briefing, *see* ADD-013-108.

*Third*, President Trump has demonstrated "good cause" for seeking to remove in late August 2024. That was less than two months after the Supreme Court in *Trump* recognized an evidentiary immunity that—as DANY never denies—changed the controlling law and, thus, enabled the President's second removal notice. DANY does not dispute that it suffered no prejudice from the timing of the President's removal notice; instead, it wrongly argues (for the first time) that the "good cause" standard contains an implicit 30-day limit. Not so: Congress already wrote an *explicit* 30-day limit into the statute that governs *civil* federal-officer removal, 28 U.S.C. § 1446(b)(3), but chose not to impose that limit for criminal cases. DANY also incorrectly insists that President Trump waived removal by briefing *Trump* to the state trial court, but DANY never disputes that the prospect of incarceration in just ten days left President Trump no choice but to proceed in state court as he did. To try to block removal, DANY is left to misstate the black-letter law of waiver and distort the record.

DANY's newfound reliance on the slow progress of the state appeal as grounds to deny removal is particularly misplaced. President Trump has diligently pressed removal for *more than two years* and has requested expedited briefing schedules and prompt rulings with increasing urgency as

the state-court appeal has progressed. DANY, by contrast, urged the district court to move slowly on remand and opposed expedition before this Court. Congressional protection of federal officers who diligently insist on a federal forum cannot turn on how quickly courts resolve such motions, much less be defeated by delays that such officers, and especially the Chief Executive, repeatedly sought to prevent.

This Court should reverse and direct the district court to permit removal, enabling this Court to adjudicate President Trump's appeal.

## ARGUMENT

### I. DANY'S OPPOSITION CONFIRMS THAT THE FEDERAL-OFFICER REMOVAL STATUTE PERMITS REMOVAL AFTER SENTENCING.

The threshold question, which DANY relegates to the end of its opposition, is whether removal is available at this stage of this case. It plainly is, Def. Br. 26-37, and DANY offers no good argument to the contrary.

*First*, DANY wrongly claims (at 48-49) that the phrase "criminal prosecution" in the federal-officer removal statute refers only to a "pending criminal trial, not one that has already ended in a sentence." In support, DANY relies exclusively on cases interpreting the phrase "criminal prosecution" in the Sixth Amendment. But that unusual definition arises from

historical practice, not plain meaning: criminal appeals generally did not exist "for the first century of our Nation." *Martinez* v. *Court of Appeal of California, Fourth Appellate District*, 528 U.S. 152, 159 (2000).

The statutory-interpretation question here turns on the "commonly understood meaning of the statute's words." *New York* v. *National Highway Traffic Safety Admin.*, 974 F.3d 87, 95 (2d Cir. 2020). Clearly, the ordinary meaning of "criminal prosecution" encompasses the appellate phase of a criminal case. This Court and others have routinely referred to criminal cases on appeal as "criminal prosecution[s]" for at least the last century. *See, e.g.*, *United States* v. *Malenge*, 294 Fed. Appx. 642, 644 (2d Cir. 2008); *United States* v. *Kim Tae Sung*, 114 F.3d 1192, 1192 (7th Cir. 1997); *United States* v. *Perillo*, 164 F.2d 645, 647 (2d Cir. 1947); *Pennacchio* v. *United States*, 263 F. 66, 68 (2d Cir. 1920).[1] Even DANY cannot help but refer to this case as it currently stands as a "state prosecution." Br. 3.

Moreover, even if President Trump's initial "criminal prosecution" did terminate with his sentencing, his appeal would still be removable. DANY

---

[1] DANY also inaptly claims (at 48) that New York law defines a "criminal action" as terminating with the imposition of sentence, but New York law is irrelevant to how the *federal*-officer removal statute defines the operative phrase "criminal prosecution."

ignores the broad definition of "criminal prosecution" that Congress provided in the statute: "The terms 'civil action' and 'criminal prosecution' include *any proceeding* (whether or not ancillary to another proceeding) to the extent that in such proceeding a judicial order . . . is sought or issued." 28 U.S.C. § 1442(d)(1) (emphasis added). President Trump's appeal is undoubtedly a "proceeding" in which a judicial order is sought—specifically, an order reversing his conviction.

*Second*, DANY erroneously insists (at 50-51) that President Trump relies on the "statute's silence" about post-judgment removal. The statute is not silent; it *expressly* authorizes a defendant with "good cause" to remove any "pending" prosecution "at a later time" than "before trial." 28 U.S.C. § 1455(a), (b)(1). Section 1455's explicit authorization diverges from other provisions in which Congress has required removal before a particular deadline. *See, e.g.*, 12 U.S.C. § 632 ("at any time before the trial thereof"); *id.* § 1452(f) (same); Def. Br. 29-30. Importantly, DANY says nothing about any of these comparator statutes.

It is DANY that would have this Court draw erroneous inferences from "the statute's silence," Br. 50. For example, DANY notes (at 49) that the federal-officer removal statute "contains no provision authorizing the transfer

of a pending appeal from state court to a federal circuit." But that is irrelevant: as President Trump explained, appellate removal does not require any court to "transfer" anything. After granting leave to remove, the district court can simply enter an order "adopt[ing] the state court's judgment as its own," *Harris* v. *U.S. Dep't of Transp. FMCSA*, 122 F.4th 418, 426 (D.C. Cir. 2024) (Henderson, J., concurring), after which President Trump would have the right to file a notice of appeal in this Court. In protesting (at 50) what it incorrectly calls this "novel 'facilitation' procedure," DANY ignores that four different courts of appeals have unanimously approved this procedure or ones closely analogous to it, Def. Br. 31-32.

*Third*, DANY points (at 47-49) to 28 U.S.C. § 1455(b)(3), which allows a state prosecution to proceed in state court while the federal district court considers a remand motion, "except that a judgment of conviction shall not be entered [by the state court] unless the prosecution is first remanded." DANY wrongly contends (at 49) that Congress would have provided a similar "backstop" to "prevent the end of a state appeal" if removal were available throughout such appeal. That does not follow. Congress can simultaneously allow for removal at any stage under the federal-officer removal statute, and still recognize that a particular step—a judgment of conviction—requires

additional guardrails. Such a judgment may result in immediate incarceration, an irreparable outcome.

*Fourth*, DANY unpersuasively cites (at 51) three unpublished district court cases that, it claims, "concluded that removal was unavailable after sentencing." None of those cases involved federal officers, and none offers any reasoning at all.

DANY also cannot distinguish *Harris* and the broader caselaw uniformly approving post-judgment removal, for the reasons President Trump gave in his opening brief (at 35-36), none of which DANY meaningfully addresses. DANY notes (at 52) that President Trump's authorities were civil, not criminal cases. But *Harris* interpreted the same federal-officer removal statute governing here, 28 U.S.C. § 1442(a), which applies to both civil and criminal cases. Moreover, if there is anything to this criminal/civil distinction, it goes the other way: Congress would be most concerned about the serious interference with federal supremacy caused by a criminal prosecution. The premise of the federal-officer removal statute is that States may be "hostile" to federal policies and federal officers, who therefore need federal protection. *Willingham* v. *Morgan*, 395 U.S. 402, 405 (1969). There is no more dangerous

(or more efficacious) way to enact such hostility than threatening to incarcerate federal officers.

DANY separately tries and fails (at 54) to distinguish the FDIC and RTC cases by claiming that "takeovers of failing financial institutions implicate unique federal interests." But, again, so do criminal prosecutions of federal officers relating to their official acts. DANY also notes that, in the FDIC cases, "it was impossible [for the FDIC] to seek removal earlier," before its substitution for the bank defendant. Br. 53. But that is also true of a federal officer who can show "good cause" for post-trial removal in a criminal proceeding: "circumstances outside of [his] control prevented" him from removing any earlier, *New York* v. *Trump*, 158 F.4th 458, 466 (2d Cir. 2025).

*Finally*, DANY has no response to the sound policy reasons for post-judgment removal in criminal cases. Def. Br. 30-31. DANY wrongly insists (at 55) that "New York's criminal procedures" provide sufficient protection, but the issue is what Congress intended in a statute that applies to all 50 States and thousands of local prosecutors. DANY's self-serving praise also obscures the many troubling aspects of this case, including DANY's improper use of coercive tactics to procure the false testimony of its star witness, Michael

Cohen,[2] and a state-court trial judge who, among other disqualifying conflicts, made prohibited contributions to President Biden's 2020 campaign and a PAC that sought to "Stop Republicans." Def. Br. 36-37; J.A. 985-989. DANY also says that, under President Trump's interpretation, nothing prevents a federal officer from removing even many years after trial, "if a state appeal takes [that long] to resolve." Br. 54. Such hypotheticals did not trouble the D.C. Circuit in *Harris* or the eight other courts of appeals that have unanimously approved post-judgment removal, *see* Def. Br. 27-29. And, in any event, the "good cause" requirement takes care of DANY's hypotheticals.

## II. PRESIDENT TRUMP SATISFIED THE STATUTORY REQUIREMENTS FOR FEDERAL OFFICER REMOVAL.

This prosecution is "for or relating to" official Presidential acts, 28 U.S.C. § 1442(a)(1), and President Trump has at least one colorable federal defense. At a minimum, he has "made an adequate threshold showing" on both points. *Acker*, 527 U.S. at 431-432. DANY's contrary arguments are wrong.

---

[2] DANY claims (at 26) that Cohen's post-removal statements are "categorically irrelevant for good cause," but DANY itself repeatedly points to "extra-record," post-removal events—for example, developments in the First Department—in arguing against good cause. *See infra*, pp. 31-33. DANY cannot have it both ways.

### A. DANY Cannot Deny That This Prosecution "Relates To" President Trump's Official Acts.

#### 1. A prosecution "relates to" a President's official acts if the government uses such acts as evidence against him.

This case at least *colorably* "relates to" President Trump's official acts under the plain meaning of that statutory language: "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Chevron USA Inc.* v. *Plaquemines Parish*, 608 U.S. 1, 11 (2026). Some of the most significant evidence in this case—evidence DANY itself called "devastating" in its summation, J.A. 373—was testimony concerning alleged conversations between the President and senior government officials about their official duties. A central dispute on appeal is whether that evidence impermissibly concerned official Presidential acts (it did), and, if so, whether the President's conviction must be set aside (it must). DANY spends nearly ten pages of its brief here (36-45) just on the merits of those questions. This case thus plainly has an "association with or connection" with official acts sufficient to trigger removal.

In response, DANY tries to avoid the statutory text, claiming (at 26-33) that the only relevant question is whether the "charged conduct"—not the trial evidence—relates to the President's official acts. DANY thus erroneously

claims that, even post-2011 amendment, the statute still requires the "basis for the criminal action" to be "an act taken for or relating to any act under color of [federal] office." Br. 31. But that does not match the actual text that Congress wrote, which authorizes removal of any "*criminal prosecution* . . . that is . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). In ordinary English, a prosecution has an "association with or connection" with official acts if such acts are introduced and relied upon as evidence. DANY has no textual argument to the contrary.

Instead, DANY unpersuasively cites (at 28-30 & n.6) a litany of decisions supposedly supporting its "charged conduct" theory. But none of DANY's cases addressed whether the use of a defendant's official acts as evidence triggers removal; in each, the defendant sought removal based solely on the nature of the charged conduct. DANY's cases prove only that other federal officers have not had occasion (since the 2011 amendment) to seek removal based on the use of official-acts evidence. That says nothing about whether the law allows removal on those grounds, which it does.

Next, DANY wrongly argues (at 30-31) that the "for or relating to" inquiry should be limited to the charged conduct because the default removal deadline is 30 days after arraignment, and, at that stage, a "defendant will

likely only have notice of the charges, but not of the trial evidence." Again, the plain text of the statute *also* authorizes removal *after* trial for good cause. That good-cause safety valve is there for a reason, including to account for what happens at trial.

Finally, reaching for purportedly "absurd" hypotheticals, DANY contends (at 32-33) that the use in evidence of a postal employee's confession to a government supervisor cannot possibly transform the employee's prosecution for an off-duty crime into a prosecution "relating to" his official acts. If that is correct for the postal employee, it is because confessing to a crime (or using one's office to store evidence of the crime, *see* Br. 32) is not one of a postal employee's federal duties. In other words, evidence of such actions is not official-act evidence *at all*.

DANY's postal employee also does not enjoy a constitutional evidentiary immunity that applies in criminal prosecutions. The President, however, does. Thus, here, the question is how Section 1442's "relating to" language applies in light of "the peculiar constitutional concerns implicated in the prosecution of a former President." *Trump*, 603 U.S. at 631. Those concerns mirror the very reason that Congress created federal-officer removal: to prevent prosecutions from "paralyz[ing] the operations of the government."

*Tennessee* v. *Davis*, 100 U.S. 257, 263, 268 (1879); *see* Def. Br. 40-41. It would eviscerate the constitutional purpose—and be utterly illogical—if the introduction of Presidential official-acts evidence did not open the courthouse doors, so that the President may "have the validity of [his] defense of official immunity tried in a federal court," rather than in a potentially hostile state court, *Willingham*, 395 U.S. at 407. DANY has no response to that key point.

**2. DANY misused President Trump's official acts as evidence at trial.**

President Trump has made at least a *colorable* showing that DANY impermissibly introduced *some* evidence of official Presidential acts. Def. Br. 43-51. In response, DANY wrongly argues (at 36-45) that the challenged evidence concerned exclusively unofficial conduct. Thus, DANY improperly asks this Court to "choose between [the parties'] readings" of *Trump* and the state-court record, which would be "to decide the merits of this case." *Acker*, 527 U.S. at 432. President Trump is not required "virtually to win his case before he can have it removed." *Id.* at 431. Instead, to satisfy this Court's limited "jurisdictional inquiry" here, he need make only an "adequate threshold showing that the suit is 'for [or relating to] a[n] act under color of office.'" *Id.* at 432. That "colorable" standard is a low bar: an argument is colorable unless it is "immaterial" or "wholly insubstantial and frivolous."

*Latiolais* v. *Huntington Ingalls, Inc.*, 951 F.3d 286, 297 (5th Cir. 2020). Moreover, in deciding that threshold question, this Court must "credit [President Trump's] theory of the case for purposes of *both* elements of [its] jurisdictional inquiry"—that is, for both the federal-defense element *and* the "for or relating to" element. *Acker*, 527 U.S. at 432 (emphasis added).

That capacious standard makes this an easy case for removal. The word limit prevents President Trump from setting forth all his responses to DANY's meritless official-acts counterarguments. *See* ADD-049-064. But two examples demonstrate the weakness of DANY's claims.

*First*, DANY baselessly argues (at 36-40) that President Trump's Oval Office discussions with his White House Communications Director and his statements on Twitter were somehow not official acts because they involved "purely personal matters." But the Supreme Court has already recognized that, when "persons authorized to speak for the President publicly . . . deny[]" allegations of personal misconduct by the President, such denials "*may* involve conduct within the outer perimeter of the President's official responsibilities." *Clinton* v. *Jones*, 520 U.S. 681, 686 (1997) (emphasis added). An argument that eight Justices have said "may" be right is surely at least colorable.

*Second*, in claiming (at 44) that President Trump's alleged conversation with Attorney General Sessions regarding a supposed FECA violation did not plausibly "invoke any official presidential authority," DANY ignores the Supreme Court's recent opinion expressly overruling *Humphrey's Executor*. That decision, *Trump* v. *Slaughter*, clearly bars DANY's claim that the FEC is somehow an "independent agenc[y]" that is totally "free of the President." 609 U.S. 422, 452 (2026). The President has "conclusive and preclusive authority" "to decide how to prioritize and how aggressively to pursue legal actions against defendants who [allegedly] violate the law," including "federal election laws." *Trump*, 603 U.S. at 620, 626-627. The President's alleged discussions with his Attorney General about law-enforcement matters are unquestionably official acts, and are thus protected by immunity.

### B. President Trump's Second Removal Notice Asserted Colorable Federal Defenses.

#### 1. President Trump asserted a colorable defense of Presidential immunity.

To try to evade removal, DANY spills substantial ink on other premature merits arguments, claiming (at 34-35) that (i) harmless-error review applies, and (ii) DANY's introduction of official-acts evidence was

harmless beyond a reasonable doubt. DANY is wrong—or at least, colorably so—on both counts. *See* ADD-064-073.

*First*, in *Trump*, the Supreme Court made clear that violations of Presidential immunity are not ordinary evidentiary mistakes—they are errors that "raise a unique risk" of "prejudice[]," not only to "the President himself, but [to] the institution of the Presidency." 603 U.S. at 632. Thus, the ordinary "prosaic tools" that "protect the constitutional rights of individual criminal defendants" cannot "protect adequately the President's constitutional prerogatives." *Id.* at 631-632. Tellingly, DANY ignores this critical language from *Trump*.

Even if harmless-error analysis could in theory save DANY's conviction (and it cannot), the official-acts evidence here was not harmless beyond a reasonable doubt. That is demonstrated by DANY's own prosecutors' repeated, emphatic description of this evidence in summation as "devastating," "damaging," and "critical pieces of the puzzle" that supposedly "put the nail in the coffin" of President Trump. J.A. 373, 848. There is at least a *colorable* basis to find a "*reasonable possibility* that the erroneously admitted evidence *contributed* to the conviction," and thus was not "harmless

beyond a reasonable doubt." *People* v. *Hamlin*, 71 N.Y.2d 750, 756 (1988) (emphasis added).

Separately, DANY erroneously claims (at 33) that Presidential evidentiary immunity does not afford President Trump a federal "defense" that supports removal. As this Court has explained, there are "few limitations on what qualifies as a colorable federal defense." *Isaacson* v. *Dow Chemical Co.*, 517 F.3d 129, 138 (2d Cir. 2008). A defendant need only "raise a claim that is defensive," "based in federal law," and "aris[ing] out of [his] official duties." *Id.* The Supreme Court fashioned the "colorable federal defense" requirement to ensure that the federal-officer removal statute did not "expand[] the jurisdiction of the federal courts beyond the bounds established by the Constitution." *Mesa* v. *California*, 489 U.S. 121, 136-137 (1989). "It is the raising of a federal question in the officer's removal petition that constitutes the federal law under which the action against the federal officer arises for Art. III purposes." *Id.* President Trump's evidentiary-immunity arguments obviously raise federal questions. Nothing more is required.[3]

---

[3] DANY also briefly argues (at 42, 44) that President Trump failed to preserve his objection to Cohen's testimony about Attorney General Sessions and to the Westerhout testimony. That is wrong, *see* ADD-073-075, but regardless, DANY has no preservation objection to the other official-acts

### 2. President Trump asserted a colorable defense of federal preemption.

DANY also cannot deny that FECA preemption is another colorable federal defense here. DANY first wrongly claims (at 45) that President Trump cannot raise FECA because he "abandoned" his appeal of the district court's original 2023 remand order. But the district court's original ruling reflected DANY's repeated reassurances that "the charges here do not relate to the specific disclosures mandated by FECA." J.A. 123. At that time, the court was in no position to address DANY's end-of-trial pivot to its novel theory: a three-level pyramid of supposed criminal predicates with alleged FECA violations at the base. That drastic shift amply justifies reconsideration of the district court's initial erroneous decision. *See United States* v. *Plugh*, 648 F.3d 118, 123-124 (2d Cir. 2011).

Although DANY insists (at 23-24) that its ultimate theory did not undermine the district court's initial preemption decision, it clearly did. In 2023, President Trump argued that, because "there can be no . . . intent to commit a non-existent crime," if "NYEL § 17-152 is preempted," it would be

---

evidence justifying removal. *See In re Methyl Tertiary Butyl Ether Prods. Liability Litig.*, 341 F. Supp. 2d 351, 359 (S.D.N.Y. 2004) (federal-officer removal gives "the federal court subject matter jurisdiction over the entire case").

impermissible for DANY to "rel[y] on NYEL § 17-152 as one of the [predicate] crimes." *New York* v. *Trump*, 683 F. Supp. 3d 334, 349 (S.D.N.Y. 2023). The district court appeared to accept that framework. *Id.* It also correctly recognized that FECA preempts a state law "if the law, *or its application*, constitutes a specific regulation of conduct covered by FECA." *Id.* at 350 (emphasis added).

The district court, however, then rejected the preemption defense based solely on DANY's inaccurate assertion that the "conduct prohibited by NYEL § 17-152" would *not* include violations of "restrictions on campaign contributions and expenditures." *New York* v. *Trump*, 683 F. Supp. 3d at 350. The court further emphasized that Section 17-152 was unlike "other provisions of New York's election law that directly target campaign contributions and expenditures, *and which, therefore, are preempted.*" *Id.* (emphasis added). But at trial, DANY, having staved off removal, did rely on Section 17-152 to target alleged campaign contributions: it argued to the jury that the alleged Section 17-152 conspiracy involved an agreement to make illegal campaign

contributions in violation of FECA. Def. Br. 13-14. That application of Section 17-152 is preempted, which DANY never actually denies, *see* Br. 46-47.

Trying to muddy the waters further, DANY claims that it was merely "the fact of a FECA violation, among other illegal activities," that was "relevant as one of several circumstances that collectively established" the alleged Section 17-152 conspiracy. Br. 46-47. That response is hard to follow, perhaps intentionally, and it does not affect preemption regardless. DANY effectively acknowledges that its convoluted liability theory was "predicated on [FECA] violations," and thus required the jury to make "findings of [FECA] violations" before it could convict. Br. 47. That is why DANY asked the trial court to instruct the jury on the elements of a FECA violation, which the court did, Def. Br. 14.

Where Congress has "occupie[d] the field" with federal regulations and an express preemption provision, as it has with FECA, *Holtzman* v. *Oliensis*, 91 N.Y.2d 488, 495 (1998), States may not circumvent the preemption by embedding an alleged violation of the preemptive federal statute into a state-law offense. *See* ADD-042-045 (collecting cases). DANY's two cases (at 47) are not to the contrary. *People* v. *Pymm*, 76 N.Y.2d 511 (1990), did not involve a federal statute with an express preemption provision on point. And in *State*

v. *Chappell*, 939 N.E.2d 1234 (Ohio 2010), an Ohio case, the court never even addressed preemption, because it was "not properly before [it]," *id.* at 1238. In sum, preemption independently supports removal here.

## III. PRESIDENT TRUMP DID HAVE GOOD CAUSE FOR SEEKING TO REMOVE WHEN HE DID.

Finally, DANY fails to establish that President Trump lacked good cause for seeking to remove less than two months after the Supreme Court's decision in *Trump*. Def. Br. 55-67.

### A. President Trump Could Not Have Filed The Second Removal Notice Before Trial Or Before *Trump* v. *United States*.

*First*, DANY erroneously claims (at 17) that the "good cause" clock should start in March 2024, when President Trump filed a pre-trial motion in the state court seeking to preclude official-acts evidence. However, before the Supreme Court's decision in *Trump* on July 1, 2024, binding Second Circuit precedent would not have permitted removal based on evidentiary immunity. *See* Def. Br. 57; U.S. Amicus Br. 27-28. DANY does not claim otherwise. Nor could it. Until *Trump*, DANY repeatedly and wrongly argued, citing law from this Circuit and others, that "evidence of otherwise immune conduct is nonetheless admissible in a trial regarding criminal conduct for non-immune acts." ADD-075. *Trump* was undeniably a "change in controlling law" that

provided "new grounds for removal that could not reasonably have been raised" earlier. *New York* v. *Trump*, 158 F.4th at 466.

In response, DANY baselessly claims (at 18) that a "defendant is not 'prevented' from seeking removal simply because the federal court might reject his" argument. That makes no sense. By definition, a "change in controlling law" occurs when a court would have rejected the defendant's removal argument under an old precedent that is then superseded. DANY's sole citation, *Callahan*, is inapposite. There, the plaintiffs sought leave to amend their complaint by explaining that they did not bring their claim earlier because it "would have been *superfluous*" prior to the relevant change in law. *Callahan* v. *County of Suffolk*, 96 F.4th 362, 370 (2d Cir. 2024) (emphasis added). That was not enough; the plaintiffs had to identify a prior precedent that would have *foreclosed* their claim. *Id.* at 370-371. President Trump has done that here.[4]

[4] DANY invokes (at 17) an irrelevant out-of-circuit district court decision (*Meadows*) rejecting a defendant's attempt to excuse a late removal notice by pointing to *Trump*. Meadows (who of course was never President) "acknowledged" that he could "have sought removal" regardless of "the issuance of the opinion in *Trump*." 2024 WL 4198384, at *4 (D. Ariz. Sep. 16, 2024).

In addition, even if pre-*Trump* Second Circuit law would have recognized an evidentiary immunity, President Trump could not "reasonably have raised" that immunity as "grounds for removal" until the state court actually permitted some official-acts evidence to be introduced at his trial. *New York* v. *Trump*, 158 F.4th at 468. The state trial court told President Trump to wait to raise his immunity objection until trial, as necessary. *See* Def. Br. 56. Had President Trump tried to remove before any such trial ruling, DANY would have responded that removal was improperly "speculative," which is exactly what DANY said in opposing President Trump's pre-trial attempt to remove based on FECA preemption.

### B. President Trump Acted Diligently By Seeking To Remove Within Two Months Of *Trump*.

The two-month window between the Supreme Court's decision in *Trump* and the President's motion for leave to remove caused no prejudice to DANY or the state trial court. DANY does not claim otherwise. Nor does DANY deny that courts generally treat the complete absence of such prejudice as a significant factor in the good-cause analysis. *See* Def. Br. 60. DANY also does not dispute that courts in this Circuit regularly find two-month "delays" consistent with "good cause," under procedural rules that this

Court has already identified as instructive here. *New York* v. *Trump*, 158 F.4th at 465; *see* Def. Br. 59.

Instead, DANY trots out a new argument, not raised on the prior appeal before this Court, wrongly claiming (at 19) that the federal-officer removal statute's "default statutory deadline" for removal (30 days after arraignment) implicitly limits the "good cause" window to just 30 days. But if Congress wanted that kind of restriction, it would have said so expressly. Indeed, the *civil* federal-officer removal statute does just that—it generally requires a defendant to file a late notice of removal "within 30 days after receipt" of information "from which it may first be ascertained that the case . . . has become removable." 28 U.S.C. § 1446(b)(3). By contrast, in this criminal context, Congress opted for the flexible "good cause" standard instead.

Even the premise of DANY's implicit 30-day limit argument is mistaken. DANY assumes that Federal Rule of Civil Procedure 16(b) imposes no "default" deadline to amend a pleading. But the federal civil rules do provide a default window for amendment: 21 days after a relevant event. *See* Fed. R. Civ. P. 15(a)(1). Despite that, courts repeatedly find that parties may act with reasonable diligence and consistent with "good cause" if they take much longer to seek to amend under Rule 16(b), including up to two or three months.

*See* Def. Br. 59. The same approach is warranted here. President Trump moved with sufficient diligence.

**C. President Trump Did Not Waive His Right To Remove.**

DANY also wrongly claims that President Trump waived his right to remove by raising his evidentiary immunity defense to the state trial court immediately after *Trump* was decided. As President Trump has explained (at 63-64), he was forced to do that to avoid imminent sentencing in the middle of the 2024 Presidential campaign. He then sought a federal forum shortly after the state court made clear that it planned to improperly foreclose any interlocutory appeal of its immunity decision prior to sentencing. *See* Def. Br. 61-66. Where such extraordinary circumstances "compel a defendant's state-court" action to avoid "potential harm," there is no waiver. *Albuquerque* v. *Soto Enterprises, Inc.*, 864 F.3d 1089, 1099 (10th Cir. 2017). A compelled, involuntary action in state court does not "manifest [a defendant's] intent to have the matter adjudicated" in state court and "abandon his . . . right to a federal forum." *Kenny* v. *Wal-Mart Stores, Inc.*, 881 F.3d 786, 790 (9th Cir. 2018).

DANY has no answer to that dispositive point. Instead, DANY contorts both the law and the record here. It erroneously claims (at 22) that "the type

of compelled 'state-court participation'" that does not trigger waiver "is limited to compliance with procedural deadlines that, if not followed, would lead to a default." That describes the facts of some of the cases, but there is no logical reason to limit the legal principle to just one type of imminent and irreparable state-court injury (a default) while excluding all others. Nor does the law support DANY's limit. For example, it is a "long-settled rule that opposing a motion for a temporary restraining order in state court does not waive the right to remove." *Rothner* v. *City of Chicago*, 879 F.2d 1402, 1418 (7th Cir. 1989).

Indeed, in *Rothner*, the district court had denied removal on grounds nearly identical to those given by Judge Hellerstein here. The *Rothner* court had faulted the defendant for "elect[ing] to defend" against a TRO motion in state court, which the court considered an effort to "'test the waters' in state court," and then use removal to "shop from forum to forum." 879 F.2d at 1404-1405. The Seventh Circuit reversed that mistaken waiver finding, explaining that opposing an imminent TRO in state court does not manifest an intent to adjudicate the whole case there. *Id.* at 1418. The same result is warranted here.

On the facts, DANY wrongly criticizes President Trump (at 21-22) for continuing to brief the immunity issue in state court even after that court had adjourned the imminent sentencing by several months. DANY seems to be saying that President Trump should have removed as soon as he succeeded in getting sentencing adjourned. But that ignores reality. To forestall his imminent potential incarceration, President Trump had to argue to the state trial court that *Trump* undermined his conviction, and to ask for a chance to explain why before he was sentenced. There was no other way to delay sentencing. After the state court agreed to allow him to raise *Trump*, President Trump had to follow through and actually brief the issue. Having received the court's instruction to file briefs, President Trump could not have declined to do so without risking forfeiture—the very "threat of default" that, according to DANY, justifies preventative action in state court, Br. 22.

DANY also wrongly accuses President Trump of "seriously exaggerat[ing]" the unavailability of interlocutory appeal. Br. 22. DANY seems to have mixed up its dates. As of August 29, when President Trump sought to remove, the state trial court still planned to issue its ruling on September 16, and then sentence "if such is still necessary" on September 18, J.A. 793; *see* J.A. 946. No interlocutory appeal would have been possible in

that extremely narrow window. In response, DANY claims (at 22) that "the trial court agreed to a further adjournment until November" "more than a month before the rescheduled sentencing." But the letter that DANY cites is dated September 6, J.A. 1299-1302—only 12 days before the rescheduled sentencing, and after President Trump had already sought removal on August 29, Def. Br. 66 n.4.

Finally, DANY falsely claims (at 22) that President Trump "admi[tted]" to using removal "as a substitute for interlocutory appellate review." Not so. Removal was not the equivalent of interlocutory appeal of the state court's ruling on immunity; there was no such ruling to review. President Trump filed his motion for leave to remove long before the state court ultimately (and incorrectly) rejected his immunity arguments on December 16, 2024, J.A. 1249. Instead, President Trump sought to remove because the state trial court was poised to deny him his right to appellate review of Presidential immunity before "conviction *and sentence*," *Trump*, 603 U.S. at 654 (Barrett, J., concurring in part) (emphasis added). The President's timing had nothing to do with seeking a second bite at the apple. At every turn, he was using the only procedural tools available to avoid an unprecedented and imminent catastrophe: the possible incarceration of a major Presidential candidate in

the final weeks of a general election. No authority supports treating President Trump's actions here as a waiver of his right to a federal forum.

### D. DANY's Other Assorted "Good Cause" Arguments Fail.

Finally, DANY erroneously claims (at 25-26) that removal is inappropriate because President Trump has "raise[d] a host of purely state-law issues in addition to the federal defenses at issue here." President Trump unquestionably has multiple meritorious arguments under state law—arising out of the convoluted way that DANY twisted a time-barred misdemeanor to concoct an unprecedented felony charge. But a federal court may not decline jurisdiction over a properly removed case just because the case also presents questions of state law. To the contrary, one of the key reasons for removal is to ensure adjudication of "the merits of *the state-law question[s]*"—not just the federal-law questions—"free from local interests or prejudice." *Arizona* v. *Manypenny*, 451 U.S. 232, 241-242 (1981) (emphasis added).

DANY also wrongly contends (at 24-25) that the "advanced stage of the state proceedings" itself "weighs against a finding of good cause" because permitting removal now "would interrupt the state-court appeal." But the "good cause" standard protects movants who act "diligently" from "circumstances outside of their control." *New York* v. *Trump*, 158 F.4th at

466. President Trump has been diligently seeking removal since August 2024. The fact that his entitlement to remove remains unresolved over two years later is entirely due to circumstances beyond his control.

President Trump has done all he reasonably could to expedite judicial resolution of this issue. This Court first heard argument on removal in June 2025, months before even the first state-court appeal brief was filed in October of that year. But this Court did not rule until five months later, on November 6, 2025. In its opinion, rather than deciding the removal question itself (as it could have), this Court remanded to the district court. President Trump then moved this Court to immediately issue its mandate, which it did. On remand, however, the district court took another ten months to rule, despite President Trump's repeated letter requests to do so "promptly," ECF Nos. 80, 84, 88, No. 23-cv-3773 (S.D.N.Y.). As soon as the district court finally ruled, President Trump immediately appealed, requested a highly expedited briefing schedule, and asked this Court to schedule oral argument as soon as early October. Dkt. 7 at 8. This Court granted expedition, but did not adopt the schedule that President Trump requested. It instead gave DANY the 30-day response time it had requested as a fallback to its frontline position opposing expedition altogether. Dkt. 23; *see* Dkt. 12 at 4.

Remarkably, DANY even chastised President Trump below for "complain[ing] about 'justice delayed,'" and urged the district court to take its time in deciding removal. ECF No. 89 at 1-2, No. 23-cv-3773 (S.D.N.Y.). DANY then opposed expedition in this Court on the hollow ground that President Trump "would not suffer cognizable prejudice even if the First Department were to issue a ruling" before this appeal is decided. Dkt. 12 at 3. In these circumstances, DANY cannot invoke the progress of the state-court appeal as a reason to deny removal.

There is more. As DANY has elsewhere explained, the First Department "will likely take months"—if not a year or longer—to decide the state-court appeal given the "lengthier briefing" and "larger record[]." Dkt. 12 at 1. This Court will hear oral argument only 11 days after the First Department does. If this Court concludes that removal is warranted, and that time is of the essence to minimize interference with the state courts, this Court can and should issue a summary order directing the district court to grant removal, while planning to issue its opinion as soon as possible thereafter. Such opinion-to-come orders are "common practice" in this Circuit where special circumstances require them. *Hassoun* v. *Searls*, 976 F.3d 121, 129 & n.4 (2d Cir. 2020) (collecting examples). This is such a case.

Indeed, a prompt decision here would accord with the "high respect" that federal courts "owe[] to the office of the Chief Executive." *Cheney* v. *U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 385 (2004). After this Court rules on removal, the parties can then refile their appellate briefs and the record with this Court, so that it can decide the merits of this appeal, as required under the federal-officer removal statute.

## CONCLUSION

The Court should reverse the district court's order denying President Trump leave to file a removal notice, and remand with instructions to grant leave to remove and adopt the state trial court's judgment.

Respectfully submitted,

/s/ *Robert J. Giuffra, Jr.*
ROBERT J. GIUFFRA, JR.
JOHN L. WARDEN
MAXWELL F. GOTTSCHALL
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

BRENDAN P. CULLEN
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California 94301
(650) 461-6500

DIANE L. MCGIMSEY
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California 90067
(310) 712-6600

*Counsel for Defendant-Appellant*
*President Donald J. Trump*

OCTOBER 29, 2026

# CERTIFICATE OF COMPLIANCE

This Brief complies with the word limit of Second Circuit Rule 32.1(a)(4)(B) because it contains 6,996 words. This Brief also complies with the requirements of Federal Rule of Appellate Procedure 32(a) because it was prepared in 14-point font using a proportionally spaced typeface, CenturyExpd BT.

/s/ *Robert J. Giuffra, Jr.*
ROBERT J. GIUFFRA, JR.

OCTOBER 29, 2026

## CERTIFICATE OF SERVICE

I hereby certify that, on this 29th day of October, 2026, I electronically filed the foregoing Brief with the Clerk of Court using the ACMS system. I certify that service will be accomplished by the ACMS system for all participants in this case who are registered ACMS users.

/s/ *Robert J. Giuffra, Jr.*
ROBERT J. GIUFFRA, JR.